**E-FILED**
Wednesday, 12 October, 2016  11:10:36 AM
Clerk, U.S. District Court, ILCD

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD

---

Sajida Ahad, MD,
on behalf of herself and all others
similarly situated,

Plaintiff,

v.

Board of Trustees of Southern Illinois University
and SIU Physicians & Surgeons, Inc.

Defendants.

**Case No.  3:15-cv-03308-SEM-TSH**

**Judge Sue E. Myerscough**

**Mag. Judge Schanzle-Haskins**

**Jury Trial Demanded**

---

### AMENDED CLASS ACTION AND COLLECTIVE ACTION COMPLAINT

---

1.     Plaintiff Sajida Ahad, a female physician, received unequal pay for equal work as compared to male colleagues for each of the approximately six years she worked for Southern Illinois University Medical School ("SIU Medical School" or "SIUSM") and SIU Physicians & Surgeons, Inc. ("SIU Physicians & Surgeons" or "SIU Healthcare").

2.     After Dr. Ahad resigned, her male replacement who had only recently completed his residency was paid a starting salary of $75,000 more than her final salary.  On information and belief, unlike Dr. Ahad, her male replacement was also paid a $25,000 signing bonus and guaranteed annual income totaling above $300,000.

3.     Dr. Ahad's experience at SIU Medical School was not unique.  In 2012, the Journal of the American Medical Association ("JAMA") published a study reporting that male physicians at academic institutions earned an average salary of $200,433, while female physicians at academic institutions earned on average $167,669.  *Gender Differences in the Salaries of Physician*

*Researchers,* Vol. 307 (No. 22) JAMA 2410-2417 (June 13, 2012).  According to the study's

statistical analysis, gender was associated with higher salary even after considering physicians'

specialty, academic rank, leadership positions, publications, and research time.

4.      In explaining these differences, the 2012 JAMA study noted that "numerous

psychological studies suggest the existence of small yet meaningful gender biases, often

unconscious, that may ultimately influence the outcomes of women's careers, including hiring,

salaries, and promotions" and explained that "[t]hese biases have been demonstrated to be

particularly likely to be mobilized when women are mothers."

5.      In September 2016, JAMA Internal Medicine published another study, finding that

female physicians, on average, earn almost $20,000 per year less than their male counterparts.

*Sex Differences in Physician Salary in US Public Medical Schools,* 176 JAMA Internal Medicine

1294–1304, 1294-1304 (2016).  According to the September 2016 study, at some medical

schools, female physicians earn $59,000 per year less than male physicians.  SIU School of

Medicine is worse.  The September 2016 JAMA study, which analyzed salary differences for

10,241 physician faculty members at 24 medical schools, found that such vast pay discrimination

occurred throughout ages, specialties, and academic ranks.  According to the September 2016

study, even higher ranked female faculty made roughly the same salary as lower ranked male

faculty.

6.      This lawsuit addresses how SIU School of Medicine, and its related entities here,

contribute to the gender pay gap between male physician faculty members and female physician

faculty members like Dr. Ahad and her former coworkers.

7.      Dr. Ahad and other female physicians employed as faculty by SIU School of
Medicine were paid less than men with the same position and rank, who performed the same or
substantially similar work, including but not limited to the examples described herein.

8.      From 2007 to 2016, the average total compensation of female Associate
Professors and Assistant Professors employed by SIU Physicians & Surgeons and SIU School of
Medicine was more than $62,000 less each year than that of their male counterparts. For any
given year in that time frame, male Associate Professors and Assistant Professors always
averaged at least $41,000 more per year in total compensation than female Associate Professors
and Assistant Professors. Within the Surgery department specifically, female Associate
Professors and Assistant Professors' average total yearly compensation was approximately
$77,000 less than that of male Associate Professors and Assistant Professors' compensation from
2007 to 2016.

9.      Over the past 10 years, the disparity in base salary between male and female
Associate Professors and Assistant Professors at SIU Physicians & Surgeons and SIU School of
Medicine has grown substantially.  In 2007, female Associate Professors and Assistant
Professors averaged a base salary of approximately $13,000 less than the base salary of male
Associate Professors and Assistant Professors.  In 2016, that difference has swelled to $33,000.

10.     Compensation data from SIU Physicians & Surgeons shows a similar disparity.
Female Associate Professors and Assistant Professors averaged approximately $42,000 less than
male Associate Professors and Assistant Professors in compensation from SIU Physicians &
Surgeons each year over the past ten years.

11.     Through this lawsuit, Dr. Ahad seeks to redress gender-based discrimination
inflicted by Defendants Board of Trustees of Southern Illinois University, the entity which operates

the SIU School of Medicine, and SIU Physicians & Surgeons, Inc. (collectively, "Defendants"), which operated and continue to operate as a joint or common employer.

12.     Defendants violated civil rights laws by providing male physicians with significantly higher wages than female physicians, including Dr. Ahad, for equal work or substantially similar work and by denying them equal terms, conditions, benefits and privileges of employment.

13.     Dr. Ahad brings this action on behalf of herself and all other similarly situated individuals. She asserts individual and collective action claims under the Federal Equal Pay Act, 29 U.S.C. § 206 ("Equal Pay Act"), as well as individual and class claims under Title VII of the Civil Rights Act of 1964, as amended, Title 42 U.S.C. § 2000e, *et seq.* ("Title VII"), the Illinois Equal Pay Act of 2003, 820 ILCS 112 ("IL Equal Pay Act"), and the Illinois Civil Rights Act of 2003, 740 ILCS 23 ("IL Civil Rights Act").

## JURISDICTION AND VENUE

14.     Jurisdiction over Dr. Ahad's Federal Equal Pay Act claim is conferred upon this Court pursuant to 29 U.S.C. § 216(b) and 28 U.S.C. § 1331.

15.     Dr. Ahad filed a timely EEOC charge dated July 28, 2014, including Title VII discrimination claims alleged in this complaint and received a right-to-sue notice.

16.     Jurisdiction over Dr. Ahad's IL Equal Pay Act and her Illinois Civil Rights Act claims are conferred upon this Court pursuant to 28 U.S.C. § 1367.

17.     Venue in the United States District Court for the Central District of Illinois is appropriate under 28 U.S.C. § 1391 (a) and (b), as a substantial part of the events or omissions giving rise to Dr. Ahad's claims occurred in the Central District of Illinois.

18.     Relief is sought against Defendants as well as their employees, agents, assistants, and successors.

## PARTIES

19.     The named Plaintiff, Sajida Ahad, MD ("Dr. Ahad"), is a female citizen of Pakistan who is a permanent resident of the United States and resides in Cedar Rapids, Iowa.  At times material to this Complaint, Dr. Ahad resided within the Central District of Illinois and worked in Springfield, Illinois.

20.     At all times relevant hereto, Dr. Ahad was an "employee" of Defendants as that term is used in the Equal Pay Act at 29 U.S.C. § 206, the IL Equal Pay Act at 820 ILCS 112/5, and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq.

21.     Defendant Board of Trustees of Southern Illinois University ("SIU Trustees") was created by the Illinois General Assembly for the purpose of operating, managing, controlling, and maintaining Southern Illinois University and Southern Illinois University School of Medicine.

22.     Defendant SIU Trustees has its principal office at 1400 Douglas Drive, Carbondale, IL 62901.

23.     Southern Illinois University School of Medicine ("SIU School of Medicine") is a medical education institution affiliated with Southern Illinois University ("SIU"), which operates under the authority of the SIU Board of Trustees.

24.     Pursuant to statute, the SIU Board of Trustees is the employer for all individuals employed by SIU School of Medicine.

25.     SIU School of Medicine employs approximately 250 physician professors who treat patients through multidisciplinary clinics incorporated as SIU Physicians & Surgeons, Inc.

26.     SIU School of Medicine educates physicians and, through its affiliated clinic, provides patient care services within Illinois including within the Central District of Illinois.  SIU

School of Medicine's functions include medical education, patient care, research and community service.

27.   Defendant SIU Physicians & Surgeons, Inc. ("SIU Physicians & Surgeons") is an Illinois corporation with its principal place of business and registered agent address at 320 E. Carpenter St., Springfield, IL 62794.  SIU Physicians & Surgeons operates under the assumed name SIU Healthcare ("SIU Healthcare"). SIU Physicians & Surgeons is a university-related entity.

28.   Through a Department of Labor matter, Dr. Ahad addressed wage claims against the Defendants under the Immigration and Nationality Act, as amended, 8 U.S.C §§ 1101 and 1182, and the implementing regulations set forth at 20 C.F.R. Part 655, Subparts H and I. *Sajida Ahad, MD v. Southern Illinois University School of Medicine,* DOL No. 2015-LCA-00023 (April 13, 2016).  In that action, SIU School of Medicine represented the interests of the SIU Board of Trustees and SIU Physicians & Surgeons with regard to Dr. Ahad's claims.  The Administrative Law Judge considered the wage obligation between SIU School of Medicine and SIU Physicians & Surgeons collectively, finding in Dr. Ahad's favor and explaining that although only SIU School of Medicine filed the H-1B petition on Dr. Ahad's behalf, "the entities are very closely intertwined." *Id.* at 2, fn. 1.  Both parties appealed the Administrative Law Judge's April 13, 2016 decision.

29.   At all material times , Defendants have shared common management, as demonstrated by the fact that the current Dean and Provost of SIU School of Medicine is also the Chief Executive Officer of SIU Physicians & Surgeons, Inc.  At all material times, Defendants engaged in interrelation of operations, centralized control of labor relations including a single human resources department, and common financial control.  At all material times, Defendants have exerted significant control over the employment decisions concerning Dr. Ahad and other female

physicians employed by Defendants.  At all material times, Defendants have in their own capacity and as a joint employer with each other, exerted significant control over the employment decisions and actions discussed herein.  At all material times, Defendants have in their own capacity and as a joint employer, directed, known of, or should have known of the unlawful conduct described herein, and failed to take prompt corrective measures within their control.

30.     Each defendant has at all material times employed more than 15 full-time employees within the United States, whether individually or as a joint employer.

31.     At all times relevant hereto, each defendant is an entity or corporation with the capacity to sue and be sued and is each an "employer," as that term is used in the Equal Pay Act at 29 U.S.C. § 206, the IL Equal Pay Act at 820 ILCS 112/5, and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.

32.     At all times relevant hereto, Defendants have conducted operations and business throughout the State of Illinois and the Central District of Illinois.

33.     At all times pertinent to this litigation, Defendants have conducted activities that involve and affect interstate commerce.

## FACTS

### Dr. Ahad's Employment Background

34.     Dr. Ahad is female and a citizen of Pakistan. She is a member of protected classes, as recognized by Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. § 2000e et seq.).

35.     Dr. Ahad received her medical degree in 1998 from Aga Khan University Medical College in Karachi, Pakistan. In 2006, she completed a residency at the Mayo Clinic in Rochester, Minnesota, an internationally-recognized and acclaimed medical facility. In 2008, Dr.

Ahad completed a prestigious surgical fellowship in advanced laparoscopy at the University of

Washington, which is among the top-ranked, publicly-funded institutions in the United States,

and its bariatric surgical program has been recognized by the National Institutes of Health

("NIH") for research excellence.

36.     Dr. Ahad was well-qualified for her work duties described herein.

37.     Based on her accomplishments, in July 2008, Dr. Ahad started work as an

Assistant Professor in the Department of General Surgery for Defendants via an O-1 visa, which

is approved only for individuals with extraordinary ability or achievement. She executed annual

compensation agreements (Exhibit A) between 2008 and 2013 that referenced obligations of SIU

Physicians & Surgeons and SIU School of Medicine, which are both affiliated entities of SIU

Trustees.

38.     The contracts required SIU School of Medicine to pay Dr. Ahad a base salary of

$125,000 per year and explained that additional variable income estimated at $125,000 per year

would be paid for "Estimated Clinical Incentives", and that her "Total Estimated Annualized

Earnings" would be $250,000. Dr. Ahad and Defendants had reached agreement in 2008 that the

first two years' wage rates (totaling $250,000 in her case) would be a guaranteed minimum rate.

Defendants did in fact honor this guarantee.  On information and belief, Defendants have had the

same two-year guarantee with most physicians following their hires.

39.     In 2011, SIU School of Medicine submitted new visa-related documentation –

including a Labor Condition Application (LCA) – to the Federal Government for an H-1B work

visa (for specialty occupations) that attested SIU School of Medicine was to pay Dr. Ahad a

required wage of $250,000 annually, as required by visa-related law and regulations.

40.      As is detailed herein, Defendants paid Dr. Ahad substantially less than male

physician counterparts. Dr. Ahad asked Defendants to equalize her pay to that of male

counterparts, but Defendants declined.  Dr. Ahad asked Defendants for educational support in the

form of funding so she could pursue a Master's in Business Administration (MBA) degree to

improve her position for a leadership role, which Defendants declined as well.

***The Base Salary Defendants' Paid to Dr. Ahad Was Substantially Less Than That Paid to
Comparator Male Physicians***

41.      Defendants have asserted that they determine physicians' base salaries in

significant part according to physician compensation data from the Association of American

Medical Colleges (AAMC).  Using the AAMC data, Defendants determine base salary for

physician jobs according to department, division, and academic rank.

42.      The AAMC list contains average salary data for various job-types and fiscal

years.  Defendants have asserted their physicians' base salaries are based on this AAMC data,

and Defendants' salary classification system has used the same ranks, departments and divisions

as the AAMC list.  Like AAMC listings, the job ranks Defendants have used for tenure track

physician faculty members, from lowest to highest rank, are: Assistant Professor, Associate

Professor and Professor.

43.      When Defendants hired Dr. Ahad in 2008, they gave her an academic base salary

of $125,000.  This base salary remained the same as of her last day working for Defendants in

March 2014.

44.      In June 2014, soon after Dr. Ahad's employment ended, Defendants hired a male

to replace her, hereafter "Male Replacement Physician."[2]  The Male Replacement Physician

---

[2] Plaintiff has elected not to identify specific individuals by name but can provide a key with
names of physicians identified in the Complaint.

assumed bariatric surgeries of the type Dr. Ahad had performed.  Despite the fact that the Male

Replacement Physician was a new physician who had recently completed his residency,

Defendants paid him a base salary of $200,000 – $75,000 more than Dr. Ahad's base salary. On

information and belief, Defendants also agreed to pay him (unlike Dr. Ahad) a $25,000 signing

bonus and guaranteed annual income totaling above $300,000.

45.     Defendants have claimed that because the Male Replacement Physician performs

trauma surgeries (along with bariatric), this somehow justifies his base salary being substantially

higher than Dr. Ahad's.  This claim is wrong for many reasons.

46.     Defendants' base-salary classification system required that the Male Replacement

Physician and Dr. Ahad both be paid an equivalent rate because Defendants gave them both the

same rank and wage classification: Assistant Professor (full time) with an appointment to the

Department of Surgery, Division of General Surgery.

47.     Defendants provided the Male Replacement Physician with a signed "Position

Description" which specified that he held precisely this rank and position, Assistant Professor

within the Department of Surgery, Division of General Surgery; the same rank that Dr. Ahad

held.

48.     Whatever AAMC base salary data applies to this position, the same (or

equivalent) value should have been applied to Dr. Ahad and Male Replacement Physician.

While AAMC data may have differed nominally each year— *e.g.*, the above position may have

had had a different value for 2008 (when Dr. Ahad was hired) and 2014 (when the Male

Replacement Physician was hired)—such differences would not remotely account for the drastic

differences here, such as the Male Replacement Physician's *starting* guaranteed salary being

$75,000 more than Dr. Ahad's *final* salary of $125,000 after nearly six years of employment.

Again, Male Replacement Physician and Dr. Ahad had the same classifications, i.e. the same department (Dept. of Surgery), division (General Surgery) and academic rank (Assistant Professor). Despite these commonalities, Defendants paid Male Replacement Physician a far higher base salary than female physician Dr. Ahad.

49.     Based on fiscal year 2013-2014 AAMC data, the average base salary for Male Replacement Physician and Dr. Ahad's classification (Assistant Professor, Dept. of Surgery, Div. General Surgery) was $236,000. Male Replacement Physician, as a new physician starting his first post-residency job, had a starting base salary and signing bonus totaling $225,000 plus guaranteed clinical income that pushed his total guaranteed income rate far higher than the $236,000 AAMC value for his classification. Yet Dr. Ahad, even after accruing years of experience in the same classification, was paid a base salary ($125,000) that was far less than the AAMC average and substantially less than the base salary Defendants paid Male Replacement Physician.

50.     Even if Defendants claimed, contrary to their own Position Description for Male Replacement Physician, that his classification should be considered Dept. of Surgery/Trauma-Critical Care Surgery (another classification used in some AAMC data), per the fiscal 2013-2014 AAMC data Dr. Ahad accessed, the average base salary for that position is nearly the same ($235,000).

51.     Further, Dr. Ahad had performed trauma surgeries for Defendants. While she performed fewer trauma surgeries than bariatric, she performed all trauma surgeries that Defendants assigned to her or asked her to perform. Even if Male Replacement Physician performed more trauma surgeries, and/or more total surgeries than Dr. Ahad, the number of surgeries is impertinent per Defendants' AAMC-related classification system for base salaries.

Of note, Defendants pay clinical wages (which are separate and in addition to base salaries) that

provide additional wages for clinical services, i.e. compensation tied to actual surgeries and

number of surgeries performed (albeit subject to a guaranteed minimum for the first two years).

52.     In Dr. Ahad's Department of Labor case, the Administrative Law Judge ("ALJ")

determined: "[W]hile the AAMC data may have served as a basis of discussion for salary

negotiations and it establishes that on a national basis assistant professors with different surgical

specialties have different average earnings, I find that here it warrants little weight in assessing

comparability of the physicians." *Ahad v. SIU School of Medicine,* DOL No. 2015-LCA-00023,

at 10.  In coming to this conclusion, the ALJ found that, despite Defendants' argument that a

physician's final one-year or two-year fellowship period is what dictated his or her actual wage

under the AAMC tables, "four of the five comparators received the exact same academic base

salary despite completing different fellowships and having different specialties." *Id.*

53.     The ALJ determined that "each surgeon had similar job responsibilities and was

an Assistant Professor with an appointment to the Division of General Surgery," finding that all

of the comparators had "similar experience, qualifications, education, job responsibilities and

specialized knowledge, in addition to having substantially the same duties and responsibilities, as

Dr. Ahad. Each surgeon went through extensive education: medical school, residency and a

specialized fellowship. Each did a general surgery residency that qualified him or her to operate

anywhere in the abdomen. Though all of the surgeons gained specialized knowledge in specific

areas of surgery, they were not limited to their areas." *Id.* at 11.

54.     Based on the foregoing reasons, the ALJ found "that the specific employment in

question is an Assistant Professor with an appointment to the Division of General Surgery" and

that the surgeons "were all employed in the specific employment and had similar experience and

qualifications." *Id.* Further, the ALJ determined that Dr. Ahad experienced a deficit of several

hundred thousand dollars in her compensation and "did not receive the actual wage for her

position." *Id.* at 12.

55.     Defendants' pay discrepancies between Dr. Ahad and Male Replacement

Physician are also not supported by other well-regarded industry data, from the Medical Group

Management Association (MGMA), which Defendant also refers to in setting compensation.

56.     The MGMA salary report from 2014, based on year 2013 data, includes more

detail than the AAMC data about many specialized job types and wage percentiles.  The MGMA

report states a median wage for a bariatric surgeon ($446,501) and a trauma surgeon ($443,199)

that are nearly the same.  So MGMA's industry-practice data does not support paying Male

Replacement Physician a higher salary than Dr. Ahad based on any assertion that he is primarily

a trauma surgeon.

57.     In short, there is no justification for Defendants to pay Male Replacement

Physician with a base salary that was almost double the base salary of the more experienced

female physician Dr. Ahad.

58.     During fiscal year 2013-2014, Defendants also paid numerous other male

physician comparators base salaries much higher than Dr. Ahad, despite them having the same

salary classification (Assistant Professor in Dept. of Surgery/General Surgery) as Dr. Ahad.

Three males– referred to hereafter as Male Physician #1, Male Physician #2 and Male Physician

#3, respectively – were each paid $175,000 base salary in comparison to Dr. Ahad's $125,000.

Another – referred to hereafter as Male Physician #4 – was paid $188,170.65 in base salary.

59.     Defendants underpaid the base salary of Dr. Ahad as compared to male physicians

in the same faculty rank, who performed the same or substantially similar work, the performance

of which required equal skill, effort, and responsibility, and which were performed under similar working conditions.

***Defendants' Clinical-Portion Wages Paid to Dr. Ahad Were Less Than Those Paid to Comparator Male Physicians***

60.     As referenced above, Dr. Ahad's contracts provided that Defendants would pay her, in addition to her academic base salary, variable income for clinical work.  Upon information and belief, each physician's variable income includes "estimated clinical incentives" and a "preliminary cap" for clinical incentives and an "absolute cap" for clinical incentives.

61.     During most new employees' first two years of employment, the "estimated clinical incentives" are guaranteed, meaning that Defendants guarantee to pay the full amount of the estimated clinical incentives, regardless of the new employee's productivity.

62.     In Dr. Ahad's contracts, Defendants estimated this clinical income, labeled as "Estimated Clinical Incentives" as $125,000 per year.  Thus, Defendants committed in contracts to pay Dr. Ahad a required base salary of $125,000 per year, plus a clinical income estimated at $125,000 per year.

63.     Defendants do not publicly disclose the clinical income physicians earn (unlike base salaries, which Defendants do publicly disclose).  However, available information indicates Defendants paid male physicians with the same position as Dr. Ahad substantially more clinical wages than they paid Dr. Ahad.

64.     On information and belief, Defendants determined from the point of hire that male physicians with the same position as Dr. Ahad would, for their first two years, earn higher guaranteed income (due in part to clinical-wage guaranteed minimum rates) than the guaranteed income rates provided to Dr. Ahad upon her hire.

65.     Defendants provided males more opportunities to earn more clinical wages than were provided to Dr. Ahad. The clinical income that Defendants actually paid a given physician (including Dr. Ahad) depended on the number of procedures the physician performed or patients the physician saw, as determined by the SIU Physicians & Surgeon's Compensation Plan. Dr. Ahad depended on Defendants to assign her surgeries.  Defendants assigned Dr. Ahad far fewer surgeries than Defendants assigned male physicians of the same job and base salary classifications.  As a result, Dr. Ahad earned substantially less clinical income than male physicians of the same job and base salary classifications.

**66.**     Defendants underpaid the clinical wages of Dr. Ahad as compared to male physicians who performed the equal or substantially similar work on jobs, the performance of which required equal skill, effort, and responsibility, and which were performed under similar working conditions.

***Other Examples of Female Physicians Paid Less Than Male Comparator Physicians***

67.     Defendants routinely paid female physicians less than male physicians who performed the same or substantially the same duties.

68.     A female Associate Professor in the division of General Surgery that performed colorectal and trauma surgeries – hereafter referred to as Female Physician #1 – was paid a base salary of $131,968.15 per year between 2011 and 2014.  Male Physician #4 and another male surgeon – hereafter Male Physician #5 – both had the same rank and division as Female Physician #1 (i.e. Associate Professor in General Surgery), but had higher base salaries.  Male Physician #4's base salary was $188,170 (approximately 18% higher than Female Physician #1) and Male Physician #5's base salary was $228,813 (approximately 27% higher).

69.     Female Physician #2, a full Professor in the Department of Surgery, earned a base salary in 2014 of $157,110.72, less than male full Professors in her department and division and even less than male Associate Professors, Male Physicians # 4 and #5.

70.     Female Physician #3, a full Professor in the Division of Ear, Nose and Throat (ENT) Surgery, earned a base salary of $214,157 in 2014, during which time she served as the Chair of her division and Residency Program Director.  In comparison, in 2014, Male Physician #6 was a Professor in the Division of General Surgery, Chair of that division and Residency Program Director, but earned a base salary of $500,000 in 2014.  Male Physician #6 earned a base salary that was more than double the base salary of Female Physician #3, even though the two were in the same faculty rank and had very similar academic and administrative responsibilities.

71.     Female Physician #4 was a Professor at SIU in the division of Ear, Nose & Throat, who had previously served as the Chair of the division and Residency Program Director. Her academic and administrative duties were very similar to Male Physician #6, but her base salary was $233,606 – less than half of the salary paid to Male Physician #6.

72.     Female Physician #5 is an Assistant Professor in the Division of Orthopedics who, on information and belief, earned a 2014 base salary of $75,000. A male Assistant Professor in the same division – hereafter Male Physician #7 – had a significantly higher base salary of $200,000.

*73.*     Near the time Defendants hired Male Physician #2 and Male Physician #3, they also hired Female Physician #6.  Female Physician #6 was fellowship-trained in trauma and critical care surgery, and she provided trauma and critical care services to the patients at the same trauma center as Male Physicians # 2 and # 3.  However, on information and belief, Female

16

Physician #6's base salary was only $99,999, substantially less than Male Physician #2 ($175,000) and Male Physician #3 ($175,000).  Moreover, Female Physician #6's total compensation was also lower than these male counterparts despite the fact that she held the same faculty rank (Assistant Professor) and the same classifications.

***Defendants Failed to Pay Dr. Ahad Even The Wage Defendants Attested They Would Pay Her***

74.     In addition to setting discriminatorily low rates of base pay for female physicians and denying them clinical wages offered to men, Defendants paid Dr. Ahad far less than the $250,000 per year ($4,807.69/week) required wage it attested to the federal government that she would be paid.

75.     Even using a $250,000 wage rate as a measure, SIU underpaid Dr. Ahad's wages by $109,495.74, as shown by a comparison of the $250,000 rate and her payroll records. Between July 7, 2011 and March 21, 2014, Defendants underpaid her wages by $109,495.74 ($679,278.52 required wages minus $569,782.78 wages paid = $109,495.74 underpaid wages between July 7, 2011 and March 21, 2014). This underpayment was in violation of Department of Labor regulations at 20 C.F.R. § 655.731(a)-(c), which required SIU School of Medicine to pay Dr. Ahad, as an H-1B visa holder, the required wage rate of $250,000 per year as attested on the LCA. Dr. Ahad addressed this issue separately through a Department of Labor proceeding as noted herein.

*76.*     Thus, Dr. Ahad's actual wages were paid at rates even lower than the (discriminatorily low) wage rate Defendants agreed to pay her.  On information and belief, Defendants did not fail to pay promised or attested wage rates or amounts to male physicians who, as compared to Dr. Ahad, performed the same or substantially similar work on jobs the

performance of which required equal skill, effort, and responsibility, and which were performed under similar working conditions.

***Defendants' Adverse Treatment of Dr. Ahad in Relation to Pregnancy***

77.     In June 2011, Plaintiff took an eight-week pregnancy and maternity leave from her work with Defendants.  Defendants did not provide Dr. Ahad with short-term disability benefits for her leave.  While Defendants initially paid benefits, they charged back the amounts from Dr. Ahad's later earnings, thus resulting in no net receipt of benefits.  Defendants had conditioned their approval of the leave on Dr. Ahad acknowledging they would not pay her benefits.  Defendants did not similarly deprive male physicians of short-term disability benefits, or make them pay back benefits, with regard to their health-related leaves from work.

78.     In a performance evaluation, Defendants indicated Plaintiff's pregnancy was a reason for low clinical productivity.  Defendants' managing administrators repeatedly told Plaintiff, for years after her return from leave, that the bariatric program was not a success and claimed that this purported lack of success was due to her leave.

79.     The ALJ in the Department of Labor hearing found that "[w]hile SIUSM claims that Dr. Ahad chose not to be productive, the evidence shows that it was SIUSM, SIU HealthCare and St. John's Hospital that made its own choices that proved to be detrimental to Dr. Ahad enhancing her compensable productivity. SIUSM's position is akin to taking away a significant portion of a person's calories and then arguing that it was his or her choice to lose weight." *Ahad v. SIU School of Medicine,* DOL No. 2015-LCA-00023, at 15.

80.     Defendants treated Dr. Ahad adversely because she had taken two months of pregnancy leave, including, but not limited to, creating a hostile work environment because she had taken this pregnancy leave, negatively referencing the leave for approximately two years

thereafter, and blaming problems with the bariatric program on the fact that Dr. Ahad had taken the leave.  Dr. Ahad complained to Defendants' Human Resources (HR) personnel about adverse conduct related to her pregnancy leave and was told the conduct occurred because HR had not conducted necessary training with the various chairs of the division as to what they should say and do with regard to pregnant employees.

*81.*     Dr. Ahad was not the only woman who experienced or complained of the discriminatory atmosphere for women that Defendants created.  Two female former residents, Jyoti Assudani, MD and Fereshteh Hajsadeghi, MD have alleged discriminatory practices by SIU School of Medicine in complaints they provided to the Chicago-based Accreditation Council for Graduate Medical Education. According to their lawyer, the residency program "has created an atmosphere of terror that discriminates against residents on the basis of nationality, ethnicity, visa requirements and gender in decisions related to remediation, extension of training, verification of credentials, work schedules and contract renewals[.]" (www.sj-r.com/article/20140603/News/140609776).

***Class Action Allegations As To Title VII, IL Equal Pay Act and IL Civil Rights Act Claims***

82.     Dr. Ahad brings this Class Action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), (b)(3), or (c)(4), seeking relief for the Defendants' systemic pattern and practice of discriminatory wage and employment practices based upon individuals' gender. This action is brought on behalf all current or former female physicians employed by Defendants from October 27, 2010 to present, who received compensation pursuant to the SIU P&S Compensation Plan or who received a base salary from the SIU School of Medicine.

83.     There are seven departments at SIU School of Medicine with physician professors also employed by SIU Physicians & Surgeons, Inc.  Those seven departments are Family and

Community Medicine, Internal Medicine, Neurology, Obstetrics and Gynecology, Pediatrics, Psychiatry, and Surgery.

84.     All SIU School of Medicine physician faculty positions at the rank of Assistant Professor require the same minimum qualifications, regardless of department.

85.     All SIU School of Medicine physician faculty positions at the rank of Associate Professor require the same minimum qualifications, regardless of department.

86.     All SIU Physicians & Surgeons, Inc. members are subject to the same compensation plan, regardless of whether they hold the academic rank of Assistant Professor, Associate Professor or Professor and regardless of department.

87.     All Associate Professors and Assistant Professors employed by SIU School of Medicine and SIU Physicians & Surgeons are subject to the terms of the same compensation agreement, with minor variations for personal details such as the physician's name and title, department, date of signing, and compensation amount.  These virtually identical compensation agreements are re-executed on an annual basis for the duration of the physician's employment with Defendants.

88.     The process for determining the initial compensation for all Assistant Professors and Associate Professors employed by SIU School of Medicine and SIU Physicians & Surgeons is the same, regardless of department.

89.     The process for determining annual compensation adjustments for all Assistant Professors and Associate Professors employed by SIU School of Medicine and SIU Physicians & Surgeons is the same, regardless of department.

90.     The process for reviewing all compensation determinations and adjustments for all Assistant Professors and Associate Professors employed by SIU School of Medicine and SIU

Physicians & Surgeons is the same, regardless of department.  As part of that annual review

process, the Dean of SIU School of Medicine, along with other members of SIU Physicians &

Surgeons's Compensation Committee, approves all such determinations and adjustments.

91.     Members of the class are so numerous and geographically dispersed across the

United States that joinder is impracticable.  The class exceeds 40 members and class member

identity is readily identifiable from information and records in possession of Defendants.

92.     There are numerous questions of law and fact common to members of the class.

Among the common questions of law or fact are: (a) whether Defendants have intentionally

discriminated against women in making wage, benefit, and employment decisions; (b) whether

Defendants paid lesser wages to female employees as compared to male employees of the same

job classification who performed the same or substantially similar work on jobs the performance

of which required equal skill, effort, and responsibility, and which were performed under similar

working conditions; (c) whether Defendants paid lesser wages to female employees as compared

to male employees of the same job classification who performed equal work on jobs,  the

performance of which required equal skill, effort, and responsibility, and which were performed

under similar working conditions; (d) whether Defendants have violated civil rights laws

guaranteeing equal treatment for women; and (e) whether wages, compensatory damages,

equitable and injunctive relief are warranted for the Class.

93.     Dr. Ahad's claims are typical of the Class.  All members of the Class were

damaged by the same unlawful policies, procedures and/or practices employed by Defendants.

Further, Dr. Ahad's claims are typical of the claims of the members of the Class, who were

injured by Defendants' same unlawful practices.

94.     Dr. Ahad will fairly and adequately protect the interest of other class members because she has no interest that is antagonistic to or which conflicts with the interests of any other class member, and Dr. Ahad is committed to the vigorous prosecution of this action and has retained competent counsel experienced in class litigation to represent her and the other members of the class.

95.     Dr. Ahad and the Class she seeks to represent have suffered substantial losses in earnings and other employment benefits and compensation as a result of Defendants' actions.

96.     Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted and/or refused to act on grounds generally applicable to the Class, making declaratory and injunctive relief appropriate with respect to Dr. Ahad and the Class as a whole. The Class members are entitled to declaratory and injunctive relief to end Defendants' systematic, common, uniform, unfair, unlawful and discriminatory policies and/or practices.

97.     Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(3) for determination of the damages claims of individual class members because the issue of liability is common to the class and the common nucleus of operative facts forms the central issue, which predominates over individual issues of proof. The primary question common to the Class is whether Defendants have engaged in systemic gender discrimination, via intentional disparate treatment and/or disparate impact (*e.g.* via application of policies and practices, even if facially-neutral, causing disparate impact), in violation of civil rights laws guaranteeing equal treatment for women.

98.     This question is central to the case and predominates over individual issues among the members of the proposed class and subclasses. Defendants have engaged in a

common course of unlawful conduct in a manner that has harmed all of the class members.

Adjudication of the legality of Defendants' practice in one proceeding will advance the litigation.

Class certification under Rule 23(b)(3) would be superior to other methods for fair and efficient

resolution of the issues because certification will avoid the need for repeated litigation by each

individual class member. The instant case will be manageable as a class action. Dr. Ahad knows

of no difficulty to be encountered in the maintenance of this action that would preclude its

adjudication as a class action.

99.     Alternatively, class certification is appropriate pursuant to Federal Rule of Civil

Procedure 23(c)(4) to litigate Dr. Ahad's claims for prospective class-wide compliance and

affirmative injunctive relief necessary to eliminate Defendants' unlawful conduct and

discrimination. Certification under this rule is also appropriate to decide whether Defendants

engaged in systemic gender discrimination in violation of civil rights laws guaranteeing equal

treatment for women.

100.    Dr. Ahad alleges (a) Defendants have engaged in a systematic pattern and practice

of discriminating, based on gender, against Dr. Ahad and other female employees; (b)

Defendants have used and continued to use an employment policy and practice of providing

wages and benefits to Dr. Ahad and other female employees that are less than wages and benefits

paid and provided to male employees for substantially similar and/or equal work; (c) Defendants

have used and continued to use an employment policy and practice of creating a hostile work

environment and providing adverse terms and conditions of employment to female employees,

including, but not limited to, Dr. Ahad, that are worse than those provided to male workers in

comparable positions; and (d) this discrimination is intentional.

101.    The unlawful employment practices complained of above were done with malice or reckless indifference to the federally-protected rights of Dr. Ahad and other female workers.

102.    As a proximate result of Defendants' willful and unlawful discrimination, Dr. Ahad and other female workers have lost wages and benefits, suffered other financial and non-financial injuries, and have suffered emotional distress.

103.    The Federal Equal Pay Act ("Equal Pay Act") at 29 U.S.C. § 206(d) requires that men and women in the same workplace be given equal pay for substantially equal jobs and work. The Illinois Equal Pay Act of 2003, 820 ILCS 112 ("IL Equal Pay Act") requires that men and women in the same workplace be given equal pay for the same or substantially similar work on jobs the performance of which require equal skill, effort, and responsibility, and which are performed under similar working conditions. Title VII provides that it is illegal to discriminate in pay, benefits and/or terms and conditions of employment based on gender. The Illinois Civil Rights Act prohibits conduct that discriminates based on sex or utilization of criteria or methods of administration that have the effect of subjecting women to discrimination because of their gender. Defendants' conduct as described above has violated these laws.

104.    Dr. Ahad's claims under these statutes are typical of those of other female workers employed by Defendants.

105.    Dr. Ahad's claims and those of similarly situated female workers will involve common questions of law or fact. Joinder of all such workers would be impracticable.

## COUNT I - VIOLATIONS OF FEDERAL EQUAL PAY ACT
### (INDIVIDUAL AND COLLECTIVE ACTION CLAIMS)

106.    Dr. Ahad incorporates all paragraphs of this Complaint as if fully set forth herein.

107.    Defendants have discriminated against Dr. Ahad and similarly-situated female workers in violation of the Fair Labor Standards Act of 1938, 29 U.S.C. § 206(d), as amended by the Equal Pay Act of 1963, by subjecting them to unequal pay on the basis of sex.

108.    Defendants have discriminated against Dr. Ahad and similarly-situated female workers by treating them differently from and less preferably than similarly-situated male employees who performed jobs which required equal skill, effort, and responsibility, and which were performed under similar working conditions. Defendants so discriminated by subjecting them to lesser (discriminatory) pay and benefits in violation of the Equal Pay Act.

109.    Defendants caused, attempted to cause, contributed to, or caused the continuation of wage rate discrimination based on sex in violation of the Equal Pay Act. Further, Defendants knew of or showed reckless disregard for the fact that their conduct was in violation of the Equal Pay Act.

110.    As a result of Defendants' conduct alleged herein and/or Defendants' willful, knowing and intentional discrimination, Dr. Ahad and similarly-situated female workers have suffered and will continue to suffer harm, including, but not limited to, lost wages, lost benefits, and other financial loss.

111.    Dr. Ahad and similarly-situated female workers should be awarded all legal and equitable remedies, including underpaid wages, doubled compensatory awards for all willful violations and reasonable attorneys' fees under 29 U.S.C. §§ 216, *et seq.*

## COUNT II - VIOLATIONS OF ILLINOIS EQUAL PAY ACT
### (INDIVIDUAL AND CLASS CLAIMS)

112.    Dr. Ahad incorporates all paragraphs of this Complaint as if fully set forth herein.

113.    This Count is brought on behalf of Dr. Ahad and all members of the class.

114.    Defendants' conduct described herein has discriminated between employees on the basis of sex by paying wages to female employees, including Dr. Ahad and similarly-situated female workers, at rates less than the rates at which Defendants paid wages to male employees for the same or substantially similar work on jobs the performance of which required equal skill, effort, and responsibility, and which were performed under similar working conditions. Defendants thereby violated the IL Equal Pay Act at 820 ILCS 112/ *et seq.*

115.    Dr. Ahad and similarly-situated female workers should be awarded the entire amount of underpayment, interest, costs, reasonable attorneys' fees and other statutory penalties or relief as may be allowed by the court.

## COUNT III- TITLE VII GENDER DISCRIMINATION
### (INDIVIDUAL AND CLASS CLAIMS)
### (DISPARATE TREATMENT AND DISPARATE IMPACT DISCRIMINATION)

116.    Dr. Ahad incorporates all paragraphs of this Complaint as if fully set forth herein.

117.    This Count is brought on behalf of Dr. Ahad and all members of the class.

118.    Defendants have discriminated against Dr. Ahad and similarly-situated female workers in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., as amended by the Civil Rights Act of 1991 ("Title VII"), by subjecting them to different and adverse treatment on the basis of their gender. Dr. Ahad and similarly-situated female workers have suffered both disparate impact and disparate treatment discrimination as a result of Defendants' conduct.

119.    Defendants have discriminated against Dr. Ahad and similarly-situated female workers by treating them differently from and less preferably than similarly-situated male employees and by subjecting them to discriminatory (lesser) pay and benefits, discriminatory terms and conditions of employment, and other forms of discrimination, in violation of Title VII.

120.    Defendants' conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Dr. Ahad and similarly-situated female workers, entitling them to punitive damages.

121.    By reason of the continuous nature of Defendants' discriminatory conduct, which persisted throughout the employment of Dr. Ahad and similarly-situated female workers, they are entitled to application of the continuing violations doctrine to all violations alleged herein. Additionally, Plaintiff, on behalf of herself and all others similarly situated, specifically invokes the Lilly Ledbetter Fair Pay Act provisions of Title VII.

122.    As a result of Defendants' conduct alleged in this complaint, Dr. Ahad and similarly-situated female workers have suffered and continue to suffer harm, including but not limited to lost wages and benefits, diminished employment opportunities, humiliation, embarrassment, emotional and physical distress, and mental anguish.

123.    Defendants' policies, practices and/or procedures have produced a disparate impact on Dr. Ahad and similarly-situated female workers with respect to their wages and other terms and conditions of their employment.

124.    By reason of Defendants' discrimination, Dr. Ahad and similarly-situated female workers are entitled to all remedies available for violations of Title VII, including an award of punitive damages. Reasonable attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

## <u>COUNT IV – ILLINOIS CIVIL RIGHTS ACT CLAIM</u>
### (INDIVIDUAL AND CLASS CLAIMS)
### (DISPARATE TREATMENT AND DISPARATE IMPACT DISCRIMINATION)

125.    Dr. Ahad incorporates all paragraphs of this Complaint as if fully set forth herein.

126.    This Count is brought on behalf of Dr. Ahad and all members of the class.

127.    Defendants Board of Trustees and SIU Medical School have discriminated against Dr. Ahad and similarly-situated female workers in violation of the Illinois Civil Rights Act, 740 ILCS 23/1 *et seq.*, by subjecting them to different and adverse treatment on the basis of their gender. Dr. Ahad and similarly-situated female workers have suffered both  disparate treatment and disparate impact discrimination as a result of Defendants' discriminatory conduct.

128.    Defendants denied Dr. Ahad and similarly situated female workers equal wages and benefits and subjected to them to discrimination in compensation on the grounds of their gender.

129.    Defendants utilized criteria or methods of administration that had the effect of subjecting Dr. Ahad and similarly situated female workers to discrimination because of their gender.

130.    As a result of Defendants' conduct alleged in this Amended Complaint, Dr. Ahad and similarly-situated female workers have suffered and continue to suffer harm, including but not limited to lost wages and benefits, diminished employment opportunities, and humiliation, embarrassment, emotional and physical distress, and mental anguish.

131.    Assuming she is a prevailing party as defined by the IL Civil Rights Act, Dr. Ahad and similarly-situated female workers are entitled to all remedies available under the IL Civil Rights Act, including an award of reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Dr. Ahad, on her own behalf and on behalf of the class members and collective action plaintiffs, prays that this Court:

A. Certify the case, with respect to Title VII, Illinois Equal Pay Act and Illinois Civil Rights Act claims, as a class action maintainable under Federal Rules of Civil Procedure Rule 23(a), (b)(2) and/or (b)(3), or (c)(4) on behalf of the proposed Plaintiff class or an alternative class as appropriate, and designate Dr. Ahad as the representative of this class and her counsel of record as class counsel;

B. Designate this action, with respect to Equal Pay Act claims, as a collective action on behalf of Dr. Ahad and similarly-situated female workers and (1) promptly issue notice pursuant to 29 U.S.C. § 216(b) to all similarly-situated female workers, which (a) apprises them of the pendency of this action, and (b) permits them to assert timely Equal Pay Act claims in this action by filing individual Consent to Sue forms pursuant to 29 U.S.C. § 216(b); and (2) toll the statute of limitations on the claims of all members of the Equal Pay Act Collective Action Opt-In Class from the date the original complaint was filed until the Equal Pay Act Collective Action Class members are provided with reasonable notice of the pendency of this action and a fair opportunity to exercise their right to opt-in as Plaintiffs;

C. Designate Dr. Ahad as representative of the Equal Pay Act Collective Action Opt-In Class and her counsel as class counsel;

D. Declare and adjudge that Defendants' employment policies, practices and/or procedures challenged herein are illegal and in violation of the rights of Class Representatives and members of the class and collective action under Title VII of the Civil Rights Act of 1964, as

amended, the Federal Equal Pay Act, the Illinois Equal Pay Act, and the Illinois Civil Rights
Act;

E. Issue a permanent injunction against Defendants and their partners, officers, trustees,
employees, agents, attorneys, successors, assigns, representatives and any and all persons acting
in concert with them from engaging in any conduct violating the laws herein;

F. Order Defendants to initiate and implement programs that will remedy the conduct
violating the laws herein;

G. Award nominal, compensatory, liquidated, statutory and punitive damages to Dr.
Ahad and class members and collective action plaintiffs;

H. Award litigation costs and expenses, including, but not limited to, reasonable
attorneys' fees, costs and pre-judgment and post-judgment interest, incurred on behalf of Dr.
Ahad, class members and collective action plaintiffs;

I. Award any other appropriate equitable relief to Dr. Ahad, class members, and
collective action plaintiffs; and

J. Award any additional and further relief as this Court may deem just and proper.


Respectfully submitted

Dr. Sajida Ahad, M.D., on behalf of herself an all
others similarly situated,

**/s/ J. Bryan Wood**
_____
                J. Bryan Wood
        One of Plaintiff's Attorneys

September 19, 2016

Michael F. Brown
DVG LAW PARTNER LLC
P.O. Box 645
Neenah, WI 54957
920-238-6781
Fax: 920-273-6177
Email: mbrown@dvglawpartner.com

J. Bryan Wood (IL ARDC # 6270845)
THE WOOD LAW OFFICE, LLC
303 W. Madison St., Suite 2650
Chicago, IL 60606
312-554-8600
Fax:  312-577-0749
E-mail:  bryan@jbryanwoodlaw.com