UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| SAJIDA AHAD, MD, on behalf of herself and all others similarly situated, <br><br>                Plaintiff, <br><br>v. <br><br>BOARD OF TRUSTEES OF SOUTHERN ILLINOIS UNIVERSITY and SIU PHYSICIANS & SURGEONS, INC., <br><br>                Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)   No.   15-cv-03308-SEM-TSH<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF HER MOTION FOR CONDITIONAL COLLECTIVE ACTION CERTIFICATION AND JUDICIAL NOTICE**

Plaintiff Sajida Ahad, M.D., by and through her counsel and pursuant to the Equal Pay Act, 29 U.S.C. § 206(d), and the enforcement provisions under 29 U.S.C. § 216(b), hereby files this Memorandum in Support of Plaintiff's Motion for Conditional Collective Action Certification and Judicial Notice.  In support of her motion, Plaintiff states as follows:

**INTRODUCTION**

As set forth in the Amended Complaint, Plaintiff Dr. Sajida Ahad, and other similarly situated female physician faculty members, were employed by Defendants, the SIU School of Medicine as governed by the SIU Board of Trustees, and SIU Physicians & Surgeons, Inc. ("SIU Physicians & Surgeons" or "SIU Healthcare").  Plaintiff alleges female physician faculty members were systematically underpaid as compared to their male counterparts.[1]  Conditional certification is

---

[1] In her Amended Complaint (ECF No. 31), Plaintiff Sajida Ahad, M.D. sued Defendants Board of Trustees of Southern Illinois University and SIU Physicians & Surgeons, Inc. ("Defendants") on behalf of herself and those similarly situated and alleged causes of action under the Equal Pay Act (Count I), the Illinois Equal Pay Act (Count II), Title VII of the Civil Rights Act of 1964

appropriate because Plaintiff and other female physician faculty were subject to the same initial policy and plans pursuant to which Defendants established their compensation at rates less than their male counterparts. Conditional certification is appropriate because Plaintiff and other female physician faculty were subject to the same Compensation Plan pursuant to which Defendants established their compensation at rates less than their male counterparts.

## FACTS

Pursuant to statute, the Board of Trustees is the employer for all individuals employed by SIU School of Medicine. *See* Exhibit 1, Rule 30(b)(6) Testimony for SIU Board of Trustees at 21:23-22:8 (hereafter, "Cox-Largent Dep.") SIU Healthcare is a separate entity affiliated with SIU School of Medicine through which patients receive clinical services. *See* Exhibit 2, Member Practice Agreement at Page 1 (hereafter, "Member Practice Agreement".) A "Master Agreement" between SIU School of Medicine and SIU Healthcare governs the relationship between the entities. *See* Exhibit 3, Master Agreement between SIU School of Medicine & SIU Healthcare (hereafter, "Master Agreement"). (Ex. 1, Cox-Largent Dep. 68:18-69:5.)

The Master Agreement requires SIU School of Medicine employees to provide services for SIU Healthcare. (Ex. 1, Cox-Largent Dep. 15:6-15:23.) All SIU Healthcare employees are also employees of SIU School of Medicine, even though SIU Healthcare has its own payroll. (Ex. 1, Cox-Largent Dep. 54:3-54:8.) SIU School of Medicine and SIU Healthcare have a single Human Resources department. (Ex. 1, Cox-Largent Dep. 54:3-54:8.)

SIU School of Medicine and SIU Healthcare also share common leadership. The current Dean of SIU School of Medicine is also the CEO of SIU Healthcare. (Ex. 1, Cox-Largent Dep. 23:22-24:9.) For at least the last eight years, the three interim and permanent Chief Executive

---

(Count III), and the Illinois Civil Rights Act (Count IV). Plaintiff's motion for conditional certification relates only to Count I of her Amended Complaint.

Officers of SIU Healthcare were all employed by SIU School of Medicine and served dual appointments. (Ex. 1, Cox-Largent Dep. 17:1-20:9.) Physicians cannot become a member of SIU Healthcare without being a faculty member or retired faculty member of SIU School of Medicine. (Ex. 1, Cox-Largent Dep. 71:5-72:21.)

SIU Healthcare and SIU School of Medicine operate a single hiring process for faculty physicians. (Ex. 1, Cox-Largent Dep. 55:5-55:8.) The only ranks for physician faculty members of SIU Healthcare and SIU School of Medicine are Professor, Associate Professor, and Assistant Professor. (Ex. 1, Cox-Largent Dep. 79:5-79:17.) The Southern Illinois University School of Medicine Guidelines on Faculty Appointments, Promotion, and Tenure set out minimum qualifications for physician faculty members. *See* Exhibit 4, SIU School of Medicine Guidelines on Faculty Appointments, Promotion, and Tenure at Pages 6-7 (hereafter, "Faculty Guidelines".) The minimum qualifications, standards, and specific requirements for each rank are the same for all physician members of SIU School of Medicine and SIU Healthcare at corresponding ranks, regardless of department. (Ex. 1, Cox-Largent Dep. 80:10-81:4.) [2]

The Master Agreement requires that all physician members of SIU Healthcare and SIU School of Medicine be compensated pursuant to a single compensation plan, aptly named the "Compensation Plan." *See* Exhibit 5, SIU Compensation Plan (hereafter, Compensation Plan.) (Ex. 5, Cox-Largent Dep. 86:14-87:12.) Physician members of SIU Healthcare and SIU School of Medicine can receive three types of compensation, all of which must be paid in accordance with the Compensation Plan: an academic base salary (paid by SIU School of Medicine), a

---

[2] Assistant Professors must have an M.D. and have completed residency training leading to board certification, if appropriate. (Ex. 4, Faculty Guidelines, Pages 6-7.) Associate Professors must have an M.D. and have completed board certification in their specialty or subspecialty. *Id*. Professors must have at least the same minimum qualifications as Assistant and Associate Professors and have a proven stature in one or more areas of research, teaching, and service. *Id*.

3

clinical base (paid by SIU Healthcare), and clinical incentives income (paid by SIU Healthcare). (Ex. 1, Cox-Largent Dep. 112:6-112:19; Ex. 5, Compensation Plan, pp. 1-4.) All physician faculty members of SIU Healthcare and SIU School of Medicine receive an academic base salary pursuant to the Compensation Plan. (Ex. 1, Cox-Largent Dep. 107:21-108:2.) The academic base salary is a fixed salary paid on a monthly basis. (Ex. 1, Cox-Largent Dep. 112:6-112:19.)

There is a single process by which physicians' initial compensation is established and annual compensation is adjusted by Defendants. (Ex. 1, Cox-Largent Dep. 57:21-58:10; Ex. 2, Member Practice Agreement.) Upon hiring, compensation is recommended and then reviewed by SIU Healthcare, the Dean and Provost of SIU School of Medicine, and Office of Management and Budget. (Ex. 1, Cox-Largent Dep. 143:19-144:12.) Each faculty physician is required to execute a nearly identical Member Practice Agreement upon accepting employment with Defendant which identifies the physician's duties and responsibilities and all compensation and fringe benefits. (Ex. 1, Cox-Largent Dep. 95:10-101:19; Ex. 2, Member Practice Agreement.)

For physicians already employed by Defendants, every year each physician faculty member is required to execute a Annual Compensation Agreement which reflects anticipated compensation for the coming year. *See* Exhibit 6, SIU Healthcare Annual Compensation Agreement (hereafter, "Annual Agreement".) (Ex. 1, Cox-Largent Dep. 94:7-95:7, 97:12-98:1, 149:10-150:12.) Each year all faculty members' compensation is formally determined and approved by a Compensation Committee. *See* Exhibit 7, Rule 30(b)(6) Testimony for SIU Healthcare, at 18:11-19:15 (hereafter, "Weichold Dep.")[3]

---

[3] The Compensation Committee has four members, consisting of three community members and the Dean of SIU School of Medicine. *Id*. On an annual basis, this committee meets to review the proposed physician compensation for the upcoming year. *Id*. The group also meets and retroactively reviews the performance of faculty members and the actual compensation that was paid during the previous year. *Id*.

Ultimately, the Dean of SIU School of Medicine and the CEO of SIU Healthcare have responsibility for administration of the Compensation Plan. (Ex. 7, Weichold Dep. 16:2-18:4.) During at least the last eight years, the Dean has had authority to increase compensation for tenure-track position members of the SIU Healthcare by 10% without additional review by the Compensation Committee. (Ex. 1, Cox-Largent Dep. 156:12-157:5.)

Under Defendants' Compensation Plan, Dr. Ahad and other female physicians employed as faculty by SIU School of Medicine and SIU Healthcare were paid less than men with a comparable rank in the same department. *See* Exhibit 8, Summary and Analysis of Voluminous Evidence (hereafter, "Summary"). Defendants' compensation records reveal substantial gender-based disparities under Defendants' Compensation Plan across all years, ranks and departments.

Specifically, those records show that in every year from 2012 to 2016, in every department where women worked, at least one female Associate Professor was paid less than a male Associate Professor in that department or a female Assistant Professor was paid less than a male Assistant Professor in that department (in 2013, no female Associate Professor or Assistant Professor worked in the Neurology Department). (Ex. 8, Summary ¶ 11.) Likewise, for Professors, in every year from 2012 to 2016, in every department where women worked, at least one female Professor earned less than a male Professor in that department (though there were multiple departments with no female Professors). (Ex. 8, Summary ¶ 11.) Average disparities from 2007 to 2016 for academic base salary, clinical compensation and total compensation exceeded tens of thousands of dollars annually. (Ex. 8, Summary ¶¶ 11-22.)

## ARGUMENT

The Equal Pay Act ("EPA"), 29 U.S.C. § 206(d) prohibits sex-based wage discrimination between men and women in the same establishment who perform jobs that require substantially

equal skill, effort and responsibility under similar working conditions. 29 U.S.C. § 206(d).[4] As part of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201, *et seq.*, the Equal Pay Act (EPA) permits employees to bring a collective action on behalf of themselves and others similarly situated. 29 U.S.C. § 216(b); *see also Hoffmann-La Roche Inc. v. Sperling,* 493 U.S. 165, 169 (1989); *North v. Bd. of Trs. of Ill. State Univ.*, 676 F. Supp. 2d 690, 694 (C.D. Ill. 2009); *Campeau v. Neuroscience, Inc.*, 86 F. Supp. 3d 912, 915 (W.D. Wis. 2015).

Although Section 216(b) of the FLSA provides for "similarly situated" employees to proceed collectively in pursuit of wages unlawfully not paid, it neither defines the term "similarly situated" nor instructs courts when to exercise their discretion and authorize notice to potential plaintiffs. *See Boyd v. Jupiter Aluminum Corp.,* No. 2:05-CV-227, 2006 U.S. Dist. LEXIS 35654 at *8 (N.D. Ind. May 31, 2006).

Judges in Central District, like the vast majority of courts in this and other circuits, use a two-step approach to determine whether employees are "similarly situated" in deciding whether to grant certification as a collective action under § 216(b). *See*, 676 F. Supp. 2d at 694; *see also Campeau*, 86 F. Supp. 3d at 915.[5] In the first step, the court determines whether the plaintiffs have made a "modest factual showing" that they are similarly situated in order to send judicially approved notice. *North*, 676 F. Supp. 2d at 694. Evidence must demonstrate a "factual nexus that binds the plaintiffs together as victims of a particular violation of the FLSA [or EPA],

---

[4] The Equal Pay Act provides that "No employer . . . shall discriminate . . . between employees on the basis of sex by paying wages to employees . . . at a rate less than the rate at which he pays wages to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1).

[5] *See also Gambo v. Lucent Techs., Inc.,* No. 05-C-3701, 2005 U.S. Dist. LEXIS 37998 at *12 (N.D. Ill. Dec. 22, 2005); *Garcia v. Salamanca Group, Ltd.,* No. 07-C-4665, 2008 U.S. Dist. LEXIS 22852 at *7 (N.D. Ill. March 24, 2008).

although a unified policy, plan, or scheme… is not necessarily required." *Woods v. Club Cabaret, Inc.*, 140 F. Supp. 3d 775, 780-81 (C.D. Ill. 2015).

If the plaintiff meets this burden, the court conditionally certifies the collective action and "may order that notice be sent to the other members of the proposed collective action, so that they will have the opportunity to opt-in." *North*, 676 F. Supp. 2d at 694. Then, to join these actions, class members must "opt in" by filing written consent. *See Espenscheid v. DirectSat USA, LLC,* 688 F.3d 872, 877 (7th Cir. 2012). In the second step, at the close of discovery, the court may revisit the "similarly situated determination" and make a final ruling on the certification. *Id*. at 695.

I. **Plaintiff Surpasses The "Modest Factual Showing" That She Is "Similarly Situated" To Female Physician Faculty Employed By Defendants.**

In analyzing whether conditional certification is appropriate, the Court's inquiry is whether Plaintiff has made a "modest factual showing" sufficient to demonstrate that she and other putative plaintiffs were *potentially* victims of a common policy or plan that violated the EPA (as enforced through the FLSA). *See North*, 676 F. Supp. 2d at 694; *see also Persin v. Career Builder, LLC,* No. 05-C-2347, 2005 U.S. Dist. LEXIS 23095 at *7 (N.D. Ill. Nov. 23, 2005); *Gambo,* 2005 U.S. Dist. LEXIS 37998 at *13.

The "modest factual showing" requirement is "not a stringent standard." *Gambo,* 2005 U.S. Dist. LEXIS 37998 at *13. Courts repeatedly emphasize that this first stage analysis is not as demanding as that employed at the second stage, and is certainly not as demanding as the analysis used to see if certification of a non-FLSA class is appropriate under Fed. R. Civ. P. 23. *See Perez v. RadioShack Corp.,* No. 02-C-78844, 2003 U.S. Dist. LEXIS 10152 at *2 (N.D. Ill. June 13, 2003); s*ee also Vazquez v. Tri-State Mgmt. Co., Inc.,* No. 01-C-5926, 2002 U.S. Dist.

LEXIS 385 at *6-7 (N.D. Ill. Jan.14, 2002); *Garza v. Chicago Transit Auth.*, No. 00-C-0438, 2001 U.S. Dist. LEXIS 6132 at *5 (N.D. Ill. May 8, 2001).

Here, Plaintiff shows she is similarly situated to Defendants' other female physician faculty as a result of Defendants' joint application and administration of their Compensation Plan pursuant to which female physician faculty are paid less than their male counterparts.

### A. Defendants jointly employ all physician faculty and employed Plaintiff.

The Fair Labor Standards Act permits actions against joint employers. *Karr v. Strong Detective Agency, Inc., Div. of Kane Services*, 787 F.2d 1205, 1207 (7th Cir. 1986). Each joint employer is individually responsible for FLSA compliance. *Karr*, 787 F.2d at 1207. Joint employment will be found in each of the following circumstances:

(1) Where there is an arrangement between the employers to share the employee's services, as, for example, to interchange employees; or

(2) Where one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee; or

(3) Where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer.

*Id.*

Here, the Defendants meet all three definitions. First, there is an arrangement by which SIU School of Medicine and SIU Healthcare share and interchange the putative collective action members' services. The Master Agreement between SIU Healthcare and SIU School of Medicine requires SIU School of Medicine faculty to provide clinical services for SIU Healthcare. (Ex. 1, Cox-Largent Dep. 15:6-15:23.) Moreover, SIU School of Medicine is contractually obligated to employ the members of SIU Healthcare. (Ex. 1, Cox-Largent Dep.

71:5-72:21.) It is not possible to become a member of SIU Healthcare without being a faculty member or retired faculty member of SIU School of Medicine. *Id.*

Second, both SIU School of Medicine and SIU Healthcare acted directly and indirectly in the interest of each other in relation to the collective action members, particularly in terms of hiring and compensating physician faculty through the application of a unified Compensation Plan (Ex. 1, Cox-Largent Dep. 80:10-81:4, 86:14-87:12.) The Dean of SIU School of Medicine and the CEO of SIU Healthcare, currently the same individual, have ultimate responsibility for administration of Defendants' Compensation Plan. (Ex. 7, Weichold Dep. 16:2-18:4.) At all relevant times, the Dean has had discretion to increase compensation for tenure-track physician members of SIU Healthcare by 10% without additional approval on behalf of both Defendants. (Ex. 1, Cox-Largent Dep. 156:12-157:5.)

Third, SIU School of Medicine and SIU Healthcare share control of their employees. As demonstrated above, the putative collective action members work under the direction of both SIU School of Medicine and SIU Healthcare. (Ex. 1, Cox-Largent Dep. 15:6-15:23.) SIU School of Medicine and SIU Healthcare have a single Human Resources department, which is run through SIU School of Medicine. (Ex. 1, Cox-Largent Dep. 54:3-54:8.) There is a single hiring process that operates for physician faculty for both SIU Healthcare and SIU School of Medicine. (Ex. 1, Cox-Largent Dep. 55:5-55:8.) And there is a single Compensation Plan that explains the compensation by both entities. (Ex. 1, Cox-Largent Dep. 57:21-58:10.)

All of the forgoing facts are true for Plaintiff and all female physician faculty. These facts establish Defendants jointly employed all physician faculty, but also satisfy the modest factual showing necessary for conditional certification.

9

**B. All physician faculty are subject to Defendants' Compensation Plan.**

As noted above, the evidence necessary to determine conditional certification is sufficient if it establishes a "factual nexus that binds the plaintiffs together as victims of a particular violation of the FLSA, although a unified policy, plan, or scheme… is not necessarily required." *Woods*, 140 F. Supp. 3d at 780-81. Here, however, Plaintiff can establish all were subject to a unified plan: Defendants' jointly administered Compensation Plan.

Like Plaintiff, the putative collective action members are all female physician faculty members either currently or formerly employed by Defendants. All physician faculty members are subject to the same standards, processes and procedures regarding compensation decisions. (Ex. 1, Cox-Largent Dep. 112:6-112:19.) Defendants' Master Agreement requires that all physician faculty members of SIU Healthcare be compensated pursuant to the Compensation Plan. (Ex. 1, Cox-Largent Dep. 86:14-87:12.) The only ranks for physician members of SIU Healthcare are Professor, Associate Professor, and Assistant Professor. (Ex. 1, Cox-Largent Dep. 79:5-79:17.) And Defendants' Faculty Guidelines set out the minimum qualifications for physician faculty members that are identical by rank, regardless of department. (Ex. 4, Faculty Guidelines, Pages 6-7.)

Assistant Professors must have an M.D. and have completed residency training leading to board certification, if appropriate. *Id.* Associate Professors must have an M.D. and have completed board certification in their specialty or subspecialty. *Id.* Professors must have at least the same minimum qualifications as Assistant and Associate Professors, but also must have a proven stature in one or more areas of research, teaching, and service. *Id.* The minimum qualifications, standards, and specific requirements for those ranks are the same for all tenure-track physician members of SIU School of Medicine and SIU Healthcare at corresponding ranks

regardless of department, presumably because their academic duties are substantially similar. (*Id.;* Ex. 1, Cox-Largent Dep. 80:10-81:4.)

All three types of compensation faculty physicians receive from Defendants – the academic base (paid by SIU School of Medicine), the clinical base (paid by SIU Healthcare), and the clinical incentives income (paid by SIU Healthcare) – must be paid in accordance with the terms of the Compensation Plan. *Id.* And, as discussed above, decisions about what compensation physician faculty will receive under the Compensation Plan are reviewed and approved in the same manner for all physician faculty. Those decisions are made, in large part, by the same individuals for all physician faculty.

All physician faculty are offered an identical agreement outlining their duties and compensation upon hiring (the Member Practice Agreement) and annually execute an Annual Compensation Agreement. (Ex. 1, Cox-Largent Dep. 95:10-101:19, 149:10-150:12; Ex. 2, Member Services Agreement; Ex. 6, Annual Compensation Agreement.) The terms of those agreements establish near uniformity with respect to critical aspects of administration of Defendants' Compensation Plan.

In light of the foregoing, the members of this putative collective action are similarly situated to Plaintiff. Plaintiff has shown that, like all other female physician faculty, she was subject to a common plan (Defendants' Compensation Plan). Plaintiff has more than made the "modest factual showing" necessary for conditional collective action certification.

C. **Female physician faculty have consistently earned less than their male counterparts under Defendants' Compensation Plan for years and across departments.**

Plaintiff's Amended Complaint alleges all putative collective action members were all victims of Defendants' discriminatory pay practices. To demonstrate conditional certification is appropriate, Plaintiff need not prove those allegations – she need only establish facts showing

11

Plaintiff and similarly situated female physician faculty *may have been* victims of those practices. However, compensation data produced by Defendants shows female faculty consistently earned less than their male counterparts, regardless of department or rank.

From 2007 to 2016, the average total compensation of female Associate Professors and Assistant Professors employed by SIU Healthcare and SIU School of Medicine was over $62,000 less each year than that of their male counterparts (the difference was approximately $78,000 in the Surgery department). (Ex. 8, Summary ¶ 13.) For any given year in that time frame, male Associate Professors and Assistant Professors always averaged at least $41,000 more per year in total compensation than female Associate Professors and Assistant Professors (the average difference for those years in the Surgery department was $77,000). (Ex. 8, Summary ¶ 14.)

Gender-based disparities also existed in the academic base salary assigned to physician faculty. Over the past 10 years, the disparity in academic base salary between male and female Associate Professors and Assistant Professors at SIU Healthcare and SIU School of Medicine has grown from approximately $13,000 annually to approximately $33,000. (Ex. 8, Summary ¶¶ 16-17.) Disparities exist for Professors, as well. On average for years 2007-2016, female Professors earned approximately $45,000 less annually than male Professors. (Ex. 8, Summary ¶¶ 16-18.)

With respect to clinical incentive compensation, female Associate Professors and Assistant Professors' average compensation for all years (2007-2016) was approximately $42,000 less than males' and female Professors' was approximately $40,000 less annually. (Ex. 8, Summary ¶¶ 21-22.)

These are not isolated instances or occurrences, particularly in the years at issue for purposes of the Equal Pay Act. In every year from 2012 to 2016, in every department where

women worked, at least one female Associate Professor was paid less than a male Associate Professor in that department or a female Assistant Professor was paid less than a male Assistant Professor in that department (in 2013, no female Associate Professor or Assistant Professor worked in the Neurology Department).  (Ex. 8, Summary ¶ 11.)  Likewise, for Professors, in every year from 2012 to 2016, in every department where women worked, at least one female Professor earned less than a male Professor in that department (though there were multiple departments with no female Professors). (Ex. 8, Summary ¶ 11.)

During these years (2012-2016), female physician faculty earned lower base salaries than males across departments, including the Surgery department.  (Ex. 8, Summary ¶¶ 19-20.)  For example, in the Psychiatry department, from 2012-2016, the highest academic base salary for an Assistant Professor was always a male and the lowest academic base salary for an Assistant Professor was always a female.  (Ex. 8, Summary ¶¶ 19.)  Similarly, in the Internal Medicine department, from 2012 to 2016, the highest academic base salary for an Assistant Professor was always a male and lowest academic base salary for an Assistant Professor was always a female.  (*Id.*)  In 2015, in the Internal Medicine department, the seven lowest academic base salaries for Assistant Professors belonged to females.  (*Id.*)

## II.  Notice Should Issue To All Current And Former Female Physician Faculty.

As demonstrated by the evidence described above, Plaintiff has shown she is similarly situated to female physician faculty members and all of them have been victims of Defendants' discriminatory Compensation Plan.  Plaintiff's Amended Complaint includes Dr. Sajida Ahad's notice of consent to proceed as a named party in this collective action.  Thus, Plaintiff satisfies all requirements necessary to pursue a collective action under the Equal Pay Act's enforcement procedures.  29 U.S.C. § 216(b).

Court-approved notice will be the most effective means of reaching putative class members. Unlike the statute of limitations for a putative class member in a Rule 23 class action, the statute of limitations for a putative collective action member is not tolled when the action is commenced. 29 U.S.C. § 256; *see also North,* 676 F. Supp. 2d at 695, n. 8. Absent tolling, the statute of limitations for a collective action member continues to run until her individual suit commences. *Id.* Thus, the Equal Pay Act suit for each member of the collective action commences when she files a written consent to become part of the action, not upon commencement of the original suit by the representative plaintiff. *Id.*

Here, judicial notice promotes the remedial purpose of Section 216(b) by preventing the erosion of claims due to the running of statutes of limitations. Because of the size and geographic scope of the putative class, Plaintiff and the Court cannot simply rely upon "word of mouth" or Plaintiff's counsel's independent efforts to provide timely, adequate notice of the lawsuit; like Plaintiff, many female physician faculty have moved out of state to more equitable employment opportunities. Plaintiff's proposed notice (attached to Plaintiff's motion as Exhibit A) is carefully drafted to mirror notice forms that courts have approved in other FLSA cases and achieves the ultimate goal of providing employees with accurate and timely notice concerning the pending collective action. As required, it is "timely, accurate, and informative." *See Hoffmann-La Roche,* 493 U.S. at 172. Accordingly, Plaintiff respectfully requests that notice issue (with any modifications the Court deems necessary).

Collective action will be the most efficient means of adjudication (particularly in light of Plaintiff's pending related claims, all of which require class certification under Rule 23). Without it, potential class members may not be able to obtain their full remedies under the Equal Pay Act. Moreover, conditionally certifying this case as a collective action furthers the FLSA's

purpose of achieving significant judicial economies through collective discovery and trial preparation. *See Hoffman-LaRoche,* 493 U.S. at 169-70. Collective adjudication here will limit the proliferation of multiple lawsuits against the Defendants and thereby conserve the Court's and the parties' resources. Because identical issues of fact and law exist amongst the Plaintiff and putative plaintiffs, proceeding collectively will serve to promote judicial economy.

## CONCLUSION

Plaintiff respectfully asks the Court to grant Plaintiff's Motion for Conditional Collective Action Certification and Judicial Notice pursuant to 29 U.S.C. § 216(b) and, after any modifications the Court deems necessary issue the Proposed Order (attached as Exhibit B to her motion) authorizing notice to be sent to similarly situated current and former employees of Defendants, approving Plaintiff's counsel as class counsel for the collective action, and approving Plaintiff Sajida Ahad, M.D. as the named plaintiff for this collective action.

                                         Respectfully submitted for Plaintiff
                                         Dr. Sajida Ahad, on behalf of herself and
                                         all others similarly situated,

                                         /s/ J. Bryan Wood
                                         Attorney for Plaintiff

J. Bryan Wood (ARDC #6270845)
The Wood Law Office, LLC
303 W. Madison St., Suite 2650
Chicago, IL 60606
bryan@jbryanwoodlaw.com
Phone: (312) 554-8600
Fax: (312) 577-0749

**CERTIFICATE OF SERVICE**

On October 18, 2016, the undersigned served the attached Plaintiff's Memorandum in Support of Her Motion for Conditional Collective Action Certification and Judicial Notice and exhibits thereto on all counsel of record by filing it via the Court's electronic case filing system and by emailing copies of exhibits filed under seal to Defendants' counsel of record Tom Wilson.

      /s/ J. Bryan Wood
J. Bryan Wood