E-FILED
Tuesday, 18 October, 2016 08:59:59 PM
Clerk, U.S. District Court, ILCD

Exhibit 8

# UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF ILLINOIS
# SPRINGFIELD DIVISION

| | |
|---|---|
| SAJIDA AHAD, MD, on behalf of herself and all others similarly situated,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>BOARD OF TRUSTEES OF SOUTHERN ILLINOIS UNIVERSITY and SIU PHYSICIANS & SURGEONS, INC.,<br><br>　　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)　No.　15-cv-03308-SEM-TSH<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## PLAINTIFF'S SUMMARY AND ANALYSIS OF VOLUMINOUS EVIDENCE

Plaintiff Sajida Ahad, M.D., by and through her counsel, hereby files this Summary and Analysis of Voluminous Evidence ("Summary") in support of Plaintiff's Motion for Conditional Collective Action Certification and Judicial Notice. Plaintiff files this Summary in lieu of attaching voluminous documents produced by Defendants containing confidential compensation of individual physicians as exhibits to Plaintiff's motion and in consideration of the Agreed Confidentiality Order between the parties. (Protective Order, ECF No. 21.) At the Court's or Defendants' request, Plaintiff can provide the underlying materials described herein informally and/or by filing them in the public record. In authenticating, summarizing and analyzing the compensation records produced by Defendants supporting Plaintiff's Motion for Conditional Collective Action Certification and Judicial Notice, Plaintiff states as follows:

　　　1.　On June 17, 2016, Plaintiff served on Defendants her First Set of Interrogatories to Defendants and her First Set of Document Requests to Defendants. By agreement, Defendants jointly responded to Plaintiff's initial discovery requests on August 3, 2016 by serving their

1

Defendants' Objections and Answers to Plaintiff's First Set of Interrogatories and Defendants' Objections and Responses to Plaintiff's First Set of Document Requests.

2. Defendant SIU Physicians & Surgeons, Inc. included a "Verification" signed by its designated Rule 30(b)(6) witness, Nelson Weichold, with its answers to Plaintiff's interrogatories. Weichold's Verification attests that Defendants' discovery responses are "true and correct to the best of his knowledge, information, and belief." At the Rule 30(b)(6) deposition, Weichold confirmed that the verification bore his signature. (Weichold 30(b)(6) Deposition 33:12-14.) Defendant Board of Trustees of Southern Illinois University also included a "Verification" which appears to be signed by George H. Perich, Executive Director of Defendants' Human Resources department. The Board of Trustees' Verification also attests that Defendants' discovery responses "are true and correct to the best of his knowledge, information and belief."

3. In Interrogatory No. 6 of Plaintiff's First Set of Interrogatories, Plaintiff asked Defendants to "[i]dentify all physicians on academic staff between 2006 and the present, including the individuals' salary and compensation information for each year of employment." In response to Interrogatory No. 6, Defendants stated: "Pursuant to Rule 33(d), see the documents in response to [Document] Request[s] # 1 and # 18." Defendants' Objections and Answers to Plaintiff's First Set of Interrogatories.

4. In response to Request No. 18 of Plaintiff's First Set of Document Requests (and other document requests and interrogatories), Defendants produced two Excel spreadsheets in native format. One Excel spreadsheet was named "SIU SOM Physicians Compensation (FY07-FY16)" (hereafter "the Physicians Compensation Spreadsheet") and the other was named "SIU SOM Physicians Academic Base (FY07-FY16)" (hereafter "the Base Salary Spreadsheet").

Both Excel spreadsheets were produced as .pdf files bates labeled SIU PRODUCTION 17311 - SIU PRODUCTION 17403. The Excel spreadsheets and the .pdf contained notes describing that the spreadsheets were prepared from records in Defendants' payroll database (the "HRMS/payroll" system).

5. The Excel spreadsheets and the .pdf contained many columns with identical information about each physician, but also information about each physician that was not contained in the other spreadsheet. Collectively, the Excel spreadsheets included (among other things) the name, employee identification number, gender, title (i.e., rank), department (i.e, organization), last known address, base salary to be paid and components of actual compensation paid for faculty physicians employed by Defendants between fiscal year 2007 and August 3, 2016.

6. The Excel spreadsheets contained records from which Plaintiff could determine and compare the academic base salary SIU School of Medicine agreed to pay each faculty physician by year, as well as the total compensation Defendants paid each faculty physician by year. However, because the records regarding faculty physicians were produced in two different Excel spreadsheets, analyzing all information about a particular physician in a particular year required combining records from each spreadsheet. Plaintiff combined the information produced by Defendants in two Excel spreadsheets into one Excel spreadsheet as follows:

    a. Columns J, K, L, and M (containing last know addresses, which appear in both spreadsheets) were deleted from the Physicians Compensation Spreadsheet.

    b. Records from Columns A, C, D, E, J and K of the Base Salary Spreadsheet (containing, respectively, fiscal year, employee identification number, name, gender, rank and organization) were copied to the Physicians Compensation Spreadsheet by cutting

and pasting those records. The modified spreadsheet was entitled Ahad Wage Data for Analysis (hereafter "the Data for Analysis spreadsheet").

      c.      Empty Columns J and K were added to the Data for Analysis Spreadsheet and labeled "Base Pay" and "Tenure," respectively.

      d.      Defendants' records from the Academic Base Spreadsheet reflecting faculty physicians' "Base Pay" and "Tenure" were copied into the empty Columns J and K in the Data for Analysis Spreadsheet by cutting and pasting those records. As a result, key components of the Academic Base Spreadsheet now appeared in the Data for Analysis Spreadsheet directly below key components of the Physicians Compensation Spreadsheet; however, records for individual physicians appeared in different sections of the Data for Analysis Spreadsheet.

      e.      The Physicians Compensation Spreadsheet did not provide a total amount of compensation paid to a particular physician in a particular year but did include the component parts of total compensation for each year in columns labeled "Regular Pay" (Column G), "Add'l Comp" (Column H) and "HC Comp" (Column I). To calculate the amount of compensation paid by the Board of Trustees (i.e., SIU School of Medicine), a new empty column labeled "Regular + Add'l" was added to the Data for Analysis Spreadsheet. The sum of regular pay and additional compensation was calculated in that column using a formula for each row (i.e., = G2+H2).

      f.      Ensuring all records produced by Defendants for a particular physician appeared in one row on the Data for Analysis Spreadsheet required creating a code combining fiscal year and employee identification number and then using formulas and adjusting the location of records from one row to another. Specifically, a new empty

column C, labeled "FYEMP" was created in the Data for Analysis Spreadsheet. The formula for this column is "=(A2&B2)" such that a number is generated for each row containing the fiscal year and employee id number for that row of records (e.g., for fiscal year 09 and employee id number 12345, the value in column FYEMP would be 0912345). The Data for Analysis Spreadsheet was then sorted by Column C ("FYEMP"), such that the row of records for a physician for a particular year from the Physicians Compensation Spreadsheet would appear immediately above the row of records from the Base Salary Spreadsheet for the same physician for the same year (for years in which both types of records were available). To adjust the location of records from one row to another, a blank column N, labeled "Base Pay2" was added and a formula was derived to move the records from the column "Base Pay" from the Base Salary Spreadsheet to the row of records from the Physicians Compensation Spreadsheet. The formula for column N is " =IF(C2=C3,(L2+L3)," ")." A similar process was created to move Tenure information from the Base Salary Spreadsheet into the same row as information from the Physicians Compensation Spreadsheet within the Data for Analysis Spreadsheet. Column O, labeled "Tenure2" was created and the formula for column O is "=IF(N2<>0,M3,0)". Because the information from the Base Salary Spreadsheet was moved, the redundant rows could be deleted using filters and formulas.

  g. To ensure the information from the Base Salary Spreadsheet moved correctly, spot-checks were conducted for various faculty physicians to compare the information in the Data for Analysis Spreadsheet to the Base Pay Spreadsheet and the Physicians Compensation Spreadsheet. All spot-checks revealed the records in the Data

for Analysis Spreadsheet were identical to the records in the two Excel spreadsheets produced by Defendants.

      h.     Having aligned information from both spreadsheets into one row, total compensation for a particular physician in a particular year could be calculated using a formula. To do that, a blank Column O labeled "Total Compensation" was created. The formula for that column was the sum of the "Regular + Add'l" column and the "HC Comp" column for each row (i.e., =I2+J2).

      7.     The notes to the Physicians Compensation Spreadsheet reflect that the fiscal year for compensation from SIU Physicians and Surgeons, Inc. in the column labeled "HC Comp" is a different time period than the fiscal year for compensation from SIU School of Medicine in the column labeled "Regular Pay" and "Add'l Comp" (even though all those records were produced by Defendants in the same spreadsheet). According to the notes, the fiscal year for HC Comp is based on the calendar year (1/1 – 12/31) and the fiscal year for "Regular Pay and "Add'l Comp" is for the Board of Trustees' fiscal year (7/1 – 6/30). Thus, a physician's records could show compensation from SIU Healthcare for a particular fiscal year but no compensation from SIU School of Medicine within the same fiscal year (or vice versa). In the comparisons below, years that reflect zero compensation in either category were excluded based on the assumption the records of payments actually made reflect a partial year's compensation.

      8.     To permit comparisons by faculty rank, each physician's "Rank" was coded into one of five categories (Adjunct, Assistant, Associate, Professor, or other) in Column M labeled "Rank Code." The coding was based on the information provided by Defendants in the "Rank" column.

9.   To permit comparisons by department, each physician's "Organization" was coded into one of seven categories (Surgery, Neurology, Obstetrics and Gynecology, Internal Medicine, Family and Community Medicine, Pediatrics, and Psychiatry) in Column N labeled "Organization Rank." The coding was based on the information provided by Defendants in the "Organization" column.

10.   Using these codes, Plaintiff was able to compare physicians' compensation, components thereof and academic base salary in any given year within the same organization and rank by gender.

**Differences In Average Total Compensation By Gender**

11.   In the years at issue for purposes of analyzing Equal Pay (2012 to 2016), male faculty physicians routinely earned more than female faculty physicians regardless of rank or department. In every year from 2012 to 2016, in every department where women worked, a female Associate Professor was paid less than a male Associate Professor in that department or a female Assistant Professor was paid less than a male Assistant Professor in that department (in 2013, no female Associate Professor or Assistant Professor worked in the Neurology Department). Likewise, for Professors, in every year from 2012 to 2016, in every department where women worked, a female Professor earned less than a male Professor in that department (though there were multiple departments with no female Professors).

12.   To determine the average total male and female compensation of Associate and Assistant Professors, Plaintiff found the mean of the "Total Compensation" column for employees coded as Assistant and Associate Professors in all organizations for both males and females. A similar process was used for Professors.

13. The average total compensation of male Assistant and Associate Professors across all organizations and all years (2007-2016) was $241,767.27. The average compensation of female Assistant and Associate Professors across all organizations and years was $179,082.69. Thus, from 2007 to 2016, the average total compensation of female Associate Professors and Assistant Professors employed by SIU Healthcare and SIU School of Medicine was more than $62,000 less each year than that of their male counterparts. Within the Surgery Department specifically, female Associate Professors' and Assistant Professors' average total compensation from 2007 to 2016 compensation was approximately $78,000 less than the total compensation of male Associate Professors and Assistant Professors.

14. Similar averages were computed on a year by year basis. For any given year from 2007 to 2016, male Associate Professors and Assistant Professors always averaged at least $41,000 more per year in total compensation than female Associate Professors and Assistant Professors. For the Surgery department, the average difference between male and female Associate Professors and Assistant Professors of individual year differences is approximately $77,000 (with males earning more than females).

15. Female Professors also earn less than male Professors. The average total compensation of male Professors across all organizations and years was $344,769 while the same average for female Professors was $265,865. Female Professors earned (on average) more than $75,000 less than male Professors.

**Differences In Base Salary By Gender**

16. The notes to the Physician Compensation Spreadsheet explain that "Regular Pay," is the "actual amount paid to physician[s] based on their academic base." The notes to the Academic Base Spreadsheet reflect that "Base Pay" is the academic base salary (i.e., the salary rate assigned to a particular physician).

17. Over the past 10 years, the disparity in academic base salary between male and female Associate Professors and Assistant Professors at SIU Healthcare and SIU School of Medicine has grown substantially. In 2007, female Associate Professors and Assistant Professors averaged a base salary of approximately $13,000 less than the academic base salary of male Associate Professors and Assistant Professors. In 2016, that difference increased to $33,000.

18. Female Professors are assigned lower academic base salaries than male Professors. Across all departments over all years (2007-2016), male Professors' average academic base salary was $231,332 and female Professors' was $184,621 – a difference of over $45,000 annually.

19. In the Psychiatry department, from 2012 to 2016, the highest academic base salary for an Assistant Professor was always a male and the lowest academic base salary for an Assistant Professor was always a female. Similarly, in the Internal Medicine department, from 2012 to 2016, the highest academic base salary for an Assistant Professor was always a male and lowest academic base salary for an Assistant Professor was always a female. In 2015, in the Internal Medicine department, the seven lowest academic base salaries for Assistant Professors belonged to females.

20. In the Surgery department, male Professors' average academic base salary over all years (2007- 2016) was $280,841, while female Professors' average academic base salary was $224,286 – a difference of over $50,000 annually. In Internal Medicine, male Professors' average academic base salary over all years (2007-2016) was $224,347, while female Professors' average academic base salary was $158,108 – a difference of over $65,000 annually.

**Differences In Clinical Incentive Compensation By Gender**

21. Compensation data from SIU Healthcare shows female physicians received less clinical incentive compensation. Female Associate Professors and Assistant Professors averaged approximately $42,000 less than male Associate Professors and Assistant Professors in compensation from SIU Healthcare each year over the past ten years.

22. The disparity in clinical compensation also exists for Professors. Over all years (2007-2016), the average annual clinical compensation paid to male Professors was $128,247.95, while the average annual clinical compensation paid to female Professors was $83,927.09 – a difference of over $40,000 annually.

Respectfully submitted for Plaintiff
Dr. Sajida Ahad, on behalf of herself and
all others similarly situated,

/s/ J. Bryan Wood
Attorney for Plaintiff

J. Bryan Wood (ARDC #6270845)
The Wood Law Office, LLC
303 W. Madison St., Suite 2650
Chicago, IL 60606
bryan@jbryanwoodlaw.com
Phone: (312) 554-8600
Fax: (312) 577-0749