UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| SAJIDA AHAD, MD, on behalf of herself and all others similarly situated, <br><br>               Plaintiff, <br><br> v. <br><br> BOARD OF TRUSTEES OF SOUTHERN ILLINOIS UNIVERSITY and SIU PHYSICIANS & SURGEONS, INC., <br><br>               Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> )   No.   15-cv-03308-SEM-TSH <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## PLAINTIFF'S REPLY TO DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR CONDITIONAL COLLECTIVE ACTION CERTIFICATION AND JUDICIAL NOTICE

Plaintiff Sajida Ahad, M.D., by and through her counsel and pursuant to the Equal Pay Act, 29 U.S.C. § 206(d), and the enforcement provisions under 29 U.S.C. § 216(b), hereby files her reply to Defendants' Response to Plaintiff's Motion for Conditional Collective Action Certification and Judicial Notice.  In support of her motion, Plaintiff states as follows:

## INTRODUCTION

As set forth in the Amended Complaint, Plaintiff Dr. Sajida Ahad, alleges female physician faculty members were systematically underpaid as compared to their male counterparts.[1]  Plaintiff seeks conditional certification and judicial notice on her Equal Pay Act ("EPA") claims pursuant to 29 U.S.C. § 216(b) because – in essence – Defendants' decisions regarding compensation of

---

[1] Defendant Board of Trustees of Southern Illinois University (i.e., "SIU School of Medicine") and Defendant SIU Physicians & Surgeons, Inc. ("SIU Healthcare") do not contest they jointly employed Plaintiff and all physicians she alleges were similarly situated.  Accordingly, the Court can treat Defendants as joint employers for purposes of determining whether conditional certification and judicial notice are appropriate.

Plaintiff and other female physician faculty were made pursuant to a uniformly implemented and administered Compensation Plan pursuant to which females received, on average, substantially less compensation than males.

Defendants attempt to avoid conditional certification and judicial notice through a hodgepodge of arguments that focus on irrelevant inquiries, request application of incorrect legal standards and ignore key undisputed facts. Defendants improperly focus on the merits of Plaintiff's substantive claims, even though caselaw explains the merits are irrelevant at this stage and discovery has been bifurcated. Defendants ask the Court to abandon the traditional test to determine whether conditional certification of a collective action is appropriate in favor of an "intermediate" standard – but ask the Court to apply an incorrect version of that "intermediate" standard or the more stringent standard applicable at decertification. Finally, Defendants improperly call for an evidentiary hearing and application of *Daubert* to obviously lay-person analysis, even though no factual findings are necessary for the Court to determine conditional certification is appropriate.

Defendants seek every means possible to distract the Court from its ultimate inquiries: (1) is there a group of potentially similarly situated plaintiffs that may be discovered by sending opt-in notices? and (2) would authorizing judicial notice serve Section 216(b)'s purposes of permitting plaintiffs to pool resources and efficiently limit the controversy to one proceeding (even if only for purposes of discovery)? The answer to both questions is "yes." Accordingly, the Court should grant Plaintiff's motion and authorize issuance of the notice attached as Exhibit A to Plaintiff's motion (i.e., ECF No. 32-1) with any modifications the Court deems appropriate.

## BACKGROUND

Because Defendants' Response to Plaintiff's Motion for Conditional Class Certification argues this Court should employ an alternate standard given the status of discovery, Plaintiff provides background information about discovery conducted.

Defendants focus extensively on the merits of Plaintiff's Equal Pay Act claim (e.g., ECF No. 41, pp. 5-10), but the parties have not engaged in discovery on the merits in this matter.  At Defendants' urging, discovery in this matter was bifurcated between "class" and "merits" discovery.  (ECF No. 19; ECF Entry March 29, 2016).

As part of class certification discovery, Plaintiff requested job descriptions, job duties, job postings or advertisements, compensation and documents related to compensation decisions for all physicians employed by Defendants' in her first set of discovery requests.  Plaintiff sought this information to be able to compare Plaintiff to physicians in other departments.

Defendants' produced policy documents, organizational charts and minutes of meetings discussing compensation issues, as well as "raw data" reflecting compensation paid or rates of pay for approximately 486 individuals identified by Defendants as physicians employed by Defendants (this is the total number of individuals in the compensation data Defendants' produced in response to Plaintiff's requests).[2]  Generally speaking, except for that "raw data," Defendants initially objected to producing information reflecting how or why compensation decisions were made for any physicians other than those identified in Plaintiff's Complaint.

Through the meet and confer process, Defendants agreed to produce that information for physicians within the division of General Surgery, a subset of the Surgery Department (with neither party waiving claims or objections regarding the information).  Other than "raw data"

_____

[2] Defendants claim (ECF No. 41, p. 2) they employ approximately 225 physicians at any point in time; however, because of employee turnover more have worked during the relevant period.

reflecting compensation paid, Defendants have not produced information they claim influences or determines compensation decisions for any physicians other than approximately 18 physicians (including Plaintiff), only two of which are outside of the General Surgery division.  Defendants have refused to produce such information for physicians outside of the General Surgery division (a subset of the Surgery Department) or specifically identified in Plaintiff's original Complaint.

The parties have not conducted any merits discovery or expert discovery pursuant to the schedule they agreed upon and entered by the Magistrate.  Plaintiff's initial expert disclosure is currently scheduled for January 10, 2017.  (ECF No. 29, p. 2).  However, Plaintiff continues to confer with Defendants on what she believes are Defendants' discovery deficiencies and will be seeking adjustments to the expert discovery schedule (and class certification schedule) to permit supplemental production, discovery motion practice or both.

## ARGUMENT

### I.  Defendants Improperly Argue The Merits of Plaintiff's Claims.

Defendants concede there are two stages of FLSA collective action certification: (i) conditional certification, followed by (ii) final certification or decertification.  (ECF No. 41, p.5). Plaintiff argues the first stage "involves conditionally certifying a class for notice purposes. There is a low standard of proof.  The court does not make merits determinations, weigh evidence, determine credibility, or specifically consider opposing evidence presented by a defendant."  *Soto v. Wings 'R Us Romeoville, Inc.*, No. 15-cv-10127, 2016 U.S. Dist. LEXIS 121223, at *18 (N.D. Ill. Sept. 8, 2016).

Plaintiff's motion (ECF No. 32) and memorandum (ECF No. 33) explain that conditional certification and notice to female physicians is appropriate because of the factual similarities among them – including the uniform implementation of Defendants' Compensation Plan and

review of all compensation decisions by SIU School of Medicine's Dean (in his capacity as Dean

and/or the permanent member of the SIU HealthCare's Compensation Committee).  (ECF No.

33, pp. 2-5, 10-13).

In attempting to rebut Plaintiff's argument, Defendants repeatedly attempt to argue the

merits of Plaintiff's substantive Equal Pay Act claims.  (*e.g.*, ECF No. 41, p.3).  Defendants

claim "Plaintiff is required to show… [Defendants' Compensation Plan] *violated the law*."  (ECF

No. 41, p.7) (emphasis in original).  And throughout their brief, Defendants focus on Plaintiff,

compare her other physicians within her division, and claim Plaintiff has not shown how

Defendants' Compensation Plan discriminated against female faculty physicians in violation of

the Equal Pay Act. (ECF No. 41, pp. 3-10).

But emphasis on the merits of Plaintiff's claims at this stage is inappropriate (particularly

given that discovery on the merits has not occurred).  Courts do not adjudicate the merits of

claims at the conditional certification stage of collective action motions.  *See, e.g., B*etancourt v.

*Maxim Healthcare Servs., Inc.,* No. 10 C 4763, 2011 U.S. Dist. LEXIS 43228, at *14-15 (N.D.

Ill. Apr. 21, 2011); *see also Coates v. Farmers Grp., Inc.*, No. 15-CV-01913-LHK, 2015 U.S.

Dist. LEXIS 165817, at *38 (N.D. Cal. Dec. 9, 2015) ("However, the notice-stage is not the

appropriate time to evaluate the merits of Coates's EPA claim."); *Wellens v. Daiichi Sankyo,*

*Inc.*, No. 13-cv-00581-WHO, 2014 U.S. Dist. LEXIS 70628, at *4 (N.D. Cal. May 22, 2014) (In

an Equal Pay Act case, "Courts have also rejected attempts by defendants to introduce evidence

going to the merits of plaintiff's allegations at the notice stage."); *North v. Bd. of Trs. of Ill. State*

*Univ.*, 676 F. Supp. 2d 690, 692 n.1 (C.D. Ill. 2009) ("The merits… are not at issue" on a motion

for conditional certification); *Coan v. Nightingale Home Healthcare, Inc.*, No. 1:05-cv-0101-

DFH-TAB, 2005 U.S. Dist. LEXIS 15475, 2005 WL 1799454, at *1 (S.D. Ind. June 29, 2005) (same).

Defendants rely heavily on a 2008 case from a sister District Court - *Bunyan v. Spectrum Brands, Inc.*, No. 07-CV-0089-MJR, 2008 U.S. Dist. LEXIS 59278 (S.D. Ill. July 31, 2008). That decision has flaws – as discussed below.  But even *Bunyan* explains that "Plaintiffs are not required to prove the merits of their claim at either stage of the certification process--that is, they need not show an actual violation of the FLSA." *Id.* at *7.  Like so many other decisions, *Bunyan* explains the Court's role is to determine "whether certification will aid the litigation in light of § 216(b)'s fundamental purposes: (1) to lower costs to the plaintiffs through the pooling of resources; and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arose from the same alleged activity." *Id.* at *7-8.

Here, the Court can advance both goals by conditionally certifying Plaintiff's collective action and ordering judicial notice.  Any opt-ins will benefit from discovery already conducted and the remaining discovery and expert work that will be completed.  Consistent with collective action practice, if the Court decides such individuals are not similarly situated after discovery is complete, the Court can then decertify the collective action and/or sever any opt-in plaintiffs who join as it deems appropriate based on a more complete record.

Contrary to Defendants' claims, conditional certification still will permit Plaintiff and others to pool resources and will lower costs to *all* parties by combining access to discovery (including expert discovery) and efficiently addressing issues relating to them in one proceeding – regardless of whether Plaintiff or any potential opt-in is successful in proving the merits of her claim.  As explained below, considering the correct standard for conditional certification, the Court should not hesitate to grant Plaintiff's motion.

II.     **Defendants Cite The Wrong Standard For Conditional Certification.**

In addition to improperly arguing the merits of Plaintiff's substantive claims, Defendants ask this Court to apply the incorrect standard for determining whether conditional certification is appropriate.

As set forth in Plaintiff's motion (and as Defendants acknowledge), there are two stages of collective action certification: (1) conditional certification, and (2) final certification or decertification.  *See Wynn v. Express, L.L.C.*, No. 11 C 4588, 2012 U.S. Dist. LEXIS 14392, at *4-5 (N.D. Ill. Feb. 6, 2012).  Step one merely requires plaintiffs to make "a modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law."  *Id.* at *4.

Step two occurs "[a]fter discovery and the opt-in process is complete."  *Id*.  At this stage, the court will either permanently certify or decertify the class using a three-factor test for decertification or final certification.  To do this, the court considers "(1) whether the plaintiffs share similar or disparate employment settings; (2) whether affirmative defenses raised by the defendant would have to be individually applied to each plaintiff; and (3) any fairness and procedural concerns."  *Id*. at *5.

A. **Defendants Incorrectly Apply The Three-Factor Test For Decertification.**

Defendants claim they are asking this Court to abandon either of these tests and argue for application of an "intermediate" standard because some discovery has been conducted.  (ECF No. 41, p. 5).  In reality, however, Defendants ask this Court to apply the three-factor test used by Courts to evaluate decertification after discovery (including discovery on the merits) is complete.  Throughout their response brief, Defendants conflate the "intermediate" standard with the three-factor test for evaluating decertification in hopes this Court will do the same.

Defendants specifically argue that "Plaintiff cannot establish that the proposed class is similarly situated" by pointing to the three-factor test employed at the second stage (i.e., final certification or decertification). (ECF No. 41, p. 9). Indeed, Defendants argue that the appropriate inquiry is: "(1) whether the plaintiffs share similar or disparate employment settings; (2) whether affirmative defenses raised by the defendant would have to be individually applied to each plaintiff; and (3) any fairness and procedural concerns." *Id*. That is the three-factor test for decertification, not an intermediate standard.

Defendants openly and inappropriately use second stage cases to argue against conditional certification. For instance, Defendants (at ECF No. 41, pp. 7, 9, 12-14) use the following cases to discuss the three-factor test courts use to conclusively determine whether plaintiffs are similarly situated (i.e., final certification or decertification): *Russell v. Ill. Bell Tel. Co.*, 721 F. Supp. 2d 804 (N.D. Ill. 2010); and *Mielke v. Laidlaw Transit, Inc.*, 313 F. Supp. 2d 759, 762 (N.D. Ill. 2004). In doing so, Defendants ignore the fact that those factors refer to a final determination in the second stage of the process and the cases address final certification or decertification.

Caselaw makes clear that the three-factor test Defendants employ and ask this Court to apply is *only* used at the second stage (i.e., final certification or decertification). *See, e.g., Gomez v. PNC Bank, N.A.*, 306 F.R.D. 156, 174 (N.D. Ill. 2014) ("After notice has been sent and additional plaintiffs have opted in to the lawsuit, the second step focuses on whether the plaintiffs who have opted in are in fact 'similarly situated' to the named plaintiffs. In order to make this determination, courts consider" the above-mentioned factors).[3]

---

[3] *See also Wynn*, 2012 U.S. Dist. LEXIS at *5 (citing this test for the second step of collective action certification); *Medina v. Happy's Pizza Franchise, L.L.C.*, No. 10 C 3148, 2012 U.S. Dist. LEXIS 13346, at *22 (N.D. Ill. Feb. 3, 2012) (applying this test "stage two of the certification process" evaluating final certification); *Marshall v. Amsted Rail Co.*, No. 10-cv-0011-MJR-

This Court should not hold Plaintiff to the burden of satisfying that factual threshold when the parties have not yet commenced discovery on the merits.  The three-factor test for final certification or decertification should not be applied until after the close of discovery, when "notice has been sent and additional plaintiffs have opted in to the lawsuit."  *Gomez*, 306 F.R.D. at 174.  None of those events have occurred yet.

**B.  An "Intermediate" Standard Exists, But Should Not Be Applied Here.**

The "intermediate" standard for which Defendants advocate exists, but not in the form Defendants describe.  Some courts have indicated an "intermediate" standard  "may be appropriate when a court has expressly allowed 'discovery on the issue of whether the plaintiffs are similarly situated' and the plaintiffs have been given access to a 'list of other . . . potential members of the proposed class.'"  *Girolamo v. Cmty. Physical Therapy & Assocs., No*. 15 C 2361, 2016 U.S. Dist. LEXIS 90128, at *8 (N.D. Ill. July 12, 2016).  But courts' use of the "intermediate" standard depends on the quantity and quality of discovery already conducted. *See, e.g., Miller v. ThedaCare Inc.,* No. 15-C-506, 2016 U.S. Dist. LEXIS 116467, at *20-21 (E.D. Wis. Aug. 29, 2016).[4]

Many courts will not apply the "intermediate" standard at all until "opt-in notice has been served and discovery *from those individuals* has been gathered."  *Girolamo*, 2016 U.S. Dist. LEXIS at *10 (emphasis added).  That has not occurred here.

One court refused to apply the "intermediate" standard even after the parties conducted significant discovery because the discovery "was not focused to obtain information about the

---

SCW, 2012 U.S. Dist. LEXIS 161768, at *23 (S.D. Ill. Nov. 13, 2012) ("At the second stage, the court considers" the three factors); *Cottle v. Falcon Holdings Mgmt., LLC*, 892 F. Supp. 2d 1053, 1064 (N.D. Ind. 2012) ("[A]t the second step, the Court considers" the three-factor test).

[4] Many factors that determine whether courts will apply the more lenient standard or the intermediate standard.  *See, e.g., Miller,* 2016 U.S. Dist. LEXIS 116467, at *21.

additional issues that are relevant at the second step. Therefore, additional discovery will likely be necessary to address the unique issues raised at the second step of the certification process, making heightened review now inappropriate." *Wynn*, 2012 U.S. Dist. LEXIS at *6.

Another court noted the "lenient standard occasionally is heightened if plaintiffs have been allowed extensive discovery, [but] an intermediate standard—not the decertification standard requested by [Defendants]—applies. The intermediate standard, while more stringent than the lenient first-step standard, is less rigorous than the second-step decertification standard." *Kurgan v. Chiro One Wellness Ctrs. LLC*, No. 10-cv-1899, 2014 U.S. Dist. LEXIS 20255, at *11 (N.D. Ill. Feb. 19, 2014).

The *Kurgan* court, like others applying the "intermediate" standard, explained that even when it applies, "Plaintiffs need only make a modest 'plus' factual showing that there is a group of *potentially* similarly situated plaintiffs that *may* be discovered by sending opt-in notices." *Kurgan*, 2014 U.S. Dist. LEXIS at *11-12 (emphasis added); *see also Bergman v. Kindred Healthcare, Inc.*, 949 F. Supp. 2d 852, 856 (N.D. Ill. 2013) (same); *Creely v. HCR ManorCare, Inc.*, 789 F. Supp. 2d 819, 826 (N.D. Ohio 2011) (same).

Here, the "intermediate" standard should not apply because the parties have not engaged in virtually any discovery regarding putative class members outside of Plaintiff's department. Admittedly, Plaintiffs took one Rule 30(b)(6) deposition of each Defendant and Plaintiff was deposed, but the parties have conducted no discovery on the merits of Plaintiff's or putative class members' claims or any expert discovery.

Defendants tout the fact they produced "over 18,000 pages of documents" (ECF No. 41, pp. 6) without noting what is missing from their production. Other than basic "raw data," Defendants have produced virtually no information from which to assess what they claim are differences among

the physicians outside of Plaintiff's division (General Surgery).  Despite requests, Defendants have

yet to even identify the specific dates individuals served as Department Chairs so Plaintiff can

determine which Department Chairs made recommendations when.  Thus, Plaintiff has no basis to

assess or compare the factors Defendants claim influenced compensation decisions.  Moreover, opt-

in notice has not been served; thus, no discovery from similarly situated individuals has been

gathered.  Nor has discovery about them (or virtually anyone else outside of Plaintiff's division)

been produced.

Defendants claim there is no interest in this lawsuit by others; but there is no reason to

believe most (or any) similarly situated physicians saw an online-only news article about the

lawsuit (as Defendants claim at ECF No. 41, pp. 15-16).  Contrary to Defendants' suggestions,

neither Plaintiff nor her counsel have been active in soliciting putative class members given

courts' preferences for judicial notice.  *See Babych v. Psychiatric Solutions, Inc.*, No. 09 C 8000,

2011 U.S. Dist. LEXIS 130167, at *20 (N.D. Ill. Nov. 9, 2011) (requiring informal solicitation

"would undermine a court's ability to provide potential plaintiffs with a fair and accurate notice

and would leave significant opportunity for misleading potential plaintiffs"); *see also Madden v.*

*Corinthian Colls., Inc.*, No. 08 C 6623, 2009 U.S. Dist. LEXIS 115331, at *11 (N.D. Ill. Dec. 8,

2009) (same); *Heckler v. DK Funding, L.L.C.*, 502 F. Supp. 2d 777, 780 (N.D. Ill. 2007) (same).

Given what Defendants have thus far failed to produce – and the absence of any discovery

on the merits – this Court should elect not to apply the "intermediate" standard requiring Plaintiff to

make a modest-plus showing Plaintiff was similarly situated to other female physicians.  The status

of discovery – particularly the lack of any discovery outside of Plaintiff's division – weighs in

favor of applying the lower first stage standard rather than the intermediate standard from

*Kurgan.  See, e.g., Girolamo*, 2016 U.S. Dist. LEXIS at *10; *Wynn*, 2012 U.S. Dist. LEXIS  at *6;

*see also Babych*, 2011 U.S. Dist. LEXIS  at *9-10 (courts "have declined to skip the first step of the conditional certification inquiry where the parties' agreed schedule indicates that there will be two stages of discovery").

### C. *Bunyan*'s "Intermediate" Standard Is An Outlier And Should Be Disregarded.

In support of what it claims is the "intermediate" standard for evaluating certification, Defendants cite *Bunyan*, 2008 U.S. Dist. LEXIS 59278. (ECF No. 41, pp. 5, 9).  But *Bunyan*'s "intermediate" standard is an outlier – that court applied an inappropriate test this Court should reject.

Specifically, the court in *Bunyan* incorrectly combined the first-stage, conditional certification standard with the second-stage, three-factor decertification standard to create what it called an "intermediate" test.  *Bunyan*, 2008 U.S. Dist. LEXIS at *17-18 & *22 (explaining that the second prong of the "intermediate" approach it created requires an analysis of whether "(1) the employment and factual settings of plaintiffs; (2) the various defenses available to defendants; and (3) considerations of fairness, procedure, and manageability.").  Put differently, in attempting to fashion a middle ground between the lenient, first-stage standard and the more stringent second-stage standard, the *Bunyan* court illogically held both must be satisfied.  Like Defendants, the *Bunyan* court conflated the standards applicable at the two different stages.  This Court should not repeat their error.

No other courts use the standard set forth in *Bunyan* as an "intermediate" approach.  Accordingly, this Court should reject the "intermediate" standard Defendants propose.  Should the Court choose to apply any "intermediate" standard, it should apply the standard set forth in *Kurgan, Bergman* and numerous other cases – which merely requires determining that there is a

group of potentially similarly situated plaintiffs that may be discovered by sending opt-in notices.  *See Kurgan*, 2014 U.S. Dist. LEXIS at *11-12; *Bergman*, 949 F. Supp. 2d at 856.

## III.  Notice Should Issue, Even Under The "Intermediate" Standard.

Assuming the Court chooses to apply the proper "intermediate" standard, conditional certification still is appropriate.  Plaintiffs have demonstrated that there is a group of potentially similarly situated plaintiffs (female physician faculty members) who were subject to the same Compensation Plan pursuant to which Defendants established their compensation at rates less than their male counterparts.  Plaintiff makes the "modest 'plus' factual showing that there is a group of *potentially* similarly situated plaintiffs that *may* be discovered by sending opt-in notices." *Kurgan*, 2014 U.S. Dist. LEXIS at *11-12 (emphasis added).

Defendants cannot and do not refute evidence showing all putative collection action members' compensation was determined pursuant to the same standards, processes and procedures pursuant to Defendants' Compensation Plan.  (ECF No. 33-1, Pl. Ex. 1, Cox-Largent Dep. 80:10-81:4, 86:14-87:12, and 112:6-19).  Plaintiff and all other female physicians hold one of three academic ranks (Professor, Associate Professor, or Assistant Professor) and Defendants' Faculty Guidelines set out the minimum qualifications for physician faculty members that are identical by rank, regardless of department.  (ECF No. 33-1, Pl. Ex. 1, Cox-Largent Dep., 79:5-79:17 and 80:10-81:4; ECF No. 33-4, Pl. Ex. 4, Faculty Guidelines, pp. 6-7).  All physician faculty are offered an identical agreement outlining their duties and compensation upon hiring (the Member Practice Agreement) and annually execute a nearly identical Annual Compensation Agreement.  (ECF No. 33-1, Pl. Ex. 1, Cox-Largent Dep. 95:10-101:19, 149:10-150:12; ECF No. 33-2, Pl. Ex. 2, Member Services Agreement; ECF No. 33-6, Pl. Ex. 6, Annual Compensation Agreement).

Improperly focusing on the merits, Defendants contend (at ECF No. 41, pp. 2-3, 11) that Plaintiff cannot establish she was similarly situated to Assistant Professors in the General Surgery division, much less other female physicians, based on her actual job performance and content (not job titles, classifications or descriptions). Defendants claim (at ECF No. 41, pp. 9, 14) that individual factors considered about the approximately 225 different physicians led to the pay disparities Plaintiff describes. Defendants arguments fail in two key respects.

First, Defendants fail to alert the Court to the fact that, in essence, Plaintiff already has proven her job was the same as other Assistant Professors in the General Surgery division after a trial before a Department of Labor Administrative Law Judge. Defendants admit that – after a trial – an ALJ found that several males received higher academic base salaries and total compensation than Plaintiff despite slightly different qualifications, backgrounds and job duties, undermining Defendants' arguments the differences justified pay disparities between them. (ECF No. 39, ¶ 52).[5]

In short, Defendants already tried and lost the issue of whether Plaintiff's job duties were different from that of other Assistant Professors of General Surgery. *See* Ex. A, DOL Order at 8, 10 (assessing "whether employees have 'substantially the same duties and responsibilities'" and determining "[e]ach of the comparators had similar job responsibilities and performed similar functions").

Second, Defendants fail to note that all physicians sign identical contracts requiring that they perform the same job duties; as academic clinicians, each physician has patient, teaching and administrative duties which are substantially the same (with limited exceptions). (ECF No. 33-2, Pl. Ex. 2, Member Practice Agreement, pp. 1-2; ECF No. 33-4, Pl. Ex. 3, Faculty

---

[5]  The ALJ's findings in Plaintiff's favor after completion of the hearing (attached as Exhibit A hereto) are pending on administrative appeal. (ECF No. 39, Affirmative Defense 3).

Guidelines, pp. 5-7) (describing duties expected of all physicians and minimum qualifications with respect to clinical and service/administrative responsibilities); *see also* Exhibit A, DOL Order, p. 6 ("In addition to their surgical work, all of the surgeons also served as professors … Each one had a teaching component, a research component and a service component") and p. 10 ("each of the comparators had similar job responsibilities and performed similar functions"). Thus, physicians at the same academic level within particular departments can appropriately be compared to each other (as Plaintiff has done in comparing average salaries).[6]

Defendants highlight the unique nature of each individual physician's duties and his/her practice. But emphasis on such granular differences that exist in any collective action ignore the overarching, common evidence that tie Plaintiff to all other physicians employed by Defendants: a small, core group of individuals controlled the uniform process by which Defendants determined, reviewed and approved compensation under Defendants' Compensation Plan for Plaintiff and all other female physicians Defendants employed.

Per Cox-Largent's declaration, all compensation "recommendations" during the relevant time frame – including those regarding academic base – were made by a core group of Department Chairpersons for the seven departments. (ECF No. 43, Cox-Largent Decl. ¶¶ 11, 14-15, 20, 34). Even with turnover in those positions, there were at most 15 individuals responsible for making all such compensation recommendations. (ECF No. 33-1, Pl. Ex. 1, Cox-Largent Dep. 135:10-139:16). Defendants claim those "decisions" are individualized, but in reality they

---

[6] Defendants' emphasis on Plaintiff's role as the only "Director of Bariatric Surgery at St. John's Hospital" is an example of the types of administrative duties; but the Department of Labor Administrative Law Judge considered that evidence and found unpersuasive in determining Plaintiff was not paid the actual (higher) wage for Assistant Professors of General Surgery. *See* Ex. A, DOL Order, p. 11 ("Like Dr. Ahad, each surgeon was required to spend a portion of his or her time doing teaching, research and service").

were made by a core group of common, high-level decision-makers applying the same criteria, policies, procedures and standardized process.

Moreover, those Department Chairpersons' "recommendations" (i.e., what Defendant call "decisions") were subject to review, approval and adjustment by the Dean (in his capacity for SIU Board of Trustees, as well as the permanent member of SIU Healthcare's Compensation Committee).  (*Id.* at 104:17-106:6, 114:20-116:9, 124:1-128:12, 143:19-150:8, 156:12-158:18; ECF No. 33-7, Pl. Ex. 7, Weichold Dep. 16:2-23:8).  Thus, regardless of how Department Chairpersons exercised discretion or the individual factors they consider, the Dean retained ultimate responsibility to ensure compensation decisions were consistent with Defendants' Compensation Plan.

Undisputed facts show Defendants' Compensation Plan was implemented by a small group of Department Chairpersons, whose recommendations are subject to approval by one person – the Dean – and all were bound to make decisions to implement Defendants' Compensation Plan.  The Seventh Circuit has found that type of evidence Plaintiff has provided sufficient to meet the far more stringent standards for class certification under Rule 23.  *See Chi. Teachers Union, Local No. 1 v. Bd. of Educ. of Chicago*, 797 F.3d 426, 435-37 (7th Cir. 2015) (ordering certification under Rule 23 and explaining that individualized, discretionary decisionmaking does not preclude class certification under Rule 23 because "a company-wide practice is appropriate for class challenge even where some decisions in the chain of acts challenged as discriminatory can be exercised by local managers with discretion—at least where the class at issue is affected in a common manner, such as where there is a uniform policy or process applied to all" and stating "subjective, discretionary decisions can be the source of a common claim if they are, for example, the outcome of employment practices or policies

controlled by higher-level directors, if all decision-makers exercise discretion in a common way because of a company policy or practice, or if all decision-makers act together as one unit").

If similar facts *necessitated* class certification under Rule 23's stringent standards, certainly Plaintiff has satisfied the "intermediate" modest-plus showing required under *Kurgan* or the lower threshold required at the first stage.  *See, e.g., Woods v. Club Cabaret, Inc.*, 140 F. Supp. 3d 775, 780-81 (C.D. Ill. 2015) (requiring a "factual nexus that binds the plaintiffs together as victims of a particular violation … , although a unified policy, plan, or scheme… is not necessarily required").  This Court should not hesitate to conditionally certify the class of female physicians and order they receive notice promptly.

## IV. *Daubert* Is Not Applicable Because Factual Findings Are Not Required.

Defendants attempt to undermine Plaintiff's summary and analysis of physician's compensation data because an expert has not yet testified about the pay disparities Plaintiff alleges exist.  In addition to ignoring the expert discovery schedule, Defendants confuse Rule 23 of the Federal Rules of Civil Procedure with a collective action, ignore standards for conditional certification and apply expert standards to lay testimony.

At this stage, the Court need not conduct an evidentiary or *Daubert* hearing because – unlike with a Rule 23 motion – the Court is not required to make factual findings to determine conditional certification is appropriate.  Defendants argue otherwise (at ECF No. 41, p.18), claiming that "[t]he Seventh Circuit has held that when an expert's report is critical to the question of class certification, the district court 'must conclusively rule on any challenge to the expert's qualifications or the reliability of the expert's information before deciding the certification motion.'" *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815-16 (7th Cir. 2010).

But unlike here, under Rule 23 a court *is* required to make factual findings necessary to determine whether the elements of Rule 23 have been satisfied in determining whether to certify a class.  As the Seventh Circuit recently explained: "[i]f there are material factual disputes that bear on the requirements for class certification [under Rule 23], the court must 'receive evidence if only by affidavit and resolve the disputes before deciding whether to certify the class.'"  *See Bell v. PNC Bank, N.A.,* 800 F.3d 360, 377 (7th Cir. 2015) (quoting *Szabo v. Bridgeport Machs., Inc.,* 249 F.3d 672, 676 (7th Cir. 2001)).  Thus, under Rule 23, the Court may be required to conduct an evidentiary hearing and, in so doing, determine whether proffered expert testimony is admissible under *Daubert*.

But *American Honda* is a Rule 23 case, not a collective action case.  It has no bearing on the instant determination of whether notice should issue (i.e., conditional certification), which has significantly different standards.  Defendants offer no instance in which their argument that *Daubert* applies at the conditional certification stage was accepted by *any* court.

That is because "[a]t the conditional certification stage, … courts do not need to make any findings of fact with respect to contradictory evidence presented by the parties or make any credibility determinations with respect to the evidence presented."  *Barnett v. Quick Test, Inc.*, No. 11 C 4435, 2012 U.S. Dist. LEXIS 47250, at *10 (N.D. Ill. Apr. 4, 2012) (internal quotation omitted); *see also Bitner v. Wyndham Vacation Resorts, Inc.*, 301 F.R.D. 354, 359 (W.D. Wis. 2014) ("[D]etermining whether plaintiffs actually are similarly situated would require making factual findings and is, therefore, a question best left to the decertification stage.") (emphasis in original); *Berndt v. Cleary Bldg. Corp.*, No. 11-cv-791-wmc, 2013 U.S. Dist. LEXIS 91619, at *22 (W.D. Wis. Jan. 24, 2013) ("Conditional certification analysis does not require th[e] court to make any findings of fact with respect to contradictory evidence presented by the parties nor

does th[e] court need to make any credibility determinations with respect to the evidence presented.") (internal quotation omitted).[7]

At this stage, the most that the Court needs to determine is "whether there is a group of *potentially* similarly situated plaintiffs that *may* be discovered by sending opt-in notices." *Kurgan*, 2014 U.S. Dist. LEXIS  at *11-12.  Plaintiffs have provided more than sufficient facts from which the Court can reasonably believe there may be members of a class of female physician faculty members whose pay was determined pursuant to Defendants' uniformly implemented Compensation Plan that were paid less than comparable males.

What Defendants refer to as "Plaintiff's statistics" are in reality no more raw data and "simple arithmetic" (addition, subtraction, and averaging) and Defendants concede courts have allowed 'simple arithmetic' without expert testimony."  (ECF No. 41, p. 17).  That is particularly true here, given that the Court does not need to make factual findings.  Accordingly, no evidentiary hearing or *Daubert* analysis is required.[8]

---

[7]  Defendants (at ECF No. 41, p. 7) cite *Acevedo v. Ace Coffee Bar, Inc.*, 248 F.R.D. 550, 555 (N.D. Ill. 2008) for the proposition that at the first stage, "courts still require plaintiffs to make factual allegations supported by admissible evidence."  *Id.*  Contrary to Defendants' citation, that case is not a Seventh Circuit decision – it is a decision of another district court.  That decision does not indicate factual findings are required.  Rather, the district court ruled only that a plaintiff may be entitled to discovery to obtain evidence from which to "show 'a reasonable basis for believing' [plaintiffs] are similarly situated to potential class members and to demonstrate a 'factual nexus that binds potential members of a collective action.'"  *Id.* (quoting *Mares v. Ceasars Entertainment, Inc.*, No. 4:06-cv-0060-JDT-WGH, 2007 U.S. Dist. LEXIS 2539, *8 (S.D. Ind. Jan. 10, 2007)).

[8]  Defendants claim (at ECF No. 41, pp.18-19) that Plaintiff improperly combined compensation from calendar and fiscal years and included partial-year compensation in calculating total compensation for each physician.  But Plaintiffs could only use the information Defendants produced.  Any alleged errors could not be *too* problematic, or Defendants would not have offered their own comparisons relying on Plaintiff's calculations.  Plaintiff notes, too, that none of Defendants' criticisms affect comparisons of academic base salary (i.e., the rate of pay for academic and administrative duties, not clinical procedures performed) which Defendants concede impacts overall compensation.  (ECF No. 43, Cox-Largent Decl. ¶ 34) ("a physician's

To be sure, Defendants' and Plaintiff's interpretations of the compensation data Defendants produced differ dramatically.  Defendants focus on isolated examples to claim some women earned more than some men in the same department – a fact which inevitably will be true in any non-gender-segregated workplace.  Contrastingly, Plaintiff focus on averages and trends that show that female physicians at SIU in the same department with the same academic title under-earn comparable men by a significant margin (consistent with peer-reviewed studies of compensation at other academic institutions).  (ECF 33, pp. 2-5, 10-13); *see also Gender Differences in the Salaries of Physician Researchers,* Vol. 307 (No. 22) JAMA 2410-2417 (June 13, 2012); *Sex Differences in Physician Salary in US Public Medical Schools,* 176 JAMA Internal Medicine 1294–1304, 1294-1304 (2016).

The parties' disputes only highlight that there are potentially similarly situated women who – like Plaintiff – may be able to prove they were paid less than male physicians in their department, notwithstanding alleged differences in specific duties, educational backgrounds or other facts Defendants claim resulted in individualized determinations.  Accordingly, this Court should grant Plaintiff's motion and afford those female physicians the opportunity to join this action.[9]

---

total annual compensation is also dependent on the amount paid the physicians for an 'academic base'").

[9] Even assuming *American Honda* does apply to Section 216(b) conditional certification, the Seventh Circuit explained that "a *Daubert* hearing is necessary under *American Honda* only if the witness's opinion is 'critical' to class certification. That requirement is not met if the court decides the motion for class certification on grounds not addressed by the witness."  *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 814 (7th Cir. 2012).  The summary and analysis offered by Plaintiff is not "critical" to determine conditional certification; it is merely helpful to show that there is reason to believe the pay disparities documented in peer-reviewed journals exist at SIU.

**CONCLUSION**

For the reasons stated herein and in her prior filings, Plaintiff respectfully asks the Court to grant Plaintiff's Motion for Conditional Collective Action Certification and Judicial Notice pursuant to 29 U.S.C. § 216(b) and, after any modifications the Court deems necessary issue the Proposed Order (attached as Exhibit B to her motion, ECF No. 32-2 authorizing notice to be sent to similarly situated current and former employees of Defendants, approving Plaintiff's counsel as class counsel for the collective action, and approving Plaintiff Sajida Ahad, M.D. as the named plaintiff for this collective action.[10]

Respectfully submitted for Plaintiff
Dr. Sajida Ahad, on behalf of herself and
all others similarly situated,

/s/ J. Bryan Wood
One of Plaintiff's Attorneys

J. Bryan Wood (ARDC #6270845)
The Wood Law Office, LLC
303 W. Madison St., Suite 2650
Chicago, IL 60606
bryan@jbryanwoodlaw.com\
Phone: (312) 554-8600
Fax: (312) 577-0749

Attorneys for Plaintiffs and All Others
Similarly Situated

Michael F. Brown
DVG LAW PARTNER, LLC
P.O. Box 645
Neenah, WI 54945
mbrown@dvglawpartner.com
Phone:  920-757-2488

---

[10] Defendants make no arguments regarding the content of the proposed notice and, therefore, have waived any such arguments.  To ensure the notice is as accurate as possible, Plaintiff does not object to the Court affording Defendants an opportunity to comment on the content of the proposed notice should the Court order it issued.

## CERTIFICATE OF SERVICE

On December 21, 2016, the undersigned served the attached Plaintiff's Reply To Defendants' Response to Plaintiff's Motion for Conditional Collective Action Certification and Judicial Notice and exhibits thereto on all counsel of record by filing it via the Court's electronic case filing system and by emailing copies of exhibits filed under seal to Defendants' counsel of record Tom Wilson.

/s/ J. Bryan Wood
J. Bryan Wood

## CERTIFICATE OF COMPLAINCE

This document exceeds 15 pages in length allowed by Local Rule 7.1(B)(4)(a) for a memorandum in support of a motion; however, pursuant to Local Rule 7.1(B)(4)(b)-(d), the undersigned certifies that this document complies with the type volume limitation because it does not contain any more than 7,000 words or 45,000 characters.  The word count of the word processing system used to prepare this document indicates there are 6,469 words in this document, including headings, footnotes, and quotations.

/s/ J. Bryan Wood
J. Bryan Wood