E-FILED
Wednesday, 18 October, 2017  07:16:00 PM
Clerk, U.S. District Court, ILCD

### UNITED STATES DISTRICT COURT
### FOR THE CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | |
|---|---|
| SAJIDA AHAD, M.D., on behalf of herself and all others similarly situated, )<br>Plaintiff, )<br>v. )<br> )<br>BOARD OF TRUSTEES OF SOUTHERN )<br>ILLINOIS UNIVERSITY and SIU PHYSICIANS )<br>& SURGEONS, INC., )<br> )<br>Defendants. ) | No.    15-cv-03308-SEM-TSH |

### PLAINTIFF'S MEMORANDUM
### IN SUPPORT OF RULE 23 CLASS CERTIFICATION

Plaintiff Sajida Ahad, M.D., by and through her attorneys and on behalf of herself and all others similarly situated, moves pursuant to Rule 23 of the Federal Rules of Civil Procedure for Class Certification.  In support, Plaintiff states as follows:

## I.    INTRODUCTION

Defendants' Compensation Plan governs compensation of Defendants' physician faculty. Defendants' administration of their Compensation Plan – for which the Dean is ultimately responsible – resulted in a common pattern of adverse treatment of female physicians.

Pursuant to their Compensation Plan, Defendants use a uniform practice for initially determining physicians' academic base salary and expected clinical compensation and then adjusting physicians' compensation annually.  Each year, the Dean and a Compensation Committee (on which the Dean sits) reviews and approves all physicians' compensation based on recommendations by Department Chairs made using specific criteria.

Under Defendants' Compensation Plan and uniform practice, female physicians received statistically significantly less pay than Defendants' male physicians from 2010 to 2016.  Even

1

after accounting for other potential explanations for pay differences, Defendants' female physicians earned at least $12,000/year less than their male counterparts.

Plaintiff Dr. Sajida Ahad consistently opposed Defendants' discriminatory pay practices since shortly after her employment with Defendants began.  Through this motion, Plaintiff seeks to certify a class of approximately 165 female physicians employed by Defendants since October 27, 2010.

As explained below, Plaintiff's Illinois Equal Pay Act, Title VII and Illinois Civil Rights Act claims raise predominant liability questions – e.g., whether Defendants' uniform practice for establishing and adjusting physicians' compensation pursuant to their Compensation Plan resulted in gender discrimination or unequal pay – making certification appropriate under Rule 23(b)(2) for liability, declaratory and injunctive relief and under Rule 23(b)(3) for damages. Alternatively, certification of liability issues under Rule 23(c)(4) is appropriate.

## II.   FACTS

SIU School of Medicine operates under the authority of Defendant SIU Board of Trustees ("the Board").  (Ex.1, Answer ¶23).[1]  Pursuant to statute, the Board is the employer of all School of Medicine employees, many of whom provide patient care through SIU Physicians & Surgeons, Inc., a university related organization also known as "SIU Healthcare."  (Ex.1, Answer ¶¶25-26, 29; Ex.2, Cox-Largent Dep. 21:23-22:8).  Plaintiff Dr. Sajida Ahad, a female physician, worked for Defendants from approximately July 28, 2008 to March 21, 2014.  (Ex.1, Answer ¶¶1, 20, 37; Ex.7, Ahad Dep. 37:22).

---

[1] Plaintiff cites exhibits using abbreviations in her motion's exhibit table.

**A. SIU School of Medicine Educates; SIU Healthcare Provides Clinical Services**

SIU School of Medicine's mission is to "assist the people in central and southern Illinois in meeting their healthcare needs through education, patient care, research and service to the community." (Ex.18, Faculty Guidelines, p. 8894). SIU Healthcare was created to provide School of Medicine faculty physicians an opportunity for clinical practices and to support the School of Medicine's mission. (Ex.4, Cox-Largent Decl. ¶6). A Master Agreement between SIU School of Medicine and SIU Healthcare requires SIU School of Medicine employees to provide services for SIU Healthcare. (Ex.2, Cox-Largent Dep. 15:6-15:23, Ex.14, Master Agreement).

Defendants' physician faculty hold three tenure-eligible academic ranks: Assistant Professor, Associate Professor and Professor. (Ex.18, Faculty Guidelines, pp. 8909-8912). All physician faculty are expected to perform certain minimum duties in three categories: research, teaching and service (including clinical service). (Ex.18, Faculty Guidelines, pp. 8900-8908; Ex.2, Cox-Largent Dep. 83:1-86:4).

**B. Defendants are Joint Employers**

Defendants control the employment decisions regarding faculty physicians, and each entity is an "employer" as used in the EPA, Title VII and Illinois EPA. (Ex.1, Answer ¶¶29, 31). Defendants have a single Human Resources department. (Ex.2, Cox-Largent Dep. 54:3-54:8). All SIU Healthcare employees are employees of SIU School of Medicine, though SIU Healthcare has its own payroll. (Ex.1, Cox-Largent Dep. 54:3-55:4). Defendants concurrently employ clinical faculty and share some common management personnel. (Ex.1, Answer ¶29). For years before the proposed class period began, each interim and permanent SIU Healthcare

Chief Executive Officer ("CEO") was employed by SIU School of Medicine and served a dual appointment.  (Ex.2, Cox-Largent Dep. 17:1-20:9).

**C.  Defendants' Department and Divisions**

Defendants employ physician faculty in different School of Medicine departments. (Ex.15, SOM Org. Chart).  Plaintiff's case focuses on seven of the ten "Clinical Science/Springfield" departments: Family & Community Medicine, Internal Medicine, Neurology, OBGYN, Pediatrics, Psychiatry and Surgery.  (Ex.2, Cox Largent Dep. 126:10-128:23, 129:22-130:3; Ex. 15, SOM Org Chart).  Faculty physicians in those departments are further classified by divisions (e.g., "General Surgery" is the division in the Department of Surgery in which Plaintiff worked).  (Ex.4, Cox-Largent Decl. ¶11; Ex.10, Sharp Reply, Exhibit 2).

**D.  Defendants' Male-Dominated Leadership**

The current SIU School of Medicine Dean and Provost Dr. Jerry Kruse (male) also is the CEO of SIU Healthcare.  (Ex.1, Answer ¶29; Ex.15 SOM Org. Chart; Ex.2, Cox-Largent Dep. 23:22-24:9).  Kruse has served as Dean and Provost since 2016; Dr. Ken Dorsey (male) served as Dean and Provost for the prior 15 years. (Ex.2, Cox-Largent Dep. 124:9-124:21).  Since at least 2010, all of SIU Healthcare's CEOs were men.  (Ex.2, Cox-Largent Dep. 17:1-19:17).

In the seven years of the proposed class period, only 15 individuals (other than Kruse) served as Department Chairs for the seven departments at issue; only 3 have been women. (Ex.16, Dept. Chairs).

**E.  Defendants' Compensation Plan and Components of Compensation**

Defendants admit all SIU Healthcare "members are subject to the same compensation plan, regardless of whether they hold the academic rank of Assistant Professor, Associate

Professor, or Professor and regardless of department." (Ex.1, Answer ¶86). The Master Agreement requires that all physician members of SIU Healthcare and SIU School of Medicine be compensated pursuant to a single compensation plan, aptly named the "Compensation Plan." (Ex.14, Master Agreement, p. 0100; Ex.19, Compensation Plan; Ex.2, Cox-Largent Dep. 86:14-87:12).

The Compensation Plan, unchanged since April 1997, "serves as the governing document for compensation;" it provides for compensation that "is market based and represents fair and reasonable compensation for the efforts of faculty members" but "without regard to the payor for a particular patient or the patient's ability to pay." (Ex. 19, Compensation Plan, p. 17276; Ex.2, Cox-Largent Dep. 103:14-103:19). The Dean of SIU School of Medicine and the CEO of SIU Healthcare are responsible for administration of the Compensation Plan. (Ex.3, Weichold Dep. 16:2-18:4).

Under the Compensation Plan, Defendants' physician faculty members can receive three types of compensation, all of which must be paid in accordance with the Compensation Plan:

- an academic base salary (paid by SIU School of Medicine);

- a clinical base (paid by SIU Healthcare);

- and clinical incentive income (paid by SIU Healthcare).

(Ex.2, Cox-Largent Dep. 112:6-112:19; Ex.19, Compensation Plan, pp. 17278-17281). "Compensation for physicians is typically divided into academic salary and clinical compensation." (Ex.5, Defs' Answer to Interrogatory 4).

<u>Academic Base Salary</u>: Pursuant to the Compensation Plan, all Defendants' physician faculty members receive a fixed academic base salary paid monthly. (Ex.2, Cox-Largent Dep.

107:21-108:2, 112:6-112:19).  Academic base salary compensates physician faculty for their

academic and administrative duties.  (Ex.2, Cox-Largent Dep. 112:1-112:5).

Clinical Compensation:  Clinical incentive income, which is also paid according to the

Compensation Plan, compensates physician faculty for their clinical duties.  (Ex.1, Answer ¶65;

Ex.19, Compensation Plan, p. 17279).  Thus, a portion of the total wages earned by many

physicians are based on the "productivity" as determined under the Compensation Plan, subject

to caps as set forth in the Compensation Plan.  (Ex.1, Answer ¶¶51, 60, 65).[2]  In general terms,

clinical compensation is calculated using a formula that assigns "Relative Value Units"

("RVUs") to the services the physician provided; RVUs are multiplied by a conversion factor for

the physician's assigned division.  (Ex.4, Wendy Cox-Largent Decl. ¶28).

## F.  Defendants' Practice for Determining Compensation

There is a single process by which physicians' initial compensation is established and

adjusted annually by Defendants.  (Ex.2, Cox-Largent Dep. 57:21-58:10; Ex.24, Member

Practice Agreement).

### 1.  Establishing Initial Compensation

"[T]he process leading to the hiring of a faculty member is standardized."  (Ex.4, Cox-

Largent Decl. ¶20).  When Defendants need to fill a position, the Department Chair completes a

recruitment form for the position identifying a salary range, including an academic base salary

and clinical compensation, which should be determined initially based, in part, on data from the

American Association of Medical Colleges ("AAMC").  (Ex.2, Cox-Largent Dep. 140:18-

143:11, 145:18-146:19, 157:20-158:18; Ex.22 Recruitment Tracking Form; Ex.4, Cox-Largent

Decl. ¶¶14-16).

---

[2] Plaintiffs do not concede clinical compensation is based on physicians' *actual* productivity; but
"productivity" as determined by the Compensation Plan influences clinical compensation.

Prior to hiring, however, the recruitment tracking form (which identifies the proposed salary range) must be reviewed and approved by the Department of Human Resources, SIU's Affirmative Action office, SIU Healthcare, the Office of Management and Budget and the Dean and Provost.  (Ex.2, Cox-Largent Dep. 143:11-143:18; Ex.4, Cox Largent Decl. ¶15).

After a candidate is selected, "his or her total compensation is negotiated with the appropriate departmental chairperson."  (Ex.5, Defs' Answer to Interrogatory No. 4).  In making compensation recommendations, Department Chairs consider specific criteria about the physician's background and qualifications (e.g., education, training, experience, fellowships, or specialty(s)) as well as market factors (e.g., need to fill the position within a timeframe, the candidate's prior salary or competing job offers, salary survey data or negotiations).  (*Id*.).  However, in implementing the Compensation Plan, the Department Chair's recommended compensation is reviewed again by SIU's Affirmative Action office, SIU Healthcare, the Office of Management and Budget and the Dean and Provost.  (Ex.2, Cox-Largent Dep. 143:19-144:12).

Upon accepting employment with Defendants, each physician faculty member executes a Member Practice Agreement which identifies the physician's duties and responsibilities and all compensation and fringe benefits; those agreements are "largely the same."  (Ex.2, Cox-Largent Dep. 95:10-101:19; Ex.24, Member Practice Agreement).  Under the Member Practice Agreement, new physicians' clinical compensation is guaranteed for the first one or two years of practice, subject to repayment obligations.  (Ex.4, Cox-Largent Decl. ¶38; Exhibit 23, Ahad Offer Letter, pp. 11335-11337).  New physicians also execute an Annual Compensation Agreement which reflects academic base salary and anticipated clinical compensation for the

coming year.  (Ex.25, Ahad 2008 Annual Compensation Agreement; Ex.2, Cox-Largent Dep. 94:7-95:7, 97:12-98:1, 149:10-150:12).

### 2.  Adjusting Compensation Annually

On an annual basis all faculty members' compensation is formally reviewed, and any adjustments are determined and approved in a single, uniform process.  (Ex.3, Weichold Dep. 18:11-19:15).  As with initial compensation, Department Chairs recommend compensation adjustments for physicians in their departments, but those recommendations are subject to review and approval by the Dean.  (Ex.2, Cox-Largent Dep. 157:20-158:18).  Additionally, "as part of the annual review process, the Compensation Committee reviews physicians' compensation." (Ex.1, Answer ¶90).

The Compensation Committee has four members:  three community members and the Dean.  (Ex.1, Answer ¶90; Ex.17, Comp. Committee; Ex.3, Weichold Dep. 18:11-19:15).  Since 2010, only 6 individuals other than the Deans have participated; only 1 was a woman.  (Ex.17, Comp. Committee).  The Compensation Committee meets annually to review physicians' performance, compensation paid during the prior year, and proposed compensation for the upcoming year.  (Ex.1, Answer ¶90; Ex.2, Cox-Largent Dep. 115:2-115:10; Ex.3, Weichhold Dep. 18:11-19:15).

As a result of the conversations in the Compensation Committee meeting, the departments' recommendation to the Dean and Compensation Committee may be adopted or rejected.  (Ex.3, Weichold Dep. 19:16-22:6).  After the Compensation Committee's review, the Dean still has authority to increase tenure-track physicians' compensation by 10% without additional review by the Compensation Committee.  (Ex.2, Cox-Largent Dep. 156:12-157:5, 157:20-158:18).

Like new physicians, each year all physicians must execute an Annual Compensation Agreement reflecting anticipated compensation for the coming year.  (Ex.2, Cox-Largent Dep. 94:7-95:7, 97:12-98:1, 149:10-150:12; Ex.26, Ahad 2013 Annual Compensation Agreement). Those agreements confirm that compensation is "recommended" by Department Chairs, but ultimately determined and approved through the process described above.

### G.  Defendants' Compensation of Plaintiff

In February 2008, Defendants sent Dr. Ahad a letter offering her employment as "an Assistant Professor on tenure track in the Department of Surgery with an appointment to the Division of General Surgery."  (Ex.23, Ahad Offer Letter, p.11335).  Dr. Ahad was well qualified for her duties.  (Ex.1, Answer ¶36).  Prior to her employment, Dr. Ahad signed an Annual Compensation Agreement reflecting an academic base salary of $125,000 and expected clinical income of $125,000 – for a total expected compensation of $250,000.  (Ex.25, Ahad 2008 Annual Agreement).  That was the same compensation reflected in her offer letter, but different than the expected salary identified in the recruitment process.  (Ex.23, Ahad Offer Letter, p. 11335; Ex.22, Recruitment Tracking Form).

Near the beginning of the proposed class period (approximately 2010 or 2011), Dr. Ahad met with her division chief and multiple female physicians to discuss her concerns about Defendants' discriminatory pay practices and believe Defendants failed to give females leadership positions and equal opportunities to succeed.  (Ex.8, Ahad Response to Interrogatory No. 7; Ex. 7, Ahad Dep. 223:6-225:14).  No formal action was taken in response.  (*Id.*)

During her employment, Defendants asked Dr. Ahad to consider taking on more responsibility for an additional category of surgeries, but changing Dr. Ahad's academic base salary was never discussed.  (Ex.7, Ahad Dep. 110:21-112:3, 199:22-205:10).  Throughout her

employment, Dr. Ahad received the same academic base salary of $125,000 per year.  (Ex.1, Answer ¶43).  Her clinical income varied from year to year, but her expected income remained the same ($125,000) for all years except for 2013.  (Ex.12, Wood Decl. ¶12).

Dr. Ahad remained an Assistant Professor until the end of her employment on March 21, 2014, when she was promoted to Associate Professor (without any accompanying change in pay).  (Ex.7, Ahad Dep. 229:4-229:20).

**H.  Plaintiff's and Others' Complaints of Gender Pay Discrimination**

In 2014, Dr. Ahad formally complained about pay discrimination and Defendants' Executive Director of Human Resources Penny McCarthy investigated.  (Ex.27, McCarthy Interview Notes, at 11064-65, 11113-14).  According to McCarthy's notes, Plaintiff complained she "hasn't seen women progress in Surgery. Difference in salary is obvious. It is online" and "SIU is 'tight knit boys club.'" (*Id.*) (emphasis added).

McCarthy's investigation notes confirm other female physicians shared Dr. Ahad's concerns:

- "General sense among female faculty of pay disparity… I'd think you'd see pattern… I've dealt with this for a long time. Just find best way to handle this the way I can [sic]."  (Ex.27, McCarthy Interview Notes, pp. 11052-11054) (emphasis added).

- "People will look on-line at base salary-discrepancy. Lack of understanding at [sic] how salaries determined…Definitely a very real perception that female surgeons being treated differently. … May make sense for 'implicit bias or unconscious bias' training workshop for all. For positions in leadership and search committees." (Ex.27, McCarthy Interview Notes, pp. 11067-11069) (emphasis added).

## I.  Statistical Evidence Shows a Common Pattern of Adverse Treatment

As the Seventh Circuit explained, "social science has tools to isolate the effects of multiple variables and determine how they influence one dependent variable…"  *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005) (discussing resources available through the Federal Judicial Center to assist understanding statistical evidence).  From a statistical perspective, differences in a factor (such as gender) matter if they are statistically significant after taking into account differences attributable to other variables.[3]

### 1.  Dr. Sharp's Initial Report

Dr. D.C. Sharp – an economist – found "widely-accepted methodologies may be used to determine whether female physicians received significantly lower pay than their similarly-situated male counterparts."  (Ex.9, Sharp Report ¶52).  Consistent with numerous legal decisions describing the value of statistical analysis in pay discrimination claims since and including *Bazemore v. Friday*, 478 U.S. 385, 399-401 (1986), he concluded "multiple regression analysis is the proper method to analyze [Plaintiff's] claims."  (*Id.*).[4]

Here, Dr. Sharp measured gender differences in compensation and the probability those differences were due to chance, taking account of characteristics ("variables") that might

---

[3] A gender difference is considered statistically significant if the probability of occurrence due to chance is .05 or less, meaning the likelihood the measured difference would occur without gender being a factor is l in 20 or less.  This equates to approximately 1.96 "standard errors" or "standard deviations," which typically establishes an inference of disparate impact.  *See Adams v. Ameritech Servs., Inc.*, 231 F.3d 414, 422-24 (7th Cir. 2000) (discussing role of statistical evidence in disparate impact cases and noting this standard); *see also Castaneda v. Partida*, 430 U.S. 482, 496 n.17 (1977) (two or three standard deviations sufficient).  (Ex.9, Sharp Report ¶¶ 28-35).

[4] Dr. Sharp has a long track-record of performing statistical analysis in employment discrimination matters on behalf of employees, employers, the EEOC, the U.S. Department of Justice, the U.S. Department of Education and the U.S. Department of State.  (Ex.9, Sharp Report at ¶¶ 6-7 and Appendix A).

otherwise explain gender compensation differences. (Ex.9, Sharp Report ¶¶28-35).  Based on

compensation data originally produced by Defendants and publicly available sources, Dr. Sharp

conducted a multiple-variable regression analyzing: (a) the academic base salary assigned by

Defendants; (b) the academic salary actually paid in a given year; and (c) clinical compensation

paid.  (Ex.9, Sharp Report ¶12; Ex.11, Sharp Dep., 99:1-4, 108:4-12).

For each component of compensation, after controlling for various factors such as year,

specialization (i.e., Department), academic rank, and factors about physicians' backgrounds, Dr.

Sharp found that "pay differences attributable to gender are statistically significant" at levels

Courts have found sufficient to infer discrimination:

| Pay Type | Annual Difference (Females' Lower Pay) | T-Statistic | Probability |
|---|---|---|---|
| Academic Salary *Rate* | -$21,329 | -4.765 | 0.00 |
| Academic Salary *Paid* | -$18,318 | -3.575 | 0.00 |
| Clinical Compensation Paid | -$30,559 | -6.54 | 0.00 |

(Sharp Report, ¶¶13, 28-37, 49, 51-56).  Thus, based on the initial data Defendants' provided,

Dr. Sharp found a common pattern of adverse treatment of Defendants' female physicians.

### 2. Dr. Sharp's Reply Report to Defendants' Expert Dr. Song

Defendants' expert, Dr. Chen Song, disagreed with Dr. Sharp's conclusions, as explained

in her report.  Unlike Dr. Sharp, Dr. Song has never testified on behalf of the EEOC or any

government agency that prosecutes discrimination claims; Dr. Song's work is and always has

been solely on behalf of employers, helping them "defend against allegations of violations of

labor and employment laws" – like she is doing in this case.  (Ex.6, Song Dep. 11:6-12:20).

To achieve that goal, Dr. Song analyzed compensation data on a department by department basis using data that Defendants and their counsel provided to her which was not previously provided to Plaintiff (including calendar year data with different department and division identifiers and positions).  (*See generally* Dkts. 48-49 and 55).[5]

In response, Dr. Sharp analyzed Defendants' new data and addressed Dr. Song's criticisms, but his additional analyses confirmed his core conclusion: "multiple regression analysis demonstrates a common pattern of gender pay disparity from 2010 to 2016 for [Defendants'] physician faculty."  (Ex.10, Sharp Reply, ¶86).

Dr. Sharp disagreed with Dr. Song's claim that Department Chairs are the "principal decision-maker" for physician compensation and that each department within SIU's School of Medicine is an autonomous "decision-making unit." (Ex.6, Song Dep. 135:24-147:14; *but see* Ex.5, Defs' Answer to Interrogatory 4, refusing to identify Department Chairs as the principal decision-maker; Ex.1, Answer, ¶90, "Defendants admit that as part of the annual review process the Compensation Committee reviews physicians' compensation"; Ex.10, Sharp Reply at ¶¶46-54, describing "levels of review above the department chair that influence compensation").

But, to test Dr. Song's theory, Dr. Sharp used a modified method of regression analysis consistent with her theory and found that, even assuming Dr. Song's theory regarding departmental independence was accurate, statistically-significant gender pay disparities still existed.  (Ex.10, Sharp Reply ¶¶75-86).

Even after Dr. Sharp (1) addressed purported methodological flaws alleged by Defendants, (2) took into account alleged productivity differences (i.e., "RVU Control"), and (3)

---

[5] Plaintiff's motion to bar Defendants' reliance on Dr. Song's analyses pursuant to Rule 37 is pending.  Plaintiff will address inadequacies in Dr. Song's report should Defendants attempt to rely on it, subject to and without waiving Plaintiff's motion.

included all control variables from the new compensation data, Dr. Sharp concluded statistically

significant disparities in total compensation existed at levels Courts have found sufficient to find

discrimination occurred:

| Pay Type | Annual Difference | T-Statistic | Probability |
|---|---|---|---|
| Total Compensation (w/o RVU Control) | -$38,130 | -3.418/-6.030 | 0.00 |
| Total Compensation (w/ RVU Control) | -$12,217 | -2.608/-3.160 | 0.00 |

(Ex.10, Sharp Reply ¶¶67-86) (summarizing Tables 3 & 4).

Thus, Defendants' administration of its Compensation Plan resulted in a common pattern

of treatment disfavoring Defendants' female physicians, regardless of individual criteria

potentially used in setting any component of any physicians' pay.

## III.  ARGUMENT

Plaintiffs seeking class certification only need to demonstrate they satsified the

requirements of Rule 23(a) and one of subsections of Rule 23(b).  *Amchem Prods. v. Windsor,*

521 U.S. 591, 613-16 (1997).  Plaintiffs "need not make that showing to a degree of absolute

certainty."  *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012).

"[C]ourt[s] should not turn the class certification proceedings into a dress rehearsal for

the trial on the merits." *Id*. at 811.  But the Court must make factual and legal inquiries necessary

to determine certification. *Id.*; *see also Szabo v. Bridgeport Machines Inc*., 249 F.3d 672, 676

(7th Cir. 2001) (requiring Court to receive evidence and resolve disputes in deciding class

certification).

The primary issue is whether the claims are most efficiently determined on a class-wide

basis rather than potentially hundreds of individual trials.  *See McReynolds v. Merrill Lynch,*

*Pierce, Fenner & Smith, Inc.,* 672 F.3d 482, 490 (7th Cir. 2012) (reversing denial of class

certification and ordering certification in unintentional employment discrimination case).

### A.   Plaintiff's Class Satisfies All Rule 23(a) Requirements.

Rule 23(a) requires Plaintiffs to demonstrate: (1) the class is too numerous to make

joinder practicable ("numerosity"); (2) there are common questions of law and fact among class

members ("commonality"); (3) the claims or defenses of the representative parties are typical of

the claims or defenses of the class ("typicality"); and (4) the representative parties will fairly and

adequately protect the interests of the class ("adequacy of representation").  *Gen. Tel. Co. of the

Sw. v. Falcon*, 457 U.S. 147, 156 (1982).  Plaintiff satisfies each of these elements.

### 1.   <u>Numerosity</u>: Plaintiff Satisfies Rule 23(a)(1).

Numerosity requires that the class be "so numerous that joinder of all members is

impracticable." Fed. R. Civ. P. 23(a)(1).  In making this determination, courts consider the

number of potential class members as well as factors such as "judicial economy and the ability of

members to bring individual lawsuits."  *Gaspar v. Linvatec Corp.*, 167 F.R.D. 51, 56 (N.D. Ill.

1996); *see also Shaver v. Trauner*, No. 97-1309, 1998 U.S. Dist. LEXIS 19648, at *12 (C.D. Ill.

July 31, 1998) (applying Rule 23(a)(1) and noting "[w]here the class numbers at least 40, joinder

is generally considered impracticable").

Here, Defendants admit current and former female physicians are identifiable from

Defendants' records and they employ more than 40 female physicians.  (Ex.1, Answer ¶91).

Defendants' records show approximately 165 female faculty physicians were employed since

October 27, 2010 and those individuals now reside in approximately 16 different states from

coast to coast.  (Ex.12, Wood Decl. ¶¶10-11).  Class members – presumably busy physicians –

may fear pursuit of their claims could distract from or negatively affect their careers.  *See*

*Warnell v. Ford Motor Co.*, 189 F.R.D. 383, 388 (N.D. Ill. 1999) (class action allows claims that "otherwise might not be brought" because suing an employer is "a risky and frightening business even for a brave employee").  Thus, the class satisfies Rule 23(a)(1).

>   2.   <u>**Commonality**</u>**: Plaintiff Satisfies Rule 23(a)(2).**

Here, Plaintiff satisfies commonality by challenging Defendants' implementation of its Compensation Plan, pursuant to which Defendants' establish and adjust female physicians' compensation using a uniform practice.  That practice results in gender pay disparities, giving rise to common questions about whether the practice and Compensation Plan discriminate on the basis of gender.  *See, e.g., McReynolds*, 672 F.3d at 490; *see also Chi. Teachers Union, Local No. 1 v. Bd. of Educ. of Chi.*, 797 F.3d 426, 438 (7th Cir. 2015); *Allen v. Int'l Truck & Engine Corp.*, 358 F.3d 469, 471 (7th Cir. 2004).

In *McReynolds*, the Seventh Circuit reversed the district court's denial of class certification in an employment action because defendant's company-wide policy was instituted by top level management and the policy influenced 100+ local branch managers' individual discretionary decisions which resulted in disparate impact in African-American brokers' compensation.  *McReynolds*, 672 F.3d at 488-89.  There, the Court found the overarching policy – which influenced managers' discretion in a common way adverse to African Americans – was the glue that held the class together.  Here, Defendants' Compensation Plan is that glue.

Subsequently, in *Chi. Teachers Union*, plaintiffs alleged intentional and disparate impact discrimination resulting from a small group of people's implementation of an overarching policy to close schools, resulting in terminations disproportionately affecting African Americans.  The district court found no commonality "because the decisions [to eliminate schools resulting in employee terminations] were made using qualitative, subjective, case-by-case review."  797 F.3d

at 435.  But the Seventh Circuit reversed, explaining "subjective, discretionary decisions can be the source of a common claim if they are, for example, the outcome of employment practices or policies controlled by higher-level directors, if all decision-makers exercise discretion in a common way because of a company policy or practice, or if all decision-makers act together as one unit."  *Id.* at 438.  Certification was required because:

> **a company-wide practice is appropriate for class challenge** even where some decisions in the chain of acts challenged as discriminatory can be exercised by local managers with discretion—at least **where the class at issue is affected in a common manner, such as where there is a uniform policy or process applied to all**.

797 F.3d at 437 (emphasis added).

Here, Defendants effectively concede there is a uniform process for determining all physicians' pay initially and adjusting that compensation annually – all pursuant to Defendants' Compensation Plan.  (See Fact Sections E and F, above; *see also* Ex.1, Answer ¶90, admitting that "as part of the annual review process, the Compensation Committee reviews physicians' compensation").  As in *Chi. Teachers' Union*, ultimate responsibility for compensation lay in the hands of one person:  the Dean, who is responsible for the administration of the Compensation Plan, reviews each step of the process to determine or adjust compensation, participates in the Compensation Committee, and ultimately has authority to adjust compensation after approval by the Compensation Committee.

Plaintiff's expert's analysis demonstrates Defendants' practice for establishing and adjusting compensation pursuant to the Compensation Plan results in a common pattern adverse to women, providing further evidence common questions exist. (Ex. 10, Sharp Reply ¶86).  *See*

*Meiresonne v. Marriot Corp.*, 124 F.R.D. 619, 624 (N.D. Ill. 1989) (evidence of statistical disparities resulting from centralized decision presented common issues).

Thus, Defendants' implementation of the Compensation Plan through its uniform practice of establishing and adjusting compensation creates common questions of law and fact satisfying Rule 23(a)(2).

### 3. Typicality: Plaintiff Satisfies Rule 23(a)(3).

The putative class also satisfies typicality, which is "determined with reference to the company's actions, not with respect to particularized defenses it might have against certain class members."  *Wagner v. Nutrasweet Co.,* 95 F.3d 527, 534 (7th Cir. 1996).  Plaintiffs' claims are typical if (1) they arise from the same event, practice, or course of conduct as the claims of the other class members; and (2) the claims are based on the same legal theory.  *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992)).

Here, Plaintiff's and class members' claims are based on the same legal theory – that their pay was based on gender.  Additionally, all putative class members were affected by the same course of conduct – implementation of Defendants' Compensation Plan, through which Defendants establish and adjust physicians' compensation.  Thus, typicality exists.

### 4. Adequacy: Plaintiff and Class Counsel Satisfy Rule 23(a)(4).

#### a. Dr. Ahad Is An Adequate Class Representative.

To satisfy Rule 23(a)(3), Plaintiff must show she "will fairly and adequately protect the interests of the class," which is not a heavy burden.  Fed. R. Civ. P. 23(a)(4); *see also Lau v. Arrow Fin. Servs., LLC*, No. 06 C 3141, 2007 U.S. Dist. LEXIS 40066, at *18 (N.D. Ill. May 22, 2007).

Plaintiff must not have interests antagonistic to or competing with those of class members. *Rosario*, 963 F.2d at 1018. Here, Plaintiff does not have conflicts with class members; she seeks remedies on behalf of all class members, including declaratory and injunctive relief which will benefit the entire class. She also has a sufficient interest in the outcome of the case. *See Gammon v. GC Servs., Ltd. P'ship*, 162 F.R.D. 313, 317 (N.D. Ill. 1995).

As evidenced by her efforts thus far, Plaintiff has been and will be a "conscientious representative plaintiff." *Fournigault v. Indep. One Mortg. Corp.*, 234 F.R.D. 641, 646 (N.D. Ill. 2006) (internal quotations omitted).

### b. Plaintiff's Counsel Are Adequate Class Counsel.

Proposed class counsel must be "competent, experienced, qualified, and generally able to conduct the proposed litigation vigorously." *Gammon*, 162 F.R.D. at 317. Attorneys Wood and Brown both have extensive experience in employment litigation and Wood (lead counsel here) was appointed class counsel in other cases. (Ex.12, Wood Decl. ¶¶1-9; Ex.13, Brown Decl. ¶¶1-6). Here, Plaintiff's counsel have defeated Defendants' motion to strike complaint allegations and obtained conditional certification of the EPA Class (aided by knowledge acquired successfully litigating Plaintiff's DOL matter). (Dkt. 18, 26, 32-33, 45 and 53; Ex.21, DOL Order). Plaintiff believes her counsel's experience here and elsewhere show they will protect the class's interests, just as Plaintiff has, satisfying Rule 23(a)(4).

## B.   Plaintiff's Class Satisfies Rule 23(b)(2) And (b)(3).

Plaintiff meets the requirements of Rule 23(b)(2) for injunctive relief and Rule 23(b)(3) for damages. Accordingly, the class should be certified under one or both provisions.

### 1.  Rule 23(b)(2) Is Appropriate For Liability And Declaratory/Injunctive Relief.

Rule 23(b)(2) certification is appropriate if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  As described above, Plaintiff's evidence proves Defendants acted in a way generally applicable to all physicians that resulted in a common pattern of treatment disadvantaging women.

Courts repeatedly explain that "'civil rights cases against parties charged with unlawful, class-based discrimination are prime examples' of Rule 23(b)(2) classes."  *Chi. Teachers Union,* 797 F.3d at 441 (quoting *Amchem,* 521 U.S. at 614); *see also Dean v. Int'l Truck & Engine Corp.,* 220 F.R.D. 319, 322 (N.D. Ill. 2004) (same).

Here Plaintiff's civil rights claims authorize injunctive relief.  *See, e.g.,* 740 ILCS 23/5 (authorizing broad injunctive relief); *see also Franks v. Bowman Transp. Co.*, 424 U.S. 747, 763-66 (1976) (noting Courts' broad equitable powers to enjoin illegal conduct and fashion equitable relief under Title VII).  Plaintiff seeks declaratory and injunctive relief for the class.  (Dkt. 31, Prayer for Relief, Paragraphs D-F) (seeking a declaration Defendants' challenged employment practices violate applicable law and requesting the Court "[o]rder Defendants to initiate and implement programs that will remedy" gender discrimination).

If, after evaluating Defendants' compensation practice, the Court determines unlawful conduct occurred or is occurring, the Court can and should enjoin that conduct and order remedial measures, including policy changes and/or monitoring.  Given the practical effect of one Plaintiff litigating claims for declaratory and injunctive relief on such claims, certification of liability issues is all but mandatory.  *See Allen*, 358 F.3d at 471 (reversing denial of certification

on harassment claims, ordering certification under Rule 23(b)(2) and requiring reconsideration of certification for damages under Rule 23(b)(3)).

Plaintiff also seeks monetary damages on behalf of the class. But that does not preclude certification of liability issues under Rule 23(b)(2). Those issues can be certified under Rule 23(b)(3). *See Chi. Teachers Union*, 797 F.3d at 442-44 (certifying damages issues under Rule 23(b)(3) and explaining "the fact that the plaintiffs might require individualized relief does not preclude certification of a class for common equitable relief" even if subsequent proceedings requiring "individualized proof" was required).

Accordingly, certification of liability, declaratory and injunctive relief on Plaintiff's claims is appropriate under Rule 23(b)(2).

## 2. Rule 23(b)(3) Certification Is Appropriate For Damages.

Because Plaintiff seeks monetary damages on behalf of the class (e.g., unpaid wages on all claims), the Court also should certify the class under Rule 23(b)(3) for damages. Rule 23(b)(3) permits certification where "questions of law or fact common to class members predominate over any questions affecting only individual members" and a "class action [is] clearly superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

### a. Common Questions Of Law Or Fact Predominate.

To satisfy predominance, not every element of Plaintiff's claims need be "susceptible to classwide proof." *Chi. Teachers Union,* 797 F.3d at 444. Only key questions relating to Plaintiff's claims must be resolved in a single proceeding.

Here, the same common questions that establish commonality demonstrate predominance. As in other discrimination cases, "the key question upon which all of the

litigation rises or falls can be answered for every plaintiff: was the [compensation] process

discriminatory?"  *Id*.  As the Seventh Circuit and district courts have repeatedly held, answering

that question in one proceeding, for all class members, will move the litigation forward.  *Id.; see*

*also McReynolds,* 672 F.3d at 490-91 (questions in disparate impact claims were most efficiently

decided once); *Allen,* 358 F.3d at 471 (certifying under Rule 23(b)(2), but describing how

liability issues will drive litigation); *Brand, v. Comcast Corp.* 302 F.R.D. 201, 220-24 (N.D. Ill.

2014) (common question of whether a hostile environment existed predominated even though

class members' experiences, testimony and damages differed).[6]

Certification is "particularly appropriate [because] a common factual issue [about

liability] acts as a predicate to recovery by any class member" on Plaintiff's claims.  *Owner-*

*Operator Indep. Drivers Ass'n., Inc. v. Allied Van Lines, Inc.*, 231 F.R.D. 280, 285 (N.D. Ill.

2005) (*citing In re Allstate Ins. Co.*, 400 F.3d 505, 508 (7th Cir. 2005)).[7]

Defendants will argue individual Department Chairs made individual decisions about

individual physicians based on different criteria.  But just as in *Chicago Teachers Union*, each

physician was evaluated "under the same *set* of criteria, analyzed by the same committee, and

ultimately subject to the decision-making authority of one person" – here the Dean.  *Chi.*

*Teachers Union,* 797 F.3d at 444 (emphasis added).

---

[6] In *Brand*, the Court declined to certify a class for pay discrimination, but in that case the
compensation analysis was not limited to the class plaintiffs sought to certify.  *Brand*, 302 F.R.D.
at 211.

[7] *See Smith v. Nike Retail Servs*., 234 F.R.D. 648, 666-67 (N.D. Ill. 2006) (predominance met,
and class certified, despite individual differences and need for sub classes); *Bell v. Woodward*
*Governor Co.,* No. 03-c-50190, 2005 U.S. Dist. LEXIS 60, *10-12 (N.D. Ill. Jan. 3, 2005)
(certifying disparate impact race discrimination pay and promotion claims pursuant to Rule
23(b)(3)).

Common questions predominate even though some of the criteria considered (e.g., by Department Chairs in making recommendations) may not have affected the ultimate compensation recommendation or decision. *Id.* at 438 ("the employer implicitly considered each factor for each employee, even if only some of the performance criteria ultimately determined the employee's fate"); *see also Porter v. Pipefitters Ass'n Local Union 597*, 208 F. Supp. 3d 894, 906 (N.D. Ill. 2016) ("The fact that individual contractors made the final hiring decisions does not matter because Plaintiffs challenge Local 597's overarching policies, which influenced the entire job assignment and hiring process").[8]

As this Court correctly reasoned in conditionally certifying the EPA Class, "whether or not compensation is affected by individualized, gender-neutral factors, such circumstances do not preclude the possibility that compensation is also affected by gender discrimination." (Dkt. 53, pp. 16-17). Determining whether that occurred is the fundamental question that predominates. *See Chi. Teachers Union*, 797 F.3d at 436 (certification required even where "the acts complained of are based on subjective discretionary factors made by multiple decision-makers").

The same evidence will be used by each class member to prove liability, and the liability issues at stake are "susceptible to generalized, class-wide proof." *In re Nassau County Strip Search Cases*, 461 F.3d 219, 227 (2d Cir. 2006); *see also Allen*, 358 F.3d at 471-72. Plaintiff's expert analysis demonstrates statistically significant differences in pay based on gender, even after controlling for differences which may be based on academic rank, year, department,

---

[8] Only sixteen total individuals served as Department Chairs and most served multiple years. (Ex.16, Dept. Chairs). Thus, even if the Court considers them as "decision-makers," evaluating their implementation of Defendants' Compensation Plan in a single proceeding would be more efficient than requiring physicians to proceed individually, given the influence of Defendants' Compensation Plan on their compensation.

division or other individual differences (including "productivity").  (Ex.10, Sharp Reply ¶¶67-86).  By controlling for those variables, Plaintiff's statistical model isolates comparisons to individuals who are alike in those respects – strongly suggesting the answer to the over-riding common question:  whether Defendants compensated physicians based on gender?

The fact individualized damages proceedings eventually may be required does not alter the predominance of the central liability issues.  *See Schmidt v. Smith & Wollensky, 26*8 F.R.D. 323, 329 (N.D. Ill. 2010) (citing *Arreola v. Godinez, 54*6 F.3d 788, 801 (7th Cir. 2008)); *see also Healy v. IBEW, Local Union No. 134*, 296 F.R.D. 587, 594 (N.D. Ill. 2013) (noting that "there are some individual issues in virtually every situation," but "the need for individual damages determinations does not, by itself, defeat class certification under Rule 23(b)(3)") (citing *Arreola*).

Rule 23(b)(3) only requires class members' damages theory be linked to a common theory of liability—not that the damages theory apply uniformly to each class member. *See Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013).  In applying *Comcast*, the Seventh Circuit explained:

> **If the issues of liability are genuinely common issues**, and the damages of individual class members can be readily determined in individual hearings, in settlement negotiations, or by creation of subclasses, **the fact that damages are not identical across all class members should not preclude class certification**.

*Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013) (emphasis added) (explaining "'common proof of damages … is not required'") (quoting *Messner*, 669 F.3d at 819); *see also* William B. Rubenstein & Alba Conte, Newberg on Class Actions § 4.54 (5th ed. 2013) ("Courts

in every circuit have therefore uniformly held that the 23(b)(3) predominance requirement is satisfied despite the need to make individualized damage determinations").

Thus, common issues predominate, notwithstanding individual questions regarding damages or defenses.

### b.  A Class Action Is Superior For Adjudicating Plaintiff's Claims.

Superiority is met where, as here, "[p]arallel litigation for each class member here would entail the same discovery and require multiple courts to weigh the same factual and legal bases for recovery." *Barnes v. Air Line Pilots Ass'n*, 310 F.R.D. 551, 562 (N.D. Ill. 2015).

Each of the factors in Rule 23(b)(3) weigh in favor of certifying the action.  Resolution of liability on a class wide basis will "greatly simplify the litigation to judgment or settlement of claims," obviating the need each class member to re-litigate liability issues using the same evidence. *See Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014).  Presenting the evidence Plaintiff has amassed regarding Defendants' allegedly unlawful conduct in one proceeding before this Court in Springfield will be far more efficient.  No other similar litigation exists and, to date, class members have not identified any interests in controlling prosecution of the claims.  Given the relatively small size of the proposed class, difficulties managing the class action will not be difficult.

Accordingly, consistent with cases like *Chi. Teachers Union*, *Porter* and others, the Court grant Rule 23(b)(3) certification for purposes of determining damages under Rule 23(b)(3), in addition to granting Rule 23(b)(2) certification liability, declaratory and injunctive relief.

C.     **Alternatively, Certification Under Rule 23(c)(4) Is Appropriate.**

If this Court determines Rule 23(b)(2) and Rule 23(b)(3) certification is inappropriate, Plaintiff requests the Court certify the class under Rule 23(c)(4) for issues relating to liability only.  Rule 23(c)(4) provides that "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues."  In *McReynolds*, the Seventh Circuit determined an unintentional discrimination claim should be certified under 23(c)(4). *McReynolds,* 672 F.3d at 491.  Here, Plaintiff requests certification over any liability issues the Court deems appropriate after receiving all briefing and evidence.

## IV.   CONCLUSION

In discrimination cases, Courts can advance litigation for the class of allegedly affected individuals by answering key liability questions in one proceeding.  Whether discrimination occurred predominates over any individual questions, including what harm individual members may have suffered.  Plaintiff's proposed class meets all of the requirements for class certification under Rule 23(a), Rule 23(b)(2) and Rule 23(b)(3), as explained above.  Alternatively, the Court should certify questions relating to liability under Rule 23(c)(4).  Accordingly, Plaintiff respectfully requests the Court grant her motion.

> Respectfully submitted for Plaintiff
> Dr. Sajida Ahad, on behalf of herself and
> all others similarly situated,
>
> /s/ J. Bryan Wood
> Attorney for Plaintiff

J. Bryan Wood (ARDC #6270845)          Michel Brown
The Wood Law Office, LLC               DVG Law Partner LLC
303 W. Madison St., Suite 2650         4321 W. College Avenue, Suite 200
Chicago, IL 60606                      Appleton, Wisconsin 54914
bryan@jbryanwoodlaw.com                mbrown@dvglawpartner.com
Phone: (312) 554-8600                  Phone: 920-757-2488
Fax: (312) 577-0749                    Fax: 920-273-6177

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that the forgoing memorandum complies with the type-volume limitation in Local Rule 7.1(B)(4)(b)(1) because it contains 6,934 words according to the word count of Microsoft Word / Microsoft Office 365 Business.

/s/ J. Bryan Wood

## CERTIFICATE OF SERVICE

On October 18, 2017, the undersigned served the attached Motion for Rule 23 Class Certification and exhibits thereto on all counsel of record by filing it via the Court's electronic case filing system and subsequently delivering copies via overnight delivery.

/s/ J. Bryan Wood