**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD, ILLINOIS**

| | | |
|---|---|---|
| SAJIDA AHAD, MD, on behalf of herself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Cause No. 15-cv-03308 |
| BOARD OF TRUSTEES OF SOUTHERN ILLINOIS UNIVERSITY SIU PHYSICIANS & SURGEONS, INC., d/b/a SIU HEALTHCARE | ) ) ) ) ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO DECERTIFY COLLECTIVE ACTION**

Defendants, the Board of Trustees of Southern Illinois University and SIU Physicians & Surgeons, Inc. d/b/a SIU Healthcare ("SIU-HC"), by and through their attorneys, HeplerBroom, LLC, submit this Memorandum of Law in Support of their Motion to Decertify Collective Action ("Motion") and move the Court to decertify the collective action conditionally certified by the Court on September 29, 2017 for the following reasons:

## I.   Applicable Law

Under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 216(b), a plaintiff may bring a collective action on behalf of herself and other "similarly situated" employees against employers who are alleged to have violated the Equal Pay Act ("EPA"). 29 U.S.C.

1

§ 216(b).  The EPA prohibits an employer from discriminating against its employees on the basis of sex by paying employees less than it pays employees of the opposite sex "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions; except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1).

In considering at Step 1 whether to conditionally certify a class as "similarly situated," the Court only required a "modest factual showing," applying a "minimal" and "fairly lenient" standard.  (d/e 53, p. 3-4).  The conditional "certification," however, was "only the district court's exercise of the discretionary power … to facilitate the sending of notice to potential class members. … '[C]ertification' is neither necessary nor sufficient for the existence of a representative action under FLSA."  *Myers v. Hertz Corp.*, 624 F.3d 537, 555 n. 10 (2d Cir. 2010).[1]

"The second step of certification" involves a "more stringent inquiry," "occurs after discovery has been largely completed[,] and allows a defendant the opportunity to

[1] In seeking conditional certification, Plaintiff submitted a "Summary and Analysis of Voluminous Evidence" discussing average total compensation.  (d/e 33-8); *see* (d/e 53, p. 9-10, 14-19).  With respect to relying on only averages, or a "t-test," the following exchange took place in Plaintiffs' expert economist's deposition:  "Q. … Would you ever try to just tell the Federal judge you can just stop at the simple t-test without looking at these other factors and have a reliable, valid conclusion?  A.  Oh, no.  No.  No.  No.  No.  No. No. … In a case like this, no.  No.  No.  No.  No. I would not stop at the t-test – the t-test of means."  Exhibit J, p. 39:18-40:11.  Thus, the analysis relied upon by Plaintiff's counsel to obtain conditional certification has been rejected by Plaintiffs' own expert.

seek decertification of the class … because various putative class members are not, in fact, similarly situated as required by the FLSA." *Weil v. Metal Techs., Inc.*, 260 F. Supp. 3d 1002, 1020 (S.D. Ind. 2017). At Step 2, the Court must determine whether the action should proceed as a collective action by analyzing "1) whether the plaintiffs share similar or disparate employment settings; 2) whether affirmative defenses raised by the defendant would have to be individually applied to each plaintiff; and 3) any fairness and procedural concerns." (d/e 53, at 6) (citing *Woods v. Club Cabaret, Inc.*, 140 F. Supp. 3d 775, 780 (C.D. Ill. 2015)). After the Court "more rigorously reviews whether the representative plaintiff and the putative claimants are in fact similarly situated so that the lawsuit may proceed as a collective action," "[t]he action may be 'de-certified' if the record reveals that they are not, and the opt-in plaintiffs' claims may be dismissed without prejudice." *Brown v. Club Assist Rd. Serv. U.S., Inc.*, 2013 WL 5304100, at *12 (N.D. Ill. Sept. 19, 2013) (internal quotation marks and citations omitted).

In considering whether to proceed as a collective action, the Court should take into account the framework of the EPA, as well as the purpose of collective actions. To establish a *prima facie* case under the EPA, a plaintiff is required to show that (1) higher wages were paid to male employees, (2) for equal work requiring substantially similar skill, effort, and responsibilities, and (3) the work was performed under similar working conditions. *Cullen v. Ind. Univ. Bd. of Trustees*, 338 F.3d 693, 698 (7th Cir. 2003). To determine whether the work done by a plaintiff was equal to that of a male comparator,

"the crucial inquiry is whether the jobs to be compared have a 'common core' of tasks, i.e., whether a significant portion of the two jobs is identical." *Id.*[2]

Thus, "[t]he proper domain of the [EPA] consists of standardized jobs in which a man is paid significantly more than a woman (or anything more, if the jobs are truly identical) and there are no skill differences." *Sims-Fingers v. City of Indianapolis*, 493 F.3d 768, 771–72 (7th Cir. 2007). A plaintiff "must establish based upon actual job performance and content—not job titles, classifications or descriptions that work performed . . . is substantially equal." *Fallon v. State of Illinois*, 882 F.2d 1206, 1208 (7th Cir. 1989). The Seventh Circuit has explained that an example of a case involving "standardized jobs" within the "proper domain of the [EPA]" is "two sixth-grade music teachers, having the same credentials and experience, teaching classes of roughly the same size in roughly comparable public schools in the same school district." *Sims-Fingers*, 493 F.3d at 771–72. "Nonstandard" jobs outside the domain of the EPA include "[t]he jobs of the managers of the different parks in the sprawling Indianapolis park system," because "the parks are so different from one another." *Id.*

---

[2] Plaintiffs have the burden of proof yet they have made no additional Rule 26 disclosures since the collective action was conditionally certified. Moreover, despite their burden and the clear factual relevance of the identity of those who Plaintiffs claim are comparator employees, Plaintiffs inexplicably objected to requests for this information, claiming "it calls for a legal conclusion." *See, e.g.*, Exhibit H, Opt-In Plaintiff Jan Rakinic's Response to Defendant's First Set of Requests for Production of Documents, ¶¶ 3, 5-8. Plaintiffs seek to proceed with a collective action yet object to production of the most basic information regarding their claims.

The Supreme Court has held that collective actions are intended to provide "plaintiffs the advantage of lower individual costs to vindicate rights by the pooling of resources. The judicial system benefits by efficient resolution in one proceeding of common issues of law and fact arising from the same alleged ... activity." *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989). Collective actions under the FLSA have been found appropriate in cases where, for example, all Plaintiffs claim the employer miscalculated overtime pay and "there is very little money at stake" for each Plaintiff (*Schilling v. PGA Inc.*, 293 F. Supp. 3d 832, 838 (W.D. Wis. 2018)), all Plaintiffs held the same position of assistant manager and claim the employer improperly classified them all as exempt from overtime pay (*Ivery v. RMH Franchise Corp.*, 280 F. Supp. 3d 1121 (N.D. Ill. 2017)), or all Plaintiffs held the same position and claim they were not paid for time spent donning and doffing uniforms (*Reed v. County of Orange*, 266 F.R.D. 446, 463-464 (C.D. Cal. 2010)).

"Decertifying a collective action is appropriate, however, when a jury trial would consist of a large number of separate mini-trials and would consume significant judicial time and resources." *Reed*, 266 F.R.D. at 462. Thus, collective actions have been found to be inappropriate and were properly decertified, for example, where plaintiffs held various positions and there were "significant differences in the duties performed by the plaintiffs" (*Hundt v. DirectSat USA, LLC*, 294 F.R.D. 101, 104 (N.D. Ill. 2013)), where although Plaintiffs were all nurses, there were "vast factual differences among Plaintiffs'

work settings" (*Camilotes v. Resurrection Health Care Corp.*, 286 F.R.D. 339, 354 (N.D. Ill. 2012)), where although all Plaintiffs were truck drivers, their "experiences—what they actually *did*—varied greatly which would require individual analyses" (*Blair v. TransAm Trucking, Inc.*, 2018 WL 1523101, at *25 (D. Kan. Mar. 28, 2018)), where all Plaintiffs held the same position but claimed they were not paid for meal breaks because "[i]t is senseless to proceed as a collective action when Plaintiffs' experiences regarding missed meals vary from day to day, and from individual to individual" (*Reed*, 266 F.R.D. at 458), and where the Plaintiffs had a "wide variety of work assignments and varied compensation structures affecting the purported class." *Anderson v. Cagle's, Inc.*, 488 F.3d 945, 952 (11th Cir. 2007).

Indeed, a "collective action is oxymoronic…where proof regarding each individual plaintiff is required to show liability." *Russell v. Ill. Bell Telephone Co.*, 721 F. Supp. 2d 804 (N.D. Ill. 2010). "A collective action is not appropriate when determining whether a plaintiff has a viable claim requires a detailed, fact-specific inquiry." *Camilotes*, 286 F.R.D. at 346. *See also Bunyan v. Spectrum Brands, Inc.*, 2008 WL 2959932, *27-29 (S.D. Ill. 2008) (proceeding as a collective action is not appropriate where "a fact-specific analysis of each individual plaintiff's [claims] would be required to determine" liability); *Forney v. TTX Co.*, Case No. 05-CV-6257, 2006 WL 1030194 (N.D. Ill. April 17, 2006) (conditional certification was denied because the necessary determination would be fact-intensive and individualized); *Pfaahler v. Consultants for Architects, Inc.*, No. 99-C-6700,

2000 WL 198888, at *2 (N.D. Ill. February 8, 2000) ("the court would be required to make a fact-intensive, individual determination as to the nature of each claimant's employment relationship... Where this is the case, certification of collective action under the FLSA is inappropriate.) The Court has acknowledged that the requirement of "individualized inquiries" is "more appropriately addressed at the second step of FLSA certification." (d/e 53, p. 16).

## II. Argument

### A. Rotondo is not a member of the class.

The class conditionally certified by the Court consists of "[a]ll current and former female faculty physicians at SIU School of Medicine **and** SIU Physicians & Surgeons, Inc., also known as SIU Healthcare." (d/e 53, p. 21) (emphasis added). The notice approved by the Court said "You may make a claim in this action if: 1) you were employed by SIU School of Medicine *and* SIU Healthcare...." (d/e 32-1) (emphasis added). A physician therefore must have been *jointly employed* by the Southern Illinois University School of Medicine ("SIU-SOM") and SIU-HC to be a member of the class. Dr. Erica Rotondo was not employed by SIU-HC; she was exclusively employed by SIU-SOM as part of its federally qualified health center ("FQHC"). Ex. F, p. 35:22-37:7 and Rotondo Dep. Ex. 3; Ex. I, ¶ 44. Counsel for Defendants advised counsel for Plaintiff in a February 27, 2017 letter that Rotondo was not a member of SIU-HC because she worked through a FQHC (d/e 52-10, p.

2), so a notice should not have been sent to her.  Rotondo is not a member of the class and should be dismissed without prejudice on this basis alone.

**B.** **Ahad and the opt-in Plaintiffs are not, in fact, similarly situated, and they have disparate employment settings.**

At Step 2, the Court assesses whether those plaintiffs who have opted in are, in fact, "similarly situated" to Ahad, the only named Plaintiff.  (d/e 53, p. 8). In evaluating whether plaintiffs share similar or disparate employment settings, the Court compares the named Plaintiff with the opt-in Plaintiffs and assesses the similarities and dissimilarities in employment responsibilities and circumstances.  *Blair*, 2018 WL 1523101, at *18.  The first factor weighs against certification where "significant factual differences exist among" the potential Plaintiffs' employment situations, particularly where Plaintiffs cannot show a "system-wide practice" affecting their pay or that "Defendants' implementation of the policy was uniform system-wide."  *Camilotes*, 286 F.R.D. at 346-351.  "[T]he more material distinctions revealed by the evidence, the more likely the district court is to decertify the collective action."  *Anderson*, 488 F.3d at 953.

Plaintiff can no longer rely on a "modest factual showing" or a "minimal" and "fairly lenient" standard.  The "more stringent inquiry" required at this stage, and examination of the Plaintiffs' actual positions and compensation, unequivocally demonstrates that no two Plaintiffs are truly "similarly situated."

The facts set forth in the Motion regarding each of the Plaintiffs demonstrate that these Plaintiffs did not have "standardized jobs" where "there are no skill differences."

While three Plaintiffs were in the Department of Surgery, and two Plaintiffs were in the Division of General Surgery, all Plaintiffs had vastly different employment settings. Plaintiffs cannot establish "similarity" by pointing to generalities such as "caring for patients" or "teaching at a medical school." At issue here are not "sixth-grade music teachers, having the same credentials and experience." *Sims-Fingers*, 493 F.3d at 772. Each plaintiff had unique training in bariatric surgery, colorectal surgery, cardiothoracic surgery, or osteopathic family medicine that not only qualified her for her position, but which she also practiced on a daily basis in caring for patients or teaching medical residents. "Significant factual differences exist among" the Plaintiffs' positions and job duties. This analysis alone demonstrates that Plaintiffs are not "similarly situated."

Further, "significant factual differences exist among" all Plaintiffs' compensation structures for both their academic and clinical compensation, and each Plaintiff had different circumstances affecting her productivity and ultimate compensation. While Plaintiff has argued that the purported "common policy or plan" includes the Member Practice Agreement and the Compensation Plan (see d/e 53, p. 11-12), Rotondo was not subject to those agreements at all but rather was subject to the FQHC Provider Compensation Plan and the FQHC Pooling Agreement. Ex. F, p. 35:22-37:7, 129:22-130:20 and Rotondo Dep. Exs. 5 and 27; Ex. C, ¶ 37; (d/e 33-2) (The Member Practice Agreement is made between the Member and SIU-HC); (d/e 33-5) (the Compensation Plan affects compensation for SIU-HC faculty members). While the other Plaintiffs were subject to

the Member Practice Agreement and the Compensation Plan, those agreements do not identify specific compensation for specific types of physicians and do not identify all factors affecting individual compensation. *See* (d/e 33-2) at 11198 (Member Practice Agreement provides that compensation shall be in accordance with the Compensation Plan and will include Clinical Base Salary and Academic Base Salary); (d/e 33-5) at 17276 (Compensation Plan is "designed to ensure that the faculty members' compensation … is market based and represents fair and reasonable compensation for the efforts of the faculty members.")

Further, in addition to the Member Practice Agreement and Compensation Plan, Ahad was subject to her responsibilities under the Medical Director Agreement for Bariatric Surgery (Ex. B, p. 124:6-127:3 and Ahad Dep. Exs. 29-33); Vassileva was subject to her responsibilities under the Medical Director Agreement for the Valve Program (Ex. E, p. 45:20-47:17 and Vassileva Dep. Exs. 15-18); and Rakinic was not subject to any additional agreements. Thus, there is no common set of employment agreements among Plaintiffs.

In reality, the only "common policy" that affected Ahad, Vassileva, and Rakinic's compensation was the RVU system relating to clinical productivity. All three of these Plaintiffs have admitted this is a gender-neutral policy. Ex. B, p. 91:1-94:11; Ex. D, p. 28:20-23; Ex. E, p. 38:17-21.

Moreover, the four Plaintiffs all held different academic positions and all four Plaintiffs' academic base salary was determined by different considerations. Ahad's academic base was wholly determined by her position of Medical Director of the Bariatric Surgery Program at St. John's Hospital; Vassileva's base was adjusted based on market forces and preservation of the division and a promotion to Associate Professor; Rakinic's was adjusted based on cost of living increases, two individual equity adjustments (for different reasons), an administrative appointment, and a promotion to Professor; and Rotondo's was based on her position as a clinical, non-tenure track faculty member with a separate compensation structure. Clinical income was similarly individualized: Ahad was not productive enough in her startup practice; Vassileva successfully developed her clinical practice but later her productivity nose-dived due to changes in referrals and interpersonal relationships; Rakinic has been very productive throughout but occasionally suffers when taking on a partner; and Rotondo's clinical income did not depend on her individual productivity. Neither Plaintiffs' academic pay nor Plaintiffs' clinical pay was based on a "system-wide practice." Analysis of only these four Plaintiffs demonstrates the individualized inquiry and factors impacting each faculty member's compensation.

Accordingly, "Plaintiffs have failed to satisfy the 'similarly situated' standard. The similarities among the proposed plaintiffs are too few, and the differences among the proposed plaintiffs are too many." *Zavala v. Wal Mart Stores Inc.*, 691 F.3d 527, 537–38 (3d

Cir. 2012). "To find otherwise would reduce Section 216(b)'s requirement that plaintiffs be 'similarly situated' to a mere requirement that Plaintiffs share an employer, a job title, and a professed entitlement to additional wages." *Ruiz v. Citibank, N.A.*, 93 F. Supp. 3d 279, 300 (S.D.N.Y. 2015). The Court should find that Plaintiffs are not "similarly situated" here and decertify the collective action.

## C. The affirmative defenses raised by the defendants must be individually applied to each Plaintiff.

The second factor considers "whether defendants' defenses could be applied across the board to plaintiffs' claims and potential plaintiffs' claims or whether many and perhaps disparate defenses could be raised." *Russell*, 721 F. Supp. 2d at 820. If these Plaintiffs meet their *prima facie* case under the EPA, "the burden of proof shifts to the employer to show that the pay disparity is due to: (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) any other factor other than sex." *Fallon*, 882 F.2d at 1211 (citing 29 U.S.C. § 206(d)(1)(i)-(iv)). "These are affirmative defenses on which the employer bears the burden of proof (persuasion)." *Id.* "The fourth affirmative defense (any other factor other than sex) is a broad 'catch-all' exception and embraces an almost limitless number of factors, so long as they do not involve sex." *Id.*

Defendants will show with the above-described evidence (and other evidence) that each Plaintiffs' compensation was based on factors other than sex, including, but not limited to, level of education, specific credentials, years of experience in her field, specific

12

job responsibility, specialized job knowledge, medical specialty, seniority, merit, available funding, degree of independent responsibility, productivity, market forces, the nature of her duties, and other applicable criteria. Given the disparity in Plaintiffs' positions, these defenses are also "disparate" and cannot be applied "across the board" to all Plaintiffs. Indeed, because Plaintiffs are not "similarly situated," proof of Defendants' affirmative defenses under the EPA as to how each of the four Plaintiffs were compensated would consist of four separate sets of evidence. Accordingly, this factor also strongly favors decertification.

Defense of the case would additionally include rebuttal of Plaintiffs' claims that there were male employees earning higher wages for performing equal work requiring substantially similar skill, effort, and responsibilities. Plaintiffs have identified the male employees they claim were performing "equal work," with whom they allegedly shared a "common core of tasks" and where purportedly "a significant portion of the two jobs is identical." *Cullen*, 338 F.3d at 698. Assessment of these claims likewise cannot be performed in an "across the board" fashion because there is nothing "collective"' about them. Again, four different sets of evidence would need to be presented by both Plaintiffs and Defendants.

**Ahad**, a bariatric surgeon who completed a fellowship in bariatric surgery, claims that Drs. Cetindag, Wall, Rea, Wohltmann, and Hassan performed equal work. Ex. B, p. 152:22-153:12. Rea was a transplant surgeon who had completed a two-year fellowship

in abdominal transplant surgery at Mayo Clinic. Ex. C, ¶ 40.  Cetindag, Wall, and Wohltmann were all trauma surgeons who had completed a fellowship in trauma/critical care surgery. *Id.*, ¶¶ 41, 44, 46.  Hassan, Plaintiff's husband, was a colorectal surgeon who had completed a fellowship in colorectal surgery. *Id.*, ¶¶ 17, 19, 22; Ex. B, p. 30.

**Vassileva**, a cardiothoracic surgeon who joined Defendants directly out of her residency, claims that Drs. Hazelrigg, Arentzen, Pyle, and Stevens perform equal work. Ex. E, p. 19:10-15.  Hazelrigg is the Chair of the Division of Cardiothoracic surgery. *Id.*, p. 26:17-27:1. Arentzen, Pyle, and Stevens were all Clinical Associate Professors (non-tenure track) and all were all in private practice prior to joining Defendants, had extensive experience in cardiothoracic surgery, and brought with them an established patient practice and referral sources for their practices. *Id.*, p. 9:2-11:6; Exhibit C, ¶ 34, 35.

**Rakinic**, Chief of Colorectal Surgery, claims that Drs. Sutyak, Wall, Reid, Whitehurst, and Garfinkel perform equal work. Ex. D, p. 33:1-13.  Sutyak is the Director of the Southern Illinois Trauma Center ("SITC"), and Wall, Reid, are Whitehurst are all full-time trauma/critical care surgeons at the SITC.  Ex. C, ¶ 12, 44, 47; Ex. I, ¶ 31.  Rakinic testified that "my day job is doing my stuff" but, as to treating trauma patients, "that's their day job," referring to Sutyak, Wall, Reid, and Whitehurst.   Ex. D., p. 133:11-134:9. The trauma surgeons also were contractually required to take four trauma calls a month, while Rakinic is not. *Id.*, p. 36:11-20 (Dr. Sutyak, Dr. Wall, Dr. Reid, and Dr. Whitehurst "are obligated by contract to take four trauma calls a month. I don't have that obligation

in my contract.") Garfinkel is a transplant surgeon and Director of the MMC pancreas and kidney transplant program. Ex. C, ¶ 40.

**Rotondo** claims that Drs. Higuchi, Dynda, Kreckman, Gleason, and Lausen performed equal work. Ex. F, p. 19:4-7, 104:2-105:21, 133:1-7. Higuchi was hired August 6, 2012, in the Department of Family & Community Medicine, Springfield Division as the Director, Geriatrics Program. Ex. I, ¶ 7 and Dec. Ex. 2. In addition to board certification in Family Medicine, he held a certificate of added qualifications in Geriatrics (Rotondo did not) and also had obstetrical duties (Rotondo did not). *Id.*, ¶ 10 & 11 and Dec. Exs. 5 and 6; Ex. F, p. 62:3-5. His duties principally related to geriatrics. Ex. I, ¶ 7 and Dec. Ex. 2. In August 2014, when Rotondo was hired at a first year's compensation of $218,000, he was paid less than her. *Id.*, ¶ 6 and Dec. Ex. 1; Ex. F, p. 35:16-23, Rotondo Dep. Ex. 3.

When Rotondo was hired in August 2014, Dynda, in addition to his duties as a family medicine doctor, was the Chief Medical Information Officer for the SIU Center for Family Medicine, a major administrative role. Ex. I, ¶ 14 and Dec. Ex. 9. Rotondo's total compensation when she was hired of $218,000 exceeded Dynda's. *Id.*, ¶ 12 and Dec. Ex. 7; Ex. F, p. 35:16-23, Rotondo Dep. Ex. 3. In October 2014, Dynda was appointed Chief Medical Officer for the FQHC taking on even more administrative duties and becoming Rotondo's supervisor. Ex. I, ¶ 15 and Dec. Ex. 10. Only at that time did his compensation increase to exceed hers. *Id.*, ¶ 13 and Dec. Ex. 8.

Kreckman was hired in March 2015, as the Director of Family Medicine Inpatient Services, with a major responsibility for the FQHC's in-patient services. *Id.*, ¶ 20 and Dec. Ex 15. He had 15 years of experience as a board certified family medicine physician. *Id.*, ¶ 21 and Dec. Ex. 16. Rotondo only had 5 years of experience. Ex. F, p. 135:19-24 and Rotondo Dep. Ex. 1.

Lausen has been practicing medicine since 2003, employed by SIU-SOM since October 2007, and in August 2014 was an Associate Professor and held positions of the Assistant Chair, Department of Family and Community Medicine, Director of Medical Education and Quality Initiatives, was the Program Director of the Springfield Osteopathic Family Medicine Residency, and the Director of the Springfield Family Medicine Residency Hospital Service. Ex. I, ¶ 23, 26 and Dec. Ex. 18 and 21. In August, 2014, Lausen was promoted to the senior leadership positons of Assistant Dean for Clinical Education & Chief Medical Officer and the Regional Director of Osteopathic Medical Education. *Id.*, ¶ 24 and Dec. Ex. 19.

Gleason has been practicing since 1994, was employed by SIU-SOM July 1, 1999, and, in August 2014, served as an Associate Professor and Assistant Residency Program Director and Risk and Safety Officer. *Id.*, ¶ 28, 29 and Dec. Ex. 23 and 24. Unlike Rotondo, he also held obstetrical privileges. *Id.*, ¶ 28 and Dec. Ex. 23 ("[p]articipate in … OB Call.")

Aside from the dubious merit in each Plaintiff's contentions that the identified physicians perform equal work, it is apparent that Plaintiffs have not identified a

"collective" set of comparator physicians. Ahad identifies Drs. Cetindag, Wall, Rea, Wohltmann, and Hassan; Vassileva identifies Drs. Hazelrigg, Arentzen, Pyle, and Stevens; Rakinic identifies Drs. Sutyak, Wall, Reid, Whitehurst, and Garfinkel; and Rotondo identifies Drs. Higuchi, Dynda, Kreckman, Gleason, and Lausen. The only common claimed comparator doctor is Dr. Wall who, as noted above, had a much different position than any Plaintiff as a full-time trauma/critical care surgeon. Each Plaintiff, however, must show a "common core of tasks" with male comparators and show that their actual job performance and content was substantially equal to that of male comparators. Defense of the Plaintiffs' contentions regarding those who allegedly perform equal work therefore cannot possibly be applied "across the board."

Moreover, for each position addressed, the individualized factors used to determine compensation would need to be presented, including but not limited to: (a) the need for a physician with a particular specialty or subspecialty; (b) whether the hire will be for a new position or to replace an existing faculty member; (c) individual responsibilities of the positions; (d) the salary survey data for the position; (e) the source of funding; (f) the market for the specialty, including any difficulty recruiting for the position and retaining qualified faculty in the position; and (g) the manner in which RVUs are calculated in the particular division or department. Ex. C, ¶¶ 8, 13-14, 16-18, 20, 24-33, 36-50. These factors would vary with each set of evidence for each Plaintiff.

In addition, there is a separate, unique defense for Rotondo. Prior to opting in, Rotondo signed a Separation Agreement and Release that included a release of all claims Ex. F, p. 124:3-125:11 and Rotondo Dep. Ex. 26. This defense applies to Rotondo but no other Plaintiff.

The affirmative defenses available under the EPA cannot be applied across the board in this case. Nor can rebuttal of Plaintiffs' claims of doctors performing equal work. As to each Plaintiff, many disparate defenses will be raised based on the individual circumstances of each Plaintiff. "One would be hard-pressed to imagine how a trial could proceed in any sort of manageable fashion where so many of the claims must be rebutted by individualized evidence. Accordingly, this factor weighs heavily in favor of decertification." *Reed*, 266 F.R.D. at 462.

**D. Fairness and procedural concerns support decertification.**

The purpose of a collective action is efficiency in resolving common issues that apply to all class members. *See Sperling*, 493 U.S. at 170; *Riffey v. Rauner*, 873 F.3d 558, 560 (7th Cir. 2017) (collective actions "are designed to provide an efficient vehicle to resolve the claims of a large number of plaintiffs in one fell swoop" whereby "defendants can achieve a global resolution of the dispute.") Here, however, there is no single issue that can be decided "in one fell swoop" because each Plaintiff's individual circumstances are different. As shown above, an individualized, fact-specific analysis regarding each

individual Plaintiff is required, which is wholly inconsistent with proceeding as a collective action.

The point of the "collective action" is to present "collective evidence" "on a class-wide basis" and to "perform a uniform analysis on the entire class" "without individualized evidence." *Blair,* 2018 WL 1523101, at *21-23, 27. Just like the court could not evaluate the truck drivers' claims in *Blair* that each was an employee as opposed to an independent contractor without considering the circumstances of each plaintiff, in this case, the Court would have to consider the individual circumstances of each faculty member to determine why he or she was paid the amount they were. The Plaintiffs are not "similarly situated" at all because they all have different positions, credentials, skills, responsibilities, employment agreements, and compensation considerations. Moreover, each Plaintiff identifies a different set of male comparators for her individual position.

Consequently, proceeding as a collective action would result in four simultaneous but separate trials where each Plaintiff would have to prove the details on her individual job and the details of the purported "equal" jobs of male employees. Defendants would need to offer a unique set of evidence for each Plaintiff as part of their defense, including all the circumstances surrounding the background, credentials, hiring, job duties, performance, and compensation of every Plaintiff *and* every alleged comparator for each Plaintiff, which are all different.

Under these circumstances, a "collective action is oxymoronic." While collective actions are intended to promote judicial economy and to protect the interests of plaintiffs whose damages claims might be too small to justify an individual lawsuit (which is not the case here), "those interests are not served where the 'need to address individualized factual issues' cuts against any efficiency to be gained from collective treatment and makes the aggregation of claims unmanageable." *Blakes v. Illinois Bell Tel. Co.,* 2013 WL 6662831, at *16 (N.D. Ill. Dec. 17, 2013).

Proceeding as a collective action is not only procedurally inappropriate but also is unfair to Defendants. If the case involves "an extensively fact-based inquiry … for each individual Plaintiff," then "[i]t would be fundamentally unfair to [Defendants] if the class were to remain certified. The efficiency gained by holding one trial as opposed to many cannot be obtained at the expense of [Defendants'] due process rights." *Knott v. Dollar Tree Stores, Inc.,* 897 F. Supp. 2d 1230, 1241 (N.D. Ala. 2012). Given the vast disparity in the claims of the Plaintiffs, and the defenses to each of those claims, allowing all four Plaintiffs to proceed in one action would unfairly require Defendants to conduct what should be four separate trials in a single trial. Where, as here, the "claims arise out of very different factual and employment circumstances that will not be amenable to generalized evidence[,] [d]ealing with these claims in a single trial will not merely result in confusion and inefficiency, it will inject chaos into the fact-finding process." *Reed,* 266 F.R.D. at 456.

Accordingly, the third factor, like the first two, compellingly supports decertification. The following conclusion therefore equally applies in this case:

> In light of the individualized and fact-intensive inquiry that will be required as discussed above, the Court concludes that decertifying the ... class is required. As discussed, this case is fraught with questions requiring distinct proof as to individual plaintiffs.... In addition, Defendants' defenses relating to each individual Plaintiff's claim ... cannot be addressed on a class-wide basis. Although the FLSA does not require potential class members to hold identical positions, the similarities necessary to maintain a collective action under § 216(b) must extend beyond the mere fact that Plaintiffs hold the same job title. Otherwise, it is doubtful that § 216(b) would further the interests of judicial economy, and it would undoubtedly present a ready opportunity for abuse. Therefore, based on the foregoing, Plaintiffs' conditionally certified class is hereby decertified, and the opt-in Plaintiffs will be dismissed by operation of this Order.

*Blair*, 2018 WL 1523101, at *29 (quoting *Scott v. Raudin McCormick, Inc.*, 2010 WL 5093650, at *5 (D. Kan. Dec. 8, 2010)).

## III. <u>Conclusion</u>

WHEREFORE, Defendants respectfully request that their Motion to Decertify Collective Action be granted and that the claims of all opt-in plaintiffs be dismissed without prejudice.

## CERTIFICATE OF COMPLIANCE

This document exceeds 15 pages in length allowed by Local Rule 7.1(B)(4)(a) for a memorandum in support of a motion; however, pursuant to Local Rule 7.1(B)(4)(b) –(d), the undersigned certifies that this document complies with the type volume limitation because it does not contain more than 7,000 words or 45,000 characters. The word count of the word processing system used to prepare this document indicates there are 5,544 words in this document, including headings, footnotes, and quotations.

*/s/Thomas H. Wilson*

Respectfully Submitted,

Board of Trustees of Southern Illinois University and SIU Physicians & Surgeons, Inc., d/b/a SIU Healthcare, Defendants

By: */s/ Thomas H. Wilson*

Thomas H. Wilson, #6202141
Jessica L. Galanos, #6297491
HeplerBroom, LLC
4340 Acer Grove Drive
Springfield, IL 62711
Ph:     217-528-3674
Fax:    217-528-3964
Email: thw@heplerbroom.com
          jlg@heplerbroom.com

## PROOF OF SERVICE

I hereby certify that on this 15th day of June, 2018, I caused to be electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing(s) to all counsel of record.

Michael F. Brown
DVG LAW PARTNER LLC
P.O. Box 645
Neenah, WI 54957
Email: mbrown@dvglawpartner.com
*Attorney for the Plaintiff*

J. Bryan Wood
THE WOOD LAW OFFICE, LLC
303 W. Madison St.
Suite 2650
Chicago, IL 60606
E-mail: bryan@jbryanwoodlaw.com
*Attorney for the Plaintiff*

*/s/ Thomas H. Wilson*