## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| SAJIDA AHAD, MD, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | No.    15-cv-03308-SEM-TSH |
| BOARD OF TRUSTEES OF SOUTHERN | ) | |
| ILLINOIS UNIVERSITY and SIU PHYSICIANS | ) | |
| & SURGEONS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

### PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION
### TO DECERTIFY COLLECTIVE ACTION

Dr. Sajida Ahad, Dr. Jan Rakinic, Dr. Erica Rotondo and Dr. Christina Vassileva (collectively, "Plaintiffs"), by and through their attorneys, as their opposition to Defendants' motion for decertification of Plaintiffs' Equal Pay Act claims (dkt. 86), state as follows:

### I.      INTRODUCTION

Dr. Ahad's Equal Pay Act and putative class claims should proceed along with the other three opt-in plaintiffs' claims because, as shown by facts and evidence available to the Court, all Plaintiffs are "similarly situated" as required under Section 216(b). Even if all the alleged factual differences between Plaintiffs that SIU's motion actually existed (many do not), the opt-in Plaintiffs' claims are sufficiently similar to Dr. Ahad's claims to warrant maintaining the collective action.

The parties agree that if the Court decertifies the collective action, the opt-in Plaintiffs' EPA claims should be dismissed *without* prejudice and can be refiled separately.   Fundamentally, then, Defendants' motion raises the question of whether the opt-in Plaintiffs' EPA claims should proceed separately from Dr. Ahad's claims for the purposes of remaining discovery proceedings,

1

dispositive motion briefing, and trial. In arguing that defending four lawsuits would be better than defending one, Defendants ignore what comes next.

As the Seventh Circuit has explained, if the Court grants Plaintiff's Rule 23 motion, Section 216(b) is satisfied. Thus, Plaintiffs rely on the evidence and argument submitted in support of Dr. Ahad's Rule 23 motion to oppose decertification. Regardless of whether the Court grants Rule 23 certification, decertifying the collective action would complicate, not simplify, the litigation.

If the Court decertifies the collective action, the three opt-in Plaintiffs can re-file individual lawsuits asserting their EPA claims. Assuming Rule 23 class certification is denied, litigation of Dr. Ahad's intentional and unintentional gender pay discrimination claims will continue, like the opt-in Plaintiffs' claims. Additionally, if Rule 23 decertification is denied, the opt-in Plaintiffs' could assert the same claims Dr. Ahad now asserts as individuals given the statutes of limitations have been tolled.[1]

Plaintiffs contend decertification of the collective action, and creation of four lawsuits out of one, is neither necessary nor appropriate given the facts and claims at issue in this lawsuit. In arguing otherwise, Defendants divorce the decisions they made regarding Plaintiffs' compensation from the common decision-making process this lawsuit (including EPA claims and Ahad's putative class claims) is challenging. Worse, Defendants repeatedly ignore Seventh Circuit procedural standards that undermine their arguments. For these reasons and others specified below, Defendants' motion for decertification should be denied.

---

[1] As explained in Plaintiff's Rule 23 motion, Dr. Ahad's class claim tolled the applicable limitations period for putative class members' individual claims under other statutes. (Dkt. 57, p. 3, n.1-2).

## II.    PROCEDURAL AND FACTUAL BACKGROUND

As the Court is aware, at Defendants' suggestion, discovery in this matter was bifurcated; the parties have only engaged in discovery regarding class and collective certification issues. (Minute Entry dated March 29, 2016; *see also* Dkt. 25, 47).

The Court conditionally certified Plaintiff Dr. Ahad's Equal Pay Act claims on September 29, 2017. (Dkt. 53).   Plaintiff Dr. Ahad moved for Rule 23 certification of her systemic gender pay discrimination claims under Title VII, the Illinois Equal Pay Act and the Illinois Civil Rights Act.   (Dkt. 57).   Both parties submitted and summarized significant evidence in support of their memoranda.   (Dkts. 57-1 through 57-26; Dkts. 60-64, 68-74 & 77).

During and after Rule 23 briefing, Drs. Vassileva, Rakinic and Rotondo filed Equal Pay Act opt-in consents.   (Dkts. 66, 67, 79).   Defendants then conducted discovery about the opt-in Plaintiffs, which they submit in support of their motion to decertify the collective action.   (Dkts 86-88).   Plaintiffs describe portions of that record pertinent to Defendants' motion below by reference to where it already exists in the record.

### A.  The Parties And Their Backgrounds

This case involves two employers:   SIU School of Medicine (referred to here and in other briefing as "SIU SOM" or simply "SIU"), for whom defendant SIU Board of Trustees acts, and Defendant SIU Physicians & Surgeons, Inc. (referred to as "SIU P&S" or "SIU Healthcare") (collectively, "Defendants").

Defendants jointly employ physicians in in seven key Departments.   (Dkt. 58, pp. 3-4). Plaintiffs worked in two (Surgery and Family & Community Medicine) and Drrs. Ahad, Rakinic and Vassileva ("the Surgery Department Plaintiffs") all worked in the Department of Surgery. (Dkt. 86-10, Rakinic Dep. 5:3-18; Dkt. 87-1, Rakinic Dep. Ex. 1 at 3; Dkt. 39, Answer ¶¶ 1, 20,

37; Dkt. 86-3, Ahad Dep. 37:16-22; Dkt. 86-12, Vassileva Dep., 6:2-7; Dkt. 86-14, Rotondo Dep. 12:6-9).[2]

Plaintiffs' medical education and training was mostly the same and mostly generalized. All Plaintiffs acquired medical school degrees with approximately 4 to 5 years of study and the same nature of training, *i.e.* in general medicine. (Ex. 1, DOL Hearing, 24:13-25:4; Dkt. 86-4, Ahad Dep., 118:1-24; Dkt. 86-4, Ahad Dep. Ex. 28, pp. 22-25; Dkt. 86-10, Rakinic Dep., 5:3-22, 7:3-9; Dkt. 87-1, Rakinic Dep. Ex. 1, p. D-039; Dkt. 86-12, Vassileva Dep., 3:7-8, 5:2-3, 7:9-12, 52:7-15; 53:23-54:2, Dkt. 87-4, Vassileva Dep. Ex. 1, pp. E-028-E-029; Dkt. 86-14, Rotondo Dep., 38:2-9, 135:17-136:4, Rotondo Dep. Ex. 1, p. F-040).   While Dr. Rotondo's medical degree type (Doctor of Osteopathic Medicine/D.O.) differed from the other Plaintiffs (Doctors of Medicine/MDs), her studies required all the same medical science courses as other medical students. (Dkt. 86-14, Rotondo Dep. 38:2-12).

In addition to the general medical training Dr. Rotondo received, the three Surgery Department Plaintiffs each had four or five years of general medicine study earning their MDs, and then a five or six- year residency in general surgery then fellowships or specialty training (which comprised a small part of their overall training).   (Ex. 1, DOL Hearing, 24:13-27:10; Dkt. 86-10, Rakinic Dep., 5:3-22, 7:3-9; Dkt. 87-1, Rakinic Dep. Ex. 1, p. D-039; Dkt. 86-12, Vassileva Dep., 3:7-8, 5:2-3, 7:9-12, 52:7-15; 53:23-54:2, Dkt. 87-4, Vassileva Dep. Ex. 1, pp. E-028-E-029).

_____

[2] SIU further classifies physicians within the same department by divisions (e.g., "General Surgery" is the division in the Department of Surgery in which Plaintiffs Ahad and Rakinic worked). (Dkt. 60, Cox-Largent Decl. ¶11; Dkt. 57-10, Sharp Reply, Exhibit 2, p. 39; Dkt. 86-10, Rakinic Dep., 4:22-5:2).

**B. Defendants' Common Human Resources, Job Classification And Pay Practices**

1. <u>Same Job-Classification System Applied to All SIU Physicians/ Plaintiffs</u>

Per SIU's job-classification system, all tenure-eligible physician faculty are employed in three job positions: Assistant Professor, Associate Professor and Professor. (57-18, Faculty Guidelines, pp. 8909-8912). SIU hired Ahad, Rotondo and Vassileva as Assistant Professors and promoted Ahad and Vassileva to Associate Professor. (CX-13 at 1); (Dkt. 86-14, Rotondo Dep., 36:23-37:5; Dkt. 86-12, Vassileva Dep. 6:12-15; Dkt. 86-3, Ahad Dep. 54:20-25, 229:14-2:30-1; Dkt. 86-12, Vassileva Dep. 60:21-23). SIU hired Rakinic as an Associate Professor in October 2001 and promoted her to Professor in July 2016, her current position. (Dkt. 86-10, Rakinic Dep. at 4:22-5:18; 82:19-24; Dkt. 86-10, Rakinic Dep. Ex. 6, p. D-090; Dkt. 87-1, p. D-040).

2. <u>Defendants' Common (Mostly Male) Leadership Determined Compensation</u>.

Defendants have a single Human Resources (HR) department that handles employment matters of all SIU SOM and SIU P&S employees, including Plaintiffs. (Dkt. 57-2, Cox-Largent Dep. 54:3-54:8). The Master Agreement provides SIU SOM is ultimately the entity responsible for employment-matters for faculty-physicians employed by SIU Healthcare. (Dkt. 61, Master Agreement, pp. 2, 8, 10; Sections 1.3, 3.2, 4.1 and 4.3).[3]

SIU's Dean has had decision-making responsibility in all physician-compensation matters at issue. (*See generally* Dkt. 58, pp. 6-9). Since 2016, the Dean and Provost of SIU has been Dr. Jerry Kruse (male), who was preceded by Dr. J. Kevin Dorsey (male) for 15 years. Since at least

---

[3] Section 1.3 of the Master Agreement provides "████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████." (Dkt. 57-2, Cox-Largent Dep. 15:6-15:23, Dkt. 61, Master Agreement, p. 2). Further, pursuant to Section 4, SIU Healthcare creates an agency relationship with SIU pursuant to which SIU uses SIU Healthcare's revenue "████████████████████████████" (among other things). (Dkt. 61, Master Agreement, p. 10; Sections 4.1, 4.3).

2010, all CEOs of SIU Healthcare have been men.   (Dkt 57-2, Cox-Largent Dep. 17:1-19:17124:9-124:21).

    3.   <u>All Plaintiffs Received The Same Types Of Compensation.</u>

The Master Agreement requires all SIU Healthcare Members be compensated pursuant to a single compensation plan, named the SIU P&S "▮▮▮▮▮▮▮▮▮▮." (Dkt. 61, Master Agreement, p. 0100; Dkt. 62, SIU P&S Compensation Plan; Dkt. 57-2, Cox-Largent Dep. 86:14-87:12).   Notably, too, the Master Agreement exempts Dr. Rotondo from receiving compensation pursuant to the SIU Healthcare Compensation Plan, but explains physicians like Dr. Rotondo employed by SIU to work in a Federal Qualified Health Center can be "▮▮▮▮▮▮▮▮▮▮." (Dkt. 57-2, Cox-Largent Dep. 15:6-15:23; Dkt. 61, Master Agreement, p. 8).

The Dean of SIU and the CEO of SIU Healthcare are responsible for administration of the Compensation Plan.   (Dkt. 57-3, Weichold Dep.16:2-18:4).   Per the Compensation Plan, physician faculty members may receive an *academic base salary*, a *clinical base*; and *clinical incentive income*.   (Dkt. 57-2, Cox-Largent Dep. 112:6-112:19; Dkt. 62, Compensation Plan, pp. 17278-17281).   Physicians primarily receive two types of wages:

**Academic Base Salary**: SIU pays faculty-physicians a monthly fixed academic base salary which compensates physician faculty for their academic and administrative duties.   (Dkt. 57-2, Cox-Largent Dep.107:21-108:2, 112:1-112:19); and

**Clinical Compensation**: SIU pays clinical income, to faculty-physicians in relation to their clinical (patient service- related) duties.   (Dkt. 57-1, Answer ¶65; Dkt. 62, Compensation Plan, p. 17279).

Although not a SIU Healthcare employee, Dr. Rotondo received both types of compensation – academic base salary and clinical compensation – as explained in her offer letter.   (Dkt. 87-5,

Rotondo Dep. Ex. 2).

    4. <u>Defendants' Singular Practice for Determining Compensation</u>

There is a single process by which physicians' initial compensation is established and adjusted annually by SIU. (Dkt. 57-2, Cox-Largent Dep. 57:21-58:10). Plaintiffs describe the centralized process SIU uses for establishing initial compensation and adjusting compensation in their Rule 23 memorandum. (Dkt. 58, pp. 4-9).

According to Defendants, when they need to fill a position, the Department Chair completes a recruitment form for the position identifying a salary range, including an academic base salary and clinical compensation, which should be determined initially based, in part, on data from the American Association of Medical Colleges ("AAMC"). (Dkt. 57-2, Cox-Largent Dep. 140:18-143:12, 145:18-146:19, 157:20-158:18; Dkt. 63, Recruitment Tracking Form; Dkt. 60, Cox-Largent Decl. ¶¶14-16). Prior to hiring, Defendants' proposed salary range must be reviewed and approved by the HR Department, SIU's Affirmative Action office, the Office of Management and Budget and SIU's Dean. (Dkt. 57-2, Cox-Largent Dep. 143:11-143:18; Dkt. 60, Cox Largent Decl. ¶15). After a candidate is selected, "his or her total compensation is negotiated with the appropriate departmental chairperson." (Dkt. 57-5, Defs' Answer to Interrogatory No. 4). The Department Chair's recommended compensation is reviewed again by the Dean and other reviewing parties above. (Dkt. 57-2, Cox-Largent Dep. 143:19-144:12).

On an annual basis, all faculty members' compensation is formally reviewed, and any adjustments are determined and approved in a single, uniform process. (Ex.3, Weichold Dep. 18:11-19:15). As with initial compensation, Department Chairs recommend compensation adjustments for physicians in their departments, but those recommendations are subject to review and approval by SIU's Dean. (Dkt. 57-2, Cox-Largent Dep. 157:20-158:18). Unlike the Surgery

Department Plaintiffs, Dr. Rontodo's compensation was not reviewed by SIU Healthcare's Compensation Committee (a process described in more detail in Plaintiffs' Rule 23 briefing).

For SIU Healthcare physicians, each physician faculty member executes a Member Practice Agreement and an Annual Compensation Agreement reflecting their compensation. (Dkt. 57-2, Cox-Largent Dep. 94:7-101:19, 149:10-150:12; Dkt. 57-24, Ahad 2008 Annual Compensation Agreement). As a fellow-SIU physician, Dr. Rotondo was required to execute similar documents with similar purposes.

Dr. Rotondo signed a "Southern Illinois School of Medicine FQHC Provider Compensation Agreement" with substantially-similar (and some *identical*) language in the "SIU Physicians & Surgeons, Inc. Compensation Agreement." (*Compare* Dkt . 86-14, Rotondo Dep. 73:24-74:21, Dkt. 86-14, Rotondo Dep. Ex. 4, p. F-047; *with* Dkt. 86-12, Vassileva Dep., 65:5-12; Dkt. 87-4 Vassileva Dep. Ex. 6, p. E-067).   Both are one-page contracts with terms as to academic- salary and clinical income rates to be paid to the physician/Plaintiff. Both have the same function: to contractually-set the wage rates SIU will pay the given physician.

Dr. Rotondo also signed a "Provider Compensation Plan" – a contract with SIU that describes forms of income with terms similar to those the other Plaintiffs have in their "Member Practice Agreement[s]" (*Compare* Dkt . 86-14, Rotondo Dep., 75:11-20, Dkt. 86-14, Rotondo Dep. Ex. 5; *with* Dkt. 86-12, Vassileva Dep., 63:6-15; Dkt. 87-4, Vassileva Dep. Ex. 3).   Dr. Rotondo also signed a "FQHC Practitioner Pooling Agreement" explaining how her clinical income would be paid, akin to the "Compensation Plan" of SIU Healthcare Surgery Department Plaintiffs.   (Dkt. 86-14, Rotondo Dep., 129:20-130:20; Dkt. 86-16, Rotondo Dep. Ex. 27, pp. F-082 to F-088; Dkt. 62, SIU P&S Compensation Plan; Dkt. 57-2, Cox-Largent Dep. 86:14-87:12).

**C. Like All SIU Faculty-Physicians, Plaintiffs Had The Same Core Duties.**

All SIU physician faculty— including Plaintiffs and physician-colleagues, female and male— performed the same core job duties:   research, teaching and service/clinical duties. (Dkt. 57-18, Faculty Guidelines, pp. 8900-8908; Dkt. 57-2, Cox-Largent Dep. 83:1-86:4).   SIU gives Position Descriptions to all faculty-physicians that reflect their duties above. (*See, e.g.,* Dkt. 86-15, pp. 3-8; Dkt. 86-10, pp. 52-57; Dkt. 86-11, pp. 1-3; Dkt. 86-12, pp. 38-41; Dkt. 86-4, pp. 13-14).   Review of all these Position Descriptions shows all faculty-physicians have the same core duties, *i.e.* core duties described as "Administration", "Teaching", "Research" and "Service" (or highly-similar terms to same effect).   Though specific implementation for each faculty-physician may have been different, these four core job responsibilities existed for all Plaintiffs.

**D. Plaintiffs Statistical Evidence Shows A Common Pattern Of Adverse Treatment.**

The Court's conditional certification decision relied upon a data analysis summary prepared by Plaintiff's counsel, but now both parties' experts have analyzed total compensation and Plaintiff analyzed component parts of compensation, including academic base salary.   That evidence is described extensively in Plaintiffs' Rule 23 briefing.   (Dkts. 58, 77).

Generally speaking, for each component of compensation, after controlling for various factors such as year, specialization (i.e., Department), academic rank, and factors about physicians' backgrounds, Dr. Sharp found that "pay differences attributable to gender are statistically significant" at levels Courts have found sufficient to infer discrimination:

| Pay Type | Annual Difference (Females' Lower Pay) | T-Statistic | Probability |
|---|---|---|---|
| Academic Salary *Rate* | -$21,329 | -4.765 | 0.00 |
| Academic Salary *Paid* | -$18,318 | -3.575 | 0.00 |
| Clinical Compensation Paid | -$30,559 | -6.54 | 0.00 |

(Dkt. 57-9, Sharp Report, ¶¶13, 28-37, 49, 51-56).   Even after Dr. Sharp (1) addressed purported methodological flaws alleged by Defendants, (2) took into account alleged productivity differences (i.e., "RVU Control"), and (3) included all control variables from Defendants' new compensation data, Dr. Sharp concluded statistically significant disparities in total compensation existed at levels Courts have found sufficient to find discrimination occurred:

| Pay Type | Annual Difference | T-Statistic | Probability |
|---|---|---|---|
| Total Compensation (w/o RVU Control) | -$38,130 | -3.418/-6.030 | 0.00 |
| Total Compensation (w/ RVU Control) | -$12,217 | -2.608/-3.160 | 0.00 |

(Dkt. 57-10, Sharp Reply ¶¶67-86) (summarizing Tables 3 & 4).   Thus, Dr. Sharp found a common pattern of adverse treatment of Defendants' female physicians.

### III.   ARGUMENT

### A.   Defendants Misstate Applicable Procedural And Substantive Standards.

Defendants attempt to confuse this Court into believing that to be "similarly situated" for purposes of pursuing claims together under Section 216(b), Plaintiffs must be "similarly situated" to each other in the same way as the male physicians whom they claim were paid more.   That is not the appropriate standard for evaluating whether Plaintiffs' Equal Pay Act claims should proceed collectively.   Rather, the "similarly situated" standard under Section 216(b) asks how Plaintiffs facts and claims compare to each other.

### 1.   No "White-Collar" Exemption Exists Under The Equal Pay Act Exists.

Defendants suggest (at 3-4) that the Equal Pay Act's purview does not include professional employees' like Plaintiffs, but the Seventh Circuit has explained that "[e]ven a dollar's difference

based on sex violates both Title VII and the Equal Pay Act." *King v. Acosta Sales & Mktg.*, 678 F.3d 470, 473 (7th Cir. 2012) (reversing summary judgment because defendant asserted but did not prove that potential explanations for pay differences were actual factors other than sex). Thus, Courts routinely approve of application of the EPA to sophisticated, professional employees like Plaintiffs. *See, e.g., Hildebrandt v. Ill. Dep't of Nat'l Res.*, 347 F.3d 1014, 1021 (7th Cir. 2003) (discussing EPA verdict in favor of Ph.D. forestry program administrator who oversaw "different forestry programs" than her comparators); *see also Storrs v. Univ. of Cincinnati*, 271 F. Supp. 3d 910, 936 (S.D. Ohio 2017) (denying summary judgment on associate professor's EPA claim). Nothing about the nature of Plaintiffs' jobs exempt them or Defendants as their employers from the purview of the Equal Pay Act.

### 2. Decertification Is Evaluated In Light Of Dr. Ahad's Putative Class Claims.

Throughout their brief, Defendants cite a host of cases from other circuits and districts decertifying collective actions under Section 216(b). But Defendants cite no Seventh Circuit authority providing any standard this Court must apply or guidance it should consider in deciding Defendants' motion. That is because the Seventh Circuit's holdings do not favor Defendants.

As the Seventh Circuit explained, this court retains "wide discretion to manage collective actions" but should consider the remaining named-plaintiff's claims in deciding decertification. *Alvarez v. City of Chicago*, 605 F.3d 445, 449-51 (7th Cir. 2010) (reversing dismissal of decertified opt-in plaintiffs' claims and explaining that "[o]n remand, given that the claims of the named plaintiffs will still be before it, the district court should consider whether a collective action might be the most efficient judicial resolution of this matter after all").

When Rule 23 issues are also present, "the court of appeals has stated that 'there isn't a good reason to have different standards for the certification of the two different types of action,'

so it has incorporated the requirements for Rule 23 into § 216(b)." *Jones v. Cruisin' Chubbys Gentlemen's Club*, No. 17-cv-125-jdp, 2018 U.S. Dist. LEXIS 36157, at *4-5 (W.D. Wis. Mar. 6, 2018) (quoting *Espenscheid v. DirectSat USA, L.L.C.*, 705 F.3d 770, 772 (7th Cir. 2013)).

In *Espenscheid*, the Seventh Circuit explained that the standards for certification under Rule 23 and decertification of collective actions had effectively merged. 705 F.3d 770 at 772-73. In that case, the Court noted numerous options for addressing individualized inquiries, including bifurcation of liability and damages, use of a special master and limiting class certification to declaratory and injunctive relief. *Id.* at 773-76. Ultimately, the Court upheld decertification because Plaintiffs insisted on using "representative" evidence the Court found inappropriate.

More recently, the Seventh Circuit upheld certification (and, implicitly, denial of decertification) of a class and collective of foundry workers' claims for unpaid wages based on a common theory and common evidence. *Dekeyser v. Thyssenkrupp Waupaca, Inc.*, 860 F.3d 918, 922 (7th Cir. 2017). Defendants claimed that individualized differences in exposure to a toxic chemical at the foundry and medical benefits for uncompensated time spent showering and changing clothes at the found precluded certification. *Id.* at 921-22. But the Seventh Circuit upheld Rule 23 certification because "the plaintiffs have produced common evidence tending to prove their common assertion, as Rule 23 and section 216(b) require." *Id.* at 922.

Thus, Courts routinely consider motions for decertification and Rule 23 certification together. *See, e.g., Kramer v. Am. Bank & Tr. Co.,* No. 11 C 8758, 2017 U.S. Dist. LEXIS 48360, at *33-34 (N.D. Ill. Mar. 31, 2017) (granting Rule 23 certification and basing denial of decertification on "the same reasons" the Court found Rule 23(a) and Rule 23(b)(3) satisfied); *Schilling v. PGA Inc.*, No. 16-cv-202-wmc, 2018 U.S. Dist. LEXIS 41731, at *22 (W.D. Wis. Mar. 14, 2018) (granting Rule 23 certification and basing denial of decertification on the same

reasoning, and noting the low number of collective action opt-ins was not a basis for granting decertification).

Given the merging of these standards, Plaintiffs' hereby incorporate their motion, briefing and evidence in support of Dr. Ahad's motion for Rule 23 certification. (Dkts. 57-58 and 77; Dkt. 60-64). The Court should deny Defendants' motion for decertification for all of the reasons stated therein establishing typicality, commonality and predominance regarding Dr. Ahad's intentional and unintentional systemic gender pay discrimination claims (claims which address the compensation at issue in Plaintiffs' Equal Pay Act claims).

While satisfaction of Rule 23's standards will satisfy Section 216(b), failure to satisfy Rule 23 does not foreclose Section 216(b) certification. *See, e.g., Dekeyser v. Thyssenkrupp Waupaca, Inc.*, 314 F.R.D. 449, 456 (E.D. Wis. 2016), *aff'd* 860 F.3d 918 (noting satisfying Rule 23 satisfies Section 216(b), but "the converse may not always be true"). Accordingly, Plaintiffs address factors courts commonly consider in deciding decertification.

**B.    Plaintiffs Are Similarly Situated Notwithstanding Differences In Their Positions.**

Defendants correctly note (at 3), as this Court found, that in considering whether Plaintiffs are "similarly situated" at the decertification stage, the Court considers (1) whether the Plaintiffs share similar or disparate employment settings, (2) whether affirmative defenses would be applied individually to each plaintiff; and (3) fairness and procedural concerns. (Dkt. 53, p. 6). Contrary to Defendants' arguments, each factor favors continued certification of the collective action.

**1.    All Plaintiffs Share Similar Employment Settings.**

Defendants highlight differences among Plaintiffs without noting the substantial similarities in their employment. As described above, all Plaintiffs worked under the same job classification system, all were employed by Defendant SIU and the three Surgery Department

Plaintiffs were employed by both Defendants in the same department. All four had substantially similar medical educations and the three Surgery Department Plaintiffs had substantially similar surgical residencies.

Even as they advanced through Defendants' job classification system, all Plaintiffs (like all SIU physician faculty) had the same core job duties, i.e. research, teaching and service/clinical duties. SIU issued Position Descriptions to reflecting variations on the same four core duties: "Administration", "Teaching", "Research" (aka "Research/ Academic") and "Service." These core duties are the same regardless of the given physicians' Department or position-classification, *i.e.*. the core duties apply to all faculty-physicians, including Dr. Rotondo.

Elsewhere, Defendants contended the fact that Plaintiffs worked in different departments or divisions precluded certification. But here, three Plaintiffs, Drs. Ahad, Rakinic and Vassileva all were employed by the Department of Surgery. Thus, recommendations regarding their compensation all arose from a common decision-maker: the Chair of the Department of Surgery. Two – Dr. Ahad and Dr. Rakinic – even worked in the same Division – establishing further similarities.

Defendants focus heavily on the labels they place upon physicians. For example, SIU describes Dr. Ahad as a "bariatric surgeon," whereas a male comparator like Dr. Rea is interchangeably labeled a "breast surgeon" and/or "transplant surgeon" and/or "general surgeon". (Ex. 1, DOL Hearing, 155:20-157:7). Beyond being incorrect position-titles, these labels (and related defenses) are misleading for two primary reasons.

First, the labels focus on a small portion of each physician's overall job duties, *i.e.* certain clinical duties SIU claims are uniquely specialized. Second, the labels conceal the interchangeable nature of duties (*e.g.* so-called "trauma surgeons" Reid and Sutyak have also

performed bariatric surgeries at SIU; similarly, "bariatric surgeon" Ahad had performed trauma surgeries at SIU, etc.).[4] Thus, the specialty labels Defendants used on various positions are immaterial and do not show their positions are so different the collective action should be decertified, especially for the Surgery Department Plaintiffs.

Plaintiffs' common evidence further shows Defendants' contention about departmental differences will not bear the weight Defendants place upon it. For the Surgery Department Plaintiffs, those differences are irrelevant entirely. Additionally, Plaintiffs' expert evidence suggests they do not explain compensation disparities; even assuming departments operated independently, statistically-significant gender pay disparities still existed. Given the numerous common facts that exist for all Plaintiffs, their employment settings are not so different that decertification is warranted.

## 2. Individual Affirmative Defenses Do Not Predominate Over Common Evidence.

Defendants assert two affirmative defenses that are potentially applicable to Plaintiffs' Equal Pay Act claims. (Dkt. 39, p. 54-55). Defendants' fourth affirmative defense claims "Plaintiff's salary [sic] was based on factors other than sex" – including those Defendants identify elsewhere as the criteria considered in evaluating physician compensation. *Id.* Their sixth affirmative defense claims their "actions were taken in good faith with a reasonable belief that all actions complied with the law." *Id.*

Defendants claim (at 12-13, 18-19) their evidence that "each Plaintiffs' compensation was

---

[4] Dr. Reid (male) performed bariatric surgeries for SIU, yet SIU described him as a "trauma surgeon" for purposes of litigation to distinguish him from Dr. Ahad. (Ex. 2, Reid DOL Dep. Excerpt). Dr. Sutyak (male) performed bariatric surgeries for SIU patients and was director of an SIU bariatric program (prior to Dr. Ahad), despite being labeled a "trauma surgeon" by SIU and not having a bariatric (or trauma) fellowship. (Ex. 1, DOL Hearing, 103:25-105:2, 107:24-108:2, 110:4-110:11, 210:3, 211:20, 215:1-24).

based on factors other than sex" would consist of "four separate sets of evidence" that must be applied individually to each Plaintiff.   But, as Defendants' Rule 23 briefing already admitted, "to determine why any individual physician's compensation, either academic or clinical, changed from one year to the next the Court or jury would have to examine the individual circumstances of *every* faculty member, *every* year" (emphasis original).   (Dkt. 68, pp. 7-8).   This concession dooms Defendants' claims that their EPA defenses cannot be applied across the board.   By Defendants' own admission, examination of why a particular SIU physician received certain compensation in a specific year *requires* analysis of the individual circumstances for all physicians for every year.

To be sure, Defendants can and have pointed to different documents that say different things about each of the different Plaintiffs, some of which are supported by the record.[5]   But there is no evidence those differences actually matter.   Again, Defendants' submission of evidence regarding the decisions it purportedly made through a lone witness – Wendy Cox-Largent – undermines its position.

Defendants submission evidence of compensation through Cox-Largent proves one of two things:   (1) a single witness can testify about decisions across multiple departments and divisions; or, alternatively, (2) the evidence Defendants provide does not describe the *actual* reasons for its pay decisions – only information about physicians from documents that *may* have been the basis for compensation decisions.

---

[5] Some are not.   For example, Defendants claim that only two Plaintiffs have "Medical Director Agreement[s]" (*e.g.,* Dkt. 86-4 to 86-5, Ahad Dep. Exs. 29-33), "there is no common set of employment agreements among Plaintiffs." (Dkt. 86-1 at 10).   However, careful review shows Plaintiffs are not parties to these Agreements; they are agreements between SIU and a third-party which Plaintiffs must "acknowledge and accept."

Without the benefit of merits discovery, Plaintiffs contend the later is true. Cox-Largent admitted she was not personally involved in making recommendations for physicians' compensation, other providing data. (Dkt. 57-2, Cox-Largent Dep. 151:1-17). Given her admission, Defendants cannot show individual differences like fellowships, medical director agreements or specialties actually matter. Thus, Defendants have not met their evidentiary burden at this stage.

Because others were involved in making recommendations and approving compensation decisions, at any trial on the merits, Defendants' predominantly male decision-makers (i.e., Deans and Department Chairs) must testify about why they made compensation decisions regarding physicians. Defendants contend that will be needlessly time-consuming and burdensome even though three of the four opt-ins are in the same department and two are in the same division. The parties' experience in Dr. Ahad's one-day DOL hearing involving nearly identical issues shows such evidence can be presented efficiently.

During Dr. Ahad's one-day DOL hearing, Dr. Ahad undermined Defendants' claim that her special training and duties or other facts differentiated her from her colleagues. She proved her two-year fellowship was only a small part of her education and training, that SIU Surgeons commonly performed surgeries outside their fellowship specialties and that the male head of SIU's trauma surgery center does not have a fellowship in trauma or critical care surgery; his fellowship was in immunology research. (Ex. 1, DOL Hearing, pp. 25:25-26:14, 29:22-30:25, 147:3-149:2).[6]

---

[6] Here, Dr. Rakinic testified about a great deal of cross-over work that she and other colleagues performed in others' so-called specialty areas, including trauma call. (Dkt. 86-10, Rakinic Dep., 34:5-17, 135:18-136:2).

Further undermining Defendants' purported distinctions, Dr. Ahad showed SIU asked her to switch her focus and adopt breast surgery as her primary surgical practice, demonstrating she had equal skill, education and training to perform various surgical positions within the Division of General Surgery. (Ex. 1, DOL Hearing, 80:9-22, 195:7-20).

Ultimately, at the DOL hearing, the Administrative Law Judge found (Dkt. 57-20, DOL Order, at 11):

> The weight of the evidence establishes that all of the surgeons performed a variety of different surgeries.
>
> … Like Dr. Ahad, each surgeon was required to spend a portion of his or her time doing teaching, research and service. (CX 16). Though each one focused his or her specific service duties on one or more subspecialties in general surgery, they all could and often did perform surgeries outside their specific subspecialty areas.
>
> I find that Drs. A, B, E, I and K have similar experience, qualifications, education, job responsibilities and specialized knowledge, in addition to having substantially the same duties and responsibilities, as Dr. Ahad. …
>
> Based on the forgoing reasons, I find that the specific employment in question is an Assistant Professor with an appointment to the Division of General Surgery. Based on the record Drs. A, B, E, I and K were all employed in the specific employment and had similar experience and qualifications.

Here potentially applicable affirmative defenses do not mandate decertification of the collective action. Given that Rule 23 principles are also considered, Plaintiffs note one court's explanation that "[i]t cannot be that the mere availability of an affirmative defense applicable to some but not all plaintiffs means that individual claims necessarily predominate, or defendants would have an automatic means to deny certification of virtually any class action. That is not the law." *Warnell v. Ford Motor Co.*, 189 F.R.D. 383, 388 (N.D. Ill. 1999).

### 3. Fairness and Procedural Concerns Favor One Lawsuit Over Creating Four.

Defendants contend (at 20-21) that maintaining this case as a collective action "would unfairly require Defendants to conduct what should be four separate trials in a single trial" and

"inject chaos into the fact-finding process" (internal quotation and citation omitted). That may be true for the cases Defendants rely upon – all of which involved between five and 500 times as many opt-in plaintiffs as the three involved here.[7]

Having the three opt-in Plaintiffs continue to litigate their individual Equal Pay Act claims alongside Dr. Ahad's systemic discrimination claims will pose no difficulty. As noted above, the three Surgery Department Plaintiffs worked in the same Department, and two worked in the same Division. Thus, there would be substantial overlap of evidence in their claims from common decision-makers.

Despite that, Defendants ask this Court to require four different juries to hear the complicated entity structure Defendants maintain, the joint employer evidence arising from Defendants' overlapping human resources functions, the virtually uniform process for setting and changing compensation pursuant to the Master Agreement and Compensation Plan and all of the other background evidence necessary to understand Defendants' compensation practices and decisions (e.g., which salary surveys Defendants used in conjunction with determining pay).

Each of the four trials Defendants contend would be necessary will require presentation of that complicated evidence – rendering the total trial time required by this Court even longer than what would be necessary to present the purportedly individualized evidence Defendants' claim is required. That's particularly true given that the example provided by Dr. Ahad's one-day DOL

_____

[7] *See, e.g., Hundt v. DirectSat USA, LLC*, 294 F.R.D. 101, 103 (N.D. Ill. 2013) (18 opt-in plaintiffs); *Camilotes v. Resurrection Health Care Corp.*, 286 F.R.D. 339, 343 (N.D. Ill. 2012) (86 opt-in plaintiffs); *Russell v. Ill. Bell Telephone Co.*, 721 F. Supp. 2d 804, 808 (N.D. Ill. 2010) (487 opt-in plaintiffs); *Anderson v. Cagle's, Inc.*, 488 F.3d 945, 950 (11th Cir. 2007) (approximately 2,200 opt-in plaintiffs); *Blair v. TransAm Trucking, Inc.*, No. 09-2443-EFM-KGG, 2018 U.S. Dist. LEXIS 51641, *35 (D. Kan. Mar. 28, 2018) (approximately 1,930 opt-in plaintiffs); *Reed v. County of Orange*, 266 F.R.D. 446, 449 (C.D. Cal. 2010) (683 opt-in plaintiffs).

hearing addressing virtually the same issues (i.e., did she have the same job as those to whom she compared herself that earned more).   (Dkt. 57-20, DOL Order).

The likelihood of error or inconsistency in evaluating that common evidence far outweighs Defendants undeveloped and unsupported due process concerns.   Defendants have not described how their due process rights would be impacted in any way by having a combined trial involving four plaintiffs – nor could they given three worked in the same Department, and at least one will be pursuing systemic gender pay discrimination claims under other statutes (possibly on behalf of others).   If anything, analyzing the opt-in Plaintiffs' claims individually, divorced from the body of evidence Dr. Ahad has presented regarding here claims of systemic gender discrimination, would be unfair to Plaintiffs.

### C.   Dr. Rotondo Is Similarly Situated Despite Not Working For SIU Healthcare.

Defendants make much of their assertion that "Dr. Erica Rotondo…was exclusively employed by SIU-SOM as part of its federally qualified health center ('FQHC')." (Dkt. 86-1 at 7). Admittedly, Dr. Rotondo had certain agreements and plans labeled "FQHC", rather than rather than the "Member Practice Agreement[s]" the Surgery Department Plaintiffs had.   But comparison of these various documents shows they have the same core terms and functions and nothing about the fact she was not employed by SIU Healthcare shows she is not "similarly situated."

### 1.   Dr. Rotondo's Purported "Release of Claims" Is Unenforceable.

Defendants claim the fact that Dr. Rotondo signed a release makes her claims sufficiently different from other Plaintiffs without noting the release Defendant solicited shortly after this lawsuit was filed is unenforceable.   SIU's solicitation of the release of claims while the putative class action was questionable.   *See Slavkov v. Fast Water Heater I, LP*, No. 14-cv-04324-JST,

2015 U.S. Dist. LEXIS 149013, at *6-9 (N.D. Cal. Nov. 2, 2015) (noting potential confusion and coercion that can arise when an employer solicits releases from a putative class member). Notably, Defendant SIU's release agreement failed to inform Dr. Rotondo that the putative class action was pending.   (Dkt. 86-16, Rotondo Dep. Ex. 26).   Regardless, Dr. Rotondo cannot release her EPA claims without Department of Labor or judicial approval, so her release is unenforceable.

Because Equal Pay Act claims are enforced under Section 216(b) of the FLSA, and FLSA claims cannot be waived through private settlement agreements without DOL or judicial approval, Defendant SIU's release is invalid as a matter of law.   *Brook. Sav. Bank v. O'Neil*, 324 U.S. 697, 709-10 (1945) ("To permit an employer to secure a release from the worker … will tend to nullify the deterrent effect which Congress plainly intended that § 16 (b) should have").[8]   Thus, Dr. Rotondo's release agreement does not raise any individual defense the Court must address separately – it is unenforceable as to the EPA claims she seeks to pursue.

---

[8] *See Boaz v. FedEx Customer Info. Servs.*, 725 F.3d 603, 607 (6th Cir. 2013) ("by folding the Equal Pay Act into the FLSA, Congress meant for claims under the Equal Pay Act to be unwaivable as well"); *see also Schwartz v. Florida Bd. of Regents*, 807 F.2d 901, 906 (11th Cir. 1987) (stating in dicta that allowing an employee to prospectively waive her rights under the EPA would thwart the EPA's legislative policy); *Fontenot v. Safety Council of Sw. La.*, No. 2:16-CV-84, 2017 U.S. Dist. LEXIS 101100, at *22 (W.D. La. June 28, 2017) ("Both Supreme Court and Fifth Circuit precedent indicate that a claim under the EPA, which is incorporated within the FLSA, may not be waived").   *Compare favorably Walton v. United Consumers Club*, 786 F.2d 303, 306 (7th Cir. 1986); *see also Ladegaard v. Hard Rock Concrete Cutters, Inc.*, No. 00 C 5755, 2001 U.S. Dist. LEXIS 18370, at *20 (N.D. Ill. Nov. 7, 2001) (invalidating releases of putative class members' FLSA and comparable state law claims because, "like the United States Supreme Court's recognition in *Brooklyn Sav. Bank* that the FLSA embodies a public right, Illinois courts have recognized that both the IMWL and the IWPCA involve public rights").

### 2. Dr. Rotondo Is Similarly Situated To The Surgery Department Plaintiffs.

Defendants argue (at 7-8) that Dr. Rotondo is not a member of the collective this Court and should not have received notice.[9]  Consistent with Plaintiffs' interpretation of the Court's order (dkt. 29, p. 21), Plaintiffs' counsel sent notice to all current and former faculty physicians at SIU School of Medicine employed within three years of September 28, 2017, as well as all current and former faculty at SIU Physicians & Surgeons, Inc. employed in that time-frame (i.e., to female physicians employed by either entity, not only those employed by both). (Dkt. 86-2, Def. Ex. A, p.1).

When notice was sent, Defendants did not contend sending notice to individuals only employed by SIU was required.   In fact, Plaintiffs asked Defendants for information about individuals "to whom the Court directed notice to be sent" and Defendants' counsel responded by providing contact information for women not employed by SIU Healthcare.  (Ex. 3, Wilson 9/29/2017 Email, Wilson 10/3/2017 Email).   If Defendants contended notice should have issued only to those employed by *both* entities, it could have explained its position at that time, when Plaintiffs provided Defendants with the list of individuals to whom notice had been sent or when Dr. Rotondo opted into the lawsuit.   They did not.

Defendants contend the fact that Dr. Rotondo was not employed by SIU Healthcare requires decertification.   But, as noted above and in the parties' Rule 23 briefing, Defendants have a single Human Resources (HR) department that handles employment matters all SIU physicians, including Plaintiffs.  (Dkt. 57-2, Cox-Largent Dep. 54:3-54:8).   Defendants' Master Agreement

---

[9] Defendants (at 7) rely on correspondence (dkt. 52-10, p. 2) indicating that Dr. Rotondo should be excluded from the Rule 23 class, but that communication related to who should be analyzed by the parties' experts, not who should receive notice.   Both parties' experts analyzed female physicians jointly employed by Defendants.

provides that SIU is ultimately the entity responsible for employment- matters for faculty physicians like the Surgery Department Plaintiffs, requires use of SIU Healthcare revenue for compensation of physicians (among other things) (Dkt. 61, Master Agreement at 2, 8, 10; Sections 1.3 and Section 4.1 & 4.3(e); Dkt. 57-2, Cox-Largent Dep. 15:6-15:23).

Like all other Plaintiffs, Dr. Rotondo received the same type of compensation determined in largely the same manner. Like all other Plaintiffs, the Dean approved and signed Dr. Rotondo's wage contracts. (*See, e.g.,* Dkt. 86-14, p. F-050). The fact that Dean Dorsey cannot recall participating in establishing any Plaintiffs' academic salary (as claimed at Dkt. 68-14, Defs' Ex. G, ¶ 2) shows he exercised his oversight role (or failed to exercise it) in a manner common to all Plaintiffs.

Thus, in raising the fact Dr. Rotondo's sole employer was SIU, Defendants describe a distinction without a difference. Given similarities in the joint entities' decision-making processes, shared human resources functions and personnel between the various entities, and the fact that all compensation decisions were subject to review and approval by the SIU Dean and Provost, the factual differences arising from Dr. Rotondo's employment by SIU only are irrelevant.

## IV.    CONCLUSION

As the Court found in granting conditional certification, Plaintiffs are "similarly situated" as stated in Section 216(b), and all Plaintiffs' EPA claims should proceed in this lawsuit.

Respectfully submitted this 3rd day of August 2018.

/s/ J. Bryan Wood
Counsel for Plaintiffs

J. Bryan Wood (ARDC #6270845)
Ryan O. Estes. (ARDC #6312755)
**The Wood Law Office, LLC**
303 W. Madison St., Suite 2650
Chicago, IL 60606
bryan@jbryanwoodlaw.com
Phone: (312) 554-8600
Fax: (312) 577-0749

Michel Brown
**DVG Law Partner LLC**
4321 W. College Avenue, Suite 200
Appleton, Wisconsin 54914
mbrown@dvglawpartner.com
Phone: 920-757-2488
Fax: 920-273-6177

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that the forgoing memorandum complies with the type-volume limitation in Local Rule 7.1(B)(4)(b)(1) because it contains 6,750 words according to the word count of Microsoft Word / Microsoft Office 365 Business.

/s/ J. Bryan Wood

## CERTIFICATE OF SERVICE

On August 3, 2018, the undersigned served the motion response and documents attached thereto on all counsel of record by filing it via the Court's electronic case filing system.

/s/ J. Bryan Wood