E-FILED
Friday, 17 August, 2018  02:57:39 PM
Clerk, U.S. District Court, ILCD

# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD, ILLINOIS

| | | |
|---|---|---|
| SAJIDA AHAD, MD, on behalf of herself and all others similarly situated, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No. 15-cv-03308 |
| | ) | |
| BOARD OF TRUSTEES OF SOUTHERN ILLINOIS UNIVERSITY SIU PHYSICIANS & SURGEONS, INC., d/b/a SIU HEALTHCARE | ) ) ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' REPLY IN SUPPORT OF
## MOTION TO DECERTIFY COLLECTIVE ACTION

Defendants, the Board of Trustees of Southern Illinois University ("SIU-SOM") and

SIU Physicians & Surgeons, Inc. d/b/a SIU Healthcare ("SIU-HC"), by and through their

attorneys, HeplerBroom, LLC, pursuant to leave granted by the Court in Text Orders dated

May 4, 2018 and July 13, 2018, submit this Reply in Support of their Motion to Decertify

Collective Action (d/e 86) ("Motion") and Memorandum of Law in Support of Motion to

Decertify Collective Action (d/e 86-1) ("Memorandum") and move the Court to decertify the

collective action conditionally certified by the Court on September 29, 2017.

**Introduction**

The facts elicited through discovery since the Court conditionally certified this action unequivocally demonstrate that the collective action procedure is not appropriate in this case.  The Motion to Decertify Collective Action should be granted.

**Argument**

**A.      Defendants do not "Misstate Applicable Procedural and Substantive Standards."**

Plaintiffs contend that "Defendants attempt to confuse this Court into believing that to be 'similarly situated' for purposes of pursuing claims together under Section 216(b), Plaintiffs must be 'similarly situated' to each other in the same way as the male physicians whom they claim were paid more."  Opposition at 10.  The discussion in Defendants' Motion and Memorandum in Support (d/e 86-1) shows this is not the case.

Defendants set forth the facts regarding the four Plaintiffs' positions and compensation structures, comparing these Plaintiffs to each other.  d/e 86, p. 3-17. Defendants then established that the facts in the record concerning only these Plaintiffs show that they are not "similarly situated" to each other under the applicable law and, therefore, the collective action should be decertified.  d/e 86-1, p. 8-12.  It was only in the subsequent discussion of what each Plaintiff would have to prove to present her case that Defendants discussed "the male physicians whom they claim were paid more."  *Id.* at 13-17.  Thus, Defendants focused on the fact that *these Plaintiffs* are *not* similarly situated before noting the logistical concerns flowing from each of these Plaintiffs identifying a

different set of allegedly comparable physicians.  Defendants did not make any "attempt to confuse the Court" but rather methodically discussed all factors identified by this Court as pertinent to collective action certification.

## 1.  Defendants do not claim they, or "white-collar" jobs, are exempt from the EPA

Plaintiffs argue that "Defendants suggest… that the Equal Pay Act's purview does not include professional employees like Plaintiffs."  Opposition at 10 (citing Memorandum at 3-4).  The discussion cited by Plaintiffs was not a "suggestion" by Defendants; it contained statements from the Court of Appeals for the Seventh Circuit regarding "the framework of the EPA, as well as the purpose of collective actions," which "the Court should take into account" in deciding whether to decertify the collective action.  d/e 86-1, p. 3-4.  Defendants do not argue that no group of doctors or professionals can ever make an EPA claim; Defendants argue that *these four Plaintiffs* are not similarly situated and thus proceeding as a collective action is not appropriate.

Plaintiffs cite *King v. Acosta Sales & Mktg., Inc.*, 678 F.3d 470, 473 (7th Cir. 2012), and its statement that "[e]ven a dollar's difference based on sex violates … the Equal Pay Act." Opposition at 10-11.  *King*, however, does not discuss a collective action or whether many plaintiffs were "similarly situated." *See id.*  Further, Plaintiffs' citations to *Hildebrandt* and *Storrs* (Opposition at 11) provide no support for their claims.  *Hildebrandt* does not contain any discussion of the plaintiff's Equal Pay Act claim or "approve of application of the EPA;" the plaintiff there obtained a verdict at trial on an Equal Pay Act claim but the

merits of the EPA claim were not at issue on appeal.  *See Hildebrandt v. Illinois Dept. of Nat. Res.*, 347 F.3d 1014, 1024 (7th Cir. 2003).  *Storrs* involved a single plaintiff who was an assistant professor and claimed male assistant professors in the same department made more money.  The Court found issues of fact as to the reasons the male comparators were paid more money and, in doing so, illustrates Defendants' point here—the highly individualized inquiry required to prove or disprove an EPA claim. *Storrs v. Univ. of Cincinnati*, 271 F. Supp. 3d 910, 934–35 (S.D. Ohio 2017).  The case does not contain any discussion of the issue of whether several plaintiffs were "similarly situated" *to each other* for purposes of a collective action under the EPA and, therefore, is inapposite. Defendants do not claim they are "exempt … from the purview of the Equal Pay Act" (Opposition at 11); Defendants are seeking to enforce the requirement that plaintiffs in a collective action be "similarly situated," which these Plaintiffs have not shown.

**2.      The Court has already provided the standard to be applied.**

Plaintiffs incorrectly argue that "Defendants cite no Seventh Circuit authority providing any standard this Court must apply or guidance it should consider in deciding Defendant's motion."  Opposition at 11.  First, Defendants cited many Seventh Circuit cases, and cases from district courts within the Seventh Circuit, in their Memorandum (d/e 86 at 2-5) including, as discussed above, statements from that court regarding the proper applicability of the EPA and proper use of a collective action.  More importantly, this Court already set forth the "standard" to be applied in deciding whether the matter should

proceed as a collective action (d/e 53, at 6), and Defendants specifically addressed those three factors in their Motion and Memorandum in demonstrating that decertification is appropriate.

Plaintiffs' claim that Defendants did not cite Seventh Circuit authority because those "holdings do not favor Defendants" (Opposition at 11) is likewise untrue.  Defendants (unlike Plaintiffs) discussed cases from other district courts that actually apply the three factors considered for decertification, whereas Seventh Circuit authority does not contain such in-depth analysis of those factors.

Nor are the cases cited by Plaintiffs (Opposition at 10-11) unfavorable to Defendants. *Espenscheid* involved satellite dish installation and repair technicians who claimed they were not paid required minimum and overtime wages.  *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 772 (7th Cir. 2013).  *DeKeyser* involved claims by foundry workers that they should have been paid for time spent changing clothes and showering at the end of their shifts. *DeKeyser v. Thyssenkrupp Waupaca, Inc.*, 860 F.3d 918, 920 (7th Cir. 2017).  Neither case involved the Equal Pay Act and, consequently, neither case discussed the issue presented here—whether the plaintiffs were "similarly situated" for purposes of an EPA collective action.

Plaintiffs advocate for the Court to consider decertification of the collective action and certification of a class action at the same time, using the same standard.  Opposition at 11-13.  As noted above, this Court has already articulated the standard for assessing a collective

action, and it is not the same as the standard for Rule 23 class action certification.  While Judge Posner stated in *Espenscheid* that "there isn't a good reason to have different standards for the certification of the two different types of action, and the case law has largely merged the standards," he stopped short of ruling that the requirements of Rule 23 officially have been merged into the collective action analysis, and instead, for purposes of that case, concluded that the court could, "with no distortion of our analysis, treat the entire set of suits before us as if it were a single class action."  *Espenscheid*, 705 F.3d at 772.

Here, the analysis would be distorted by conflating Rule 23 with a collective action because, unlike the 2,341 satellite technicians in *Espenscheid*, there is only one named Plaintiff and only three opt-in Plaintiffs.  Where only three Plaintiffs choose to opt into the suit and be bound by its outcome, it makes little sense for the Court to force 160 other potential class members to opt out of a class action or else be bound by the outcome.  *See id.* at 771.  Nonetheless, to the extent the Court deems it relevant, Defendants incorporate by reference their Opposition to Plaintiff's Motion for Class Certification (d/e 68).  Both that brief and the Motion and Memorandum demonstrate that proceeding as either a collective action or a class action is not appropriate in this case.  In fact, the Seventh Circuit in *Espenscheid*, in affirming the district court's decertification of the collective action, relied on one of the very arguments made by Defendants here in opposing class certification. Calculating the claimed damages for the 2,341 technicians would require an individual analysis for each class member and thus the case was inappropriate for collective status.  Similarly, cases requiring

individualized hearings to assess damages are not appropriate for class consideration under

Rule 23(b)(3). *Aiello v. Providian Financial Corp.,* 239 F.3d 876, 881 (7th Cir. 2001) ("[T]he

predominance of individual-specific issues relating to the plaintiffs' claims for

compensatory and punitive damages in turn detracts from the superiority of the class

action device in resolving these claims"); *Reed v. Advocate Health Care,* 268 F.R.D. 573, 595

(N.D. Ill. 2009) ("[W]here the issue of damages "does not lend itself to . . . mechanical

calculation, but requires separate "mini-trial[s] of an overwhelmingly large number of

individual claims, the need to calculate individual damages will defeat predominance.");

*Hyderi v. Wash. Mut. Bank FA*, 235 F.R.D. 390, 403 (N.D. Ill. 2006) (considered cumulatively

with other individualized issues, individualized damages issues defeated predominance

and superiority requirements).

## B.      Plaintiffs are not similarly situated.

Plaintiffs ask the Court to view the four Plaintiffs who held strikingly different

positions at the 30,000 foot level, arguing that all Plaintiffs were in the same job

classification system, had similar medical educations and residencies, and had the same

broad categories of duties (administration, teaching, research, and service).  Opposition

at 13-14.  They correctly note, as Defendants acknowledge, that three of the Plaintiffs were

in the same department; however, as established in the Motion and Memorandum, those

three Plaintiffs' employment settings were vastly different.

Plaintiffs ignore the details provided by Defendants, but at this stage, the Court must conduct a "more stringent inquiry" and "more rigorously review" the available facts to determine if Plaintiffs are, in fact, similarly situated. *Weil v. Metal Techs., Inc.*, 260 F. Supp. 3d 1002, 1020 (S.D. Ind. 2017); *Brown v. Club Assist Rd. Serv. U.S., Inc.*, 2013 WL 5304100, at *12 (N.D. Ill. Sept. 19, 2013). The Court must look to whether there are "significant differences in *the duties performed by the plaintiffs*" (*Hundt v. DirectSat USA, LLC*, 294 F.R.D. 101, 104 (N.D. Ill. 2013) (emphasis added)) and consider whether the Plaintiffs' "experiences—what they actually *did*—varied greatly which would require individual analyses" (*Blair v. TransAm Trucking, Inc.*, 2018 WL 1523101, at *25 (D. Kan. Mar. 28, 2018) (emphasis in original)), whether "Plaintiffs' experiences … vary from day to day, and from individual to individual" (*Reed v. County of Orange*, 266 F.R.D. 446, 458 (C.D. Cal. 2010)), and whether the Plaintiffs had a "wide variety of work assignments and varied compensation structures affecting the purported class." *Anderson v. Cagle's, Inc.*, 488 F.3d 945, 952 (11th Cir. 2007).

If so, then proceeding as a collective action is "oxymoronic" and "not appropriate when determining whether a plaintiff has a viable claim requires a detailed, fact-specific inquiry." *Russell v. Ill. Bell Telephone Co.*, 721 F. Supp. 2d 804 (N.D. Ill. 2010); *Camilotes v. Resurrection Health Care Corp.*, 286 F.R.D. 339, 346 (N.D. Ill. 2012). Here, when the Court zooms in from the high-altitude view taken by Plaintiffs and looks at what the Plaintiffs actually *did* on a day-to-day basis, and how their individual compensation structures

varied enormously depending on a multitude of individualized factors, the only conclusion is that proceeding as a collective action would be improper.

There is no question that Ahad was not similarly situated to the other Plaintiffs: she is the only person to ever hold the position of Medical Director for Bariatric Surgery. d/e 86, p. 3-4.  Rakinic was not similarly situated to any other Plaintiff because she was hired specifically to set up the colorectal residency program and is the only Plaintiff to reach the position of Professor.  *Id.* at 4-5.  Vassileva was not similarly situated to any other Plaintiff because she focused on cardiac procedures and was Medical Director for the Memorial Valve Program.  *Id.* at 5.  Rotondo was not similarly situated to any other Plaintiff because she was a family practice physician, was a Doctor of Osteopathic Medicine (D.O.), and was exclusively employed by the FQHC.  *Id.* at 6.  The facts show that, when looking at what each Plaintiff *actually did* in their jobs, each plaintiff had unique training in bariatric surgery, colorectal surgery, cardiothoracic surgery, or osteopathic family medicine that not only qualified her for her position, but which she also practiced on a daily basis in caring for patients or teaching medical residents.

Plaintiffs contend that "there is no evidence that those differences actually matter." Opposition at 16.  Nothing could be further from the truth.  Defendants submitted a plethora of evidence that the individual differences among the four Plaintiffs' employment settings significantly and uniquely affected the gravamen of Plaintiffs' claims—their pay.  The evidence shows that all four Plaintiffs' academic base salary was

determined by different considerations: (1) Ahad's academic base was wholly determined by her position of Medical Director of the Bariatric Surgery Program at St. John's Hospital; (2) Vassileva's base was adjusted based on market forces and preservation of the division and a promotion to Associate Professor; (3) Rakinic's was adjusted based on cost of living increases, two individual equity adjustments (for different reasons), an administrative appointment, and a promotion to Professor; and (4) Rotondo's was based on her position as a clinical, non-tenure track faculty member with a separate compensation structure.  d/e 86, p. 7-17.

The evidence also shows that all four Plaintiffs' clinical income was similarly uniquely affected by the differences in their positions:  (1) Ahad was not productive enough in her startup practice and therefore did not earn enough to cover her guaranteed salary; (2) Vassileva successfully developed her clinical practice but later her productivity nose-dived due to changes in referrals and interpersonal relationships; (3) Rakinic has been very productive throughout but occasionally suffers when taking on a partner; and (4) Rotondo's clinical income did not depend on her individual productivity.  *See id.*  The individual differences "actually matter" and are so significant that the collective action should be decertified.

## C.      Affirmative defenses cannot be applied across the board.

The second factor considers "whether affirmative defenses raised by the defendant would have to be individually applied to each plaintiff."  d/e 53, p. 6. If these Plaintiffs

meet their *prima facie* case under the EPA, "the burden of proof shifts to the employer to show that the pay disparity is due to: (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) any other factor other than sex." *Fallon*, 882 F.2d at 1211 (citing 29 U.S.C. § 206(d)(1)(i)-(iv)). "These are affirmative defenses on which the employer bears the burden of proof (persuasion)." *Id.* "The fourth affirmative defense (any other factor other than sex) is a broad 'catch-all' exception and embraces an almost limitless number of factors, so long as they do not involve sex." *Id.*

For this factor to favor proceeding as a collective action, there would have to be an affirmative defense that applies to all Plaintiffs equally while only presenting one set of evidence.  In other words, Defendants would need to present evidence of a single factor other than sex that applied in the same way to all Plaintiffs.  Such a defense does not exist in this case because the defense of pay being based on "any other factor other than sex" must be presented with individualized evidence as to the factors underlying each Plaintiffs' compensation, including, but not limited to, level of education, specific credentials, years of experience in her field, specific job responsibility, specialized job knowledge, medical specialty, seniority, merit, available funding, degree of independent responsibility, productivity, market forces, the nature of her duties, and other applicable criteria.  There is no question that this defense must be "individually applied to each

Plaintiff" and would consist of four separate sets of evidence.  Accordingly, this factor also strongly favors decertification.

Plaintiffs argue that Defendants would not have to present "four separate sets of evidence" because, in prior Rule 23 briefing, Defendants stated that "to determine why any individual physician's compensation, either academic or clinical, changed from one year to the next the Court or jury would have to examine the individual circumstances of *every* faculty member, *every* year."  Opposition at 16 (emphasis in original) (citing d/e 68, p. 7-8).  Plaintiffs claim that this "concession dooms Defendants' claims that their EPA defenses cannot be applied across the Board."  Opposition at 16.

The basis for this argument by Plaintiffs is a mystery; the prior statement actually proves Defendants' point.  If the issue applied "across the board," the Court or jury would only have to examine the circumstances of *one physician*, and then apply the outcome of that examination to *all physicians*.  The defenses do not apply "across the board" because the basis for the compensation of each individual physician requires an individualized comparison to other physicians, as well as consideration of several other factors, many unique to the position in question.  Plaintiffs' argument is without merit.

Further, Plaintiffs completely ignore the fact that defense of the case would include rebuttal of Plaintiffs' claims that there were male employees earning higher wages for performing equal work requiring substantially similar skill, effort, and responsibilities, yet each Plaintiff has identified a *different* set of alleged comparator physicians.  d/e 86-1,

p. 13-17.  Plaintiffs have not identified a "collective" set of comparator physicians: (1) Ahad identifies Drs. Cetindag, Wall, Rea, Wohltmann, and Hassan; (2) Vassileva identifies Drs. Hazelrigg, Arentzen, Pyle, and Stevens; (3) Rakinic identifies Drs. Sutyak, Wall, Reid, Whitehurst, and Garfinkel; and (4) Rotondo identifies Drs. Higuchi, Dynda, Kreckman, Gleason, and Lausen.

Each Plaintiff, however, must show a "common core of tasks" with male comparators and show that their actual job performance and content was substantially equal to that of male comparators.  Again, four different sets of evidence would need to be presented by both Plaintiffs and Defendants, and defense of the Plaintiffs' contentions regarding those who allegedly perform equal work cannot possibly be applied "across the board."  Plaintiffs fail to even acknowledge that they have each individually identified different sets of purported comparators which necessarily makes each Plaintiff's case, and the defense to each Plaintiff's case, separate and dissimilar.

Plaintiffs also claim that Defendants' arguments are undermined because Ahad was asked "to switch her focus and adopt breast surgery as her primary surgical practice." Opposition at 18.  Plaintiffs claim this shows she had "equal skill, education and training to perform various surgical positions."  *Id.*  To the contrary, this is just another individualized circumstance to be presented at trial; there is no evidence any other Plaintiff was offered such a change in practice.  Further, Plaintiff ignores the individualized reason Ahad was offered this change:  she was not productive enough in

her current practice.  Plaintiffs' argument again proves Defendants' point that individual, fact-specific inquires must be made as to each Plaintiff.

Plaintiffs argue that the evidentiary submissions by Wendy Cox-Largent on behalf of Defendants somehow show that Defendants can submit "evidence regarding the decisions it purportedly made through a lone witness."  Opposition at 16.  On the next page, however, Plaintiffs concede that Cox-Largent "was not personally involved in making recommendations for physicians' compensation, other [than] providing data." *Id.* at 17.  Obviously, Defendants would call those who considered the myriad of factors that are considered when determining compensation to testify regarding those factors.  As the evidence shows, these individuals cannot testify as to one factor that determined all Plaintiffs' compensation and must address each Plaintiff separately.  Cox-Largent did largely "provide data" and laid the foundation for documents that support Defendants' arguments.  *See* d/e 86-19, the Second Declaration of Cox-Largent.  In any event, even if Defendants could use only one witness to present its defenses, the question is whether that witness would present evidence that universally applies to all Plaintiffs or, conversely, whether the evidence must be applied individually to each Plaintiff.  Here, there is no doubt that separate evidence must be presented individually as to each Plaintiff, rendering Plaintiffs' argument meritless.

Plaintiffs also incorrectly suggest that some of the evidence presented by Defendants as to individual defenses or differences among Plaintiffs is not supported by

the record.  Opposition at 16 and n. 5.  Defendants pointed out that "there is no common set of employment agreements among Plaintiffs" because "in addition to the Member Practice Agreement and Compensation Plan, Ahad was subject to her responsibilities under the Medical Director Agreement for Bariatric Surgery" and "Vassileva was subject to her responsibilities under the Medical Director Agreement for the Valve Program." d/e 86-1, p. 10.  Plaintiffs contend that this argument is not supported by the record because "careful review shows Plaintiffs are not parties to these Agreements."  Opposition at 16 n. 5.  While it is true that Ahad and Vassileva were not "parties" to these agreements, that does not mean they were not "subject to" the agreements or that the agreements did not affect their individual compensation.  Further, the agreements specifically identify Ahad (d/e 86-4, p. 26) and Vassileva (d/e 86-12, p. 48) as the individuals holding the medical directorships.   Both Ahad and Vassileva also admitted that the Medical Director Agreements established their individual duties in those positions. d/e 86-4, p. 133 and Ex. A to Dep. Ex. 29-33; d/e 86-12, p. 87-89 and Ex. A to Dep. Ex. 15-18. They signed the agreement and expressly accepted them. The effect of these medical directorships on duties and compensation—which was different even between the directorships of Ahad and Vassileva (d/e 86, p. 7, 14) (Ahad's entire academic base salary came from her director position and it was her full-time job, while Vassileva only received $20,000 in income and was limited to 80 hours per year), and which did not apply to Rakinic or Rotondo, who had no such arrangements—is clearly supported by the record.

As to the separate, unique defense with respect to Plaintiff Rotondo—that she signed a Separation Agreement and Release that included a release of all claims— Plaintiffs claim that the agreement is unenforceable and, therefore, this is not a separate defense.  Opposition at 20-21.  Again, Plaintiffs have proved Defendants' point.  While the Seventh Circuit has ruled that "[i]t is is clear that a plaintiff may waive a claim under Title VII (and, by extension, under the Equal Pay Act) as part of a voluntary settlement," *Wagner v. NutraSweet Co.*, 95 F.3d 527, 532 (7th Cir. 1996), a motion seeking decertification of a collective action is not the time to debate the substantive merits of individual defenses. The question is whether an affirmative defense applies to all Plaintiffs universally or whether the defense must be applied individually.  The defense of a signed release undeniably only applies to Rotondo.  While Rotondo could later argue that the release is unenforceable, she would be the only Plaintiff doing so because the defense only applies to her.  Thus, this defense obviously does not apply "across the board" and further supports decertification.

## D.      Fairness and procedural concerns support decertification.

The purpose of a collective action is efficiency in resolving common issues that apply to all class members.  *See Sperling*, 493 U.S. at 170; *Riffey v. Rauner*, 873 F.3d 558, 560 (7th Cir. 2017) (collective actions "are designed to provide an efficient vehicle to resolve the claims of a large number of plaintiffs in one fell swoop" whereby "defendants can achieve a global resolution of the dispute.")  Plaintiffs cannot identify a single issue that

can be applied "in one fell swoop" because each Plaintiff's individual circumstances are different. An individualized, fact-specific analysis regarding each individual Plaintiff is required, which is wholly inconsistent with proceeding as a collective action.

Plaintiffs argue that "there would be substantial overlap of evidence in their claims from common decision-makers." Opposition at 19. Plaintiffs claim that decertifying the collective action would "require four different juries to hear the complicated entity structure Defendants maintain, the joint employer evidence arising from Defendants' overlapping human resource functions, the virtually uniform process for setting and changing compensation pursuant to the Master Agreement and Compensation Plan, and all of the other background evidence necessary to understand Defendants' compensation practices and decisions." *Id.*

Plaintiffs ignore that the point of the "collective action" is to present "collective evidence" "on a class-wide basis" and to "perform a uniform analysis on the entire class" "without individualized evidence." *Blair*, 2018 WL 1523101, at *21-23, 27. While the items listed by Plaintiffs may have to be presented in general for each Plaintiff, this is not a case where that "collective" evidence is *the only evidence* that needs to be presented for a determination to be made as to all Plaintiffs. Plaintiffs fail to account for the fact that volumes of *additional, individualized* evidence must also be presented concerning each Plaintiff for the trier of fact to actually consider the *reasons* for underlying compensation decisions.

Moreover, as noted above, Plaintiffs fail to acknowledge that each Plaintiff identifies a different set of male comparators for her individual position.  Plaintiffs themselves have created four different sets of evidence that must be presented.  Consequently, proceeding as a collective action would result in four simultaneous but separate trials where each Plaintiff would have to prove the details on her individual job and the details of the purported "equal" jobs of different male employees.  Defendants would need to offer a unique set of evidence for each Plaintiff as part of their defense, including all the circumstances surrounding the background, credentials, hiring, job duties, performance, and compensation of every Plaintiff *and* every alleged comparator for each Plaintiff, which are all different.  As the evidence has shown, the fact that three Plaintiffs worked in the same Department (Opposition at 20) does not lessen the amount of individualized evidence that would need to be presented as to every Plaintiff because even the three Plaintiffs in the same Department are not "similarly situated."

A "collective action is oxymoronic…where proof regarding each individual plaintiff is required to show liability." *Russell v. Ill. Bell Telephone Co.,* 721 F. Supp. 2d 804 (N.D. Ill. 2010).  "A collective action is not appropriate when determining whether a plaintiff has a viable claim requires a detailed, fact-specific inquiry." *Camilotes*, 286 F.R.D. at 346.  *See also Bunyan v. Spectrum Brands, Inc.,* 2008 WL 2959932, *27-29 (S.D. Ill. 2008) (proceeding as a collective action is not appropriate where "a fact-specific analysis of each individual plaintiff's [claims] would be required to determine" liability.)  Plaintiffs do not

and cannot make any genuine argument that a fact-specific analysis of each individual Plaintiff's circumstances is not required in this case.   Accordingly, this factor also supports decertification.

**E.      Plaintiffs' Reliance on the Department of Labor proceedings is misguided.**

Throughout their Opposition, Plaintiffs rely on proceedings before the Department of Labor.  Opposition at 4, 14, 15 and n. 4, 17, 18, 19, 20.  Plaintiffs' continued reliance on the Department of Labor proceedings is misguided as those proceedings are not relevant to the issues presented here.

The Department of Labor Administrative Law Judge was considering, in an immigration context, the "actual wage," which is the "wage rate paid by the employer to all other individuals with similar experience and qualifications for the specific employment in question."  d/e 57-20, p. 7 (quoting 20 C.F.R. § 655.731).  The question does not take into account sex, which is the entire basis of an Equal Pay Act claim.  Plaintiffs continually point to the Department of Labor proceedings but do not argue that those proceedings actually decide any issue presented in this case.

More importantly, this Court has a much more complete record on which to base its decision than that presented at the Department of Labor.  The most significant example is that at the Department of Labor, Ahad's medical director agreement was not even presented as evidence.  *See generally* d/e 57-20.  As the evidence presented in this case demonstrates, that agreement was the basis for her compensation in that it specified her

entire academic base salary and set forth her responsibilities that would be the basis of
her clinical income.

The necessity of highly individualized evidence as to each Plaintiff in this case is
underscored by Ahad's individual experience working as the Medical Director for
Bariatric Surgery in conjunction with St. John's Hospital.  The evidence shows that, unlike
any other Plaintiff, the *hospital's* actions (not Defendants' actions, as suggested by the ALJ
at the Department of Labor (d/e 57-20, p. 15)) greatly affected Dr. Ahad's practice and
productivity.  Ahad generally could not accept Medicaid patients pursuant to hospital
policy.  d/e 86-7, p. 9-11.  Thus, the limitations on taking Medicaid patients were driven
by the hospital which necessarily limited the number of patients Ahad could treat each
year and limited her ability to reach one of the Center of Excellence requirements.,
precluding her ability to take Medicare patients as well.

Further, Ahad's requests for a partner, staff, and marketing were limited by the
hospital's financial concerns.  *Id.* at 12-14.  Achievement of the Center of Excellent
classification was also dependent upon the hospital's designation of privileges for
bariatric cases.  *Id.* at 18-20.  Ahad herself stated that she was concerned about support
her program was getting from the hospital, including lack of financing for marketing and
lack of assistance in becoming a Center of Excellence.  *Id.* at 21-22.  SIU sought additional
assistance and funding from the hospital for the bariatric surgery program (*id.* at 23-24),
and Ahad admitted that it was the hospital that would need to provide additional

funding for either another bariatric surgeon or an increase in her base salary.  (d.e 86-3, p. 47).

None of these facts which affected Ahad's productivity and ability to generate RVUs were presented in the Department of Labor proceedings.  These examples demonstrate that this Court has much more information available to it than was presented at the Department of Labor.  Moreover, these are the very type of fact-specific, individual inquiries that must be delved into for each Plaintiff, making a collective action inappropriate.

**F.      Rotondo is not a member of the class**

The collective action class consists of:

> All current and former female faculty physicians at SIU School of Medicine and SIU Physicians & Surgeons, Inc., also known as SIU Healthcare, within three years of September 28, 2017 (d/e 53, p. 21).

The notice approved by the Court said "You may make a claim in this action if: 1) you were employed by SIU School of Medicine *and* SIU Healthcare…." (d/e 32-1) (emphasis added). A physician therefore must have been *jointly employed* by SIU-SOM and SIU-HC to be a member of the class.

Defendants pointed out that Dr. Erica Rotondo was not a member of the class because she was not employed by SIU-HC; she was exclusively employed by SIU-SOM as part of its FQHC.  d/e 86-1, p. 7-8.  Thus, Rotondo is not a member of the class and should be dismissed without prejudice on this basis alone.

21

In response, Plaintiffs did not even offer any alternative interpretation of this Court's Order or the approved notice that would make Rotondo a member of the class. Instead, Plaintiffs rely on their "interpretation of the Court's order" and fault Defendants for not earlier explaining their position that notice should have only been sent to those jointly employed.  Opposition at 22.  The Order and approved notice are clear that only those jointly employed are members of the class; Rotondo does not qualify and should be dismissed.

Plaintiffs then pivot and attempt to argue that Rotondo nonetheless should be considered part of the class because she is similarly situated to the other Plaintiffs. Opposition at 22-23.  They claim she "received the same type of compensation determined largely in the same manner."  *Id.* at 23.  This is not the case given that FQHC members like Rotondo are paid a salary in equal monthly amounts with an additional quarterly payment through a unique pooling agreement under which all of the fees collected by the FQHC are pooled together and are distributed to the members of the FQHC for their participatory share.  Thus, in contrast to most faculty members jointly employed by SIU-SOM and SIU-HC (all other Plaintiffs), Rotondo was not paid based upon her individual clinical productivity at the FQHC or her ability to produce RVUs. Instead, she was paid a salary with an additional component paid based upon the productivity of the FQHC. d/e 86, p. 16.

Plaintiffs further ignore the other distinctions between Rotondo and the other Plaintiffs, including her training as a D.O. and responsibilities based on that training, her prior experience, her negotiation of additional salary to purchase tail insurance, and her individual professional performance problems.  *Id.* at 16-17.  Rotondo is not similarly situated to any other Plaintiff.  In fact, no two Plaintiffs are similarly situated to each other, and the Motion to Decertify should be granted.

## G.     This Court Cannot Rely on Plaintiffs' Use of Statistics

In Plaintiff's initial Motion for Conditional Certification, Plaintiff's counsel submitted a "Summary and Analysis of Voluminous Evidence" discussing average total compensation. d/e 33-8; *See also* d/e 53, p. 9-10, 14-19.  These calculations, done by Plaintiffs' counsel, used simple averages of the SIU faculty wages in support of their argument that there was gender discrimination at SIU.  It has since become apparent that those calculations were misleading as Plaintiffs' own expert admitted that you cannot use simple averages to show gender discrimination in this case.  d/e 86-1, p. 2.  In their Response to the Motion to Decertify, Plaintiffs offer no response or justification for their use of the simple averages in their Motion for Conditional Certification nor do they now appear to try and assert them in support of their certification of the Collective Action.  Instead, Plaintiffs attempt to pivot to their expert's report they used for purposes of class action, (which includes no analysis in regard to Dr. Rotondo) and abandon their "Summary and Analysis of Voluminous Evidence" altogether.  However, the discovery conducted of the opt-in Plaintiffs and Dr.

Ahad demonstrate the glaring errors in Dr. Sharp's proffered opinions, errors so significant as to render his work irrelevant to any issues in this dispute. This fast and loose use of statistics when they are convenient is the exact type of conduct that the Seventh Circuit has warned trial courts about when examining statistical evidence.  Plaintiffs continue to dissemble with whatever statistical analysis is convenient at the time seeking to expand this case from a single claim to a unwarranted and unworkable class or collective action. The Court should not condone this type of conduct and should decertify this action as a collective action so that this case can proceed on the merits (or lack thereof) of Dr. Ahad's individual claims of discrimination.

### Conclusion

WHEREFORE, Defendants respectfully request that their Motion to Decertify Collective Action be granted and that the claims of all opt-in plaintiffs be dismissed without prejudice.

## <u>CERTIFICATE OF COMPLIANCE</u>

This document exceeds 15 pages in length allowed by Local Rule 7.1(B)(4)(a) for a memorandum in support of a motion; however, pursuant to Local Rule 7.1(B)(4)(b) –(d), the undersigned certifies that this document complies with the type volume limitation because it does not contain more than 7,000 words or 45,000 characters.  The word count of the word processing system used to prepare this document indicates there are **6,115** words in this document, including headings, footnotes, and quotations.

*/s/Thomas H. Wilson*

Respectfully Submitted,

Board of Trustees of Southern Illinois University and SIU Physicians & Surgeons, Inc., d/b/a SIU Healthcare, Defendants

By:  */s/ Thomas H. Wilson*

Thomas H. Wilson, #6202141
Jessica L. Galanos, #6297491
HeplerBroom, LLC
4340 Acer Grove Drive
Springfield, IL 62711
Ph:     217-528-3674
Fax:    217-528-3964
Email: thw@heplerbroom.com
          jlg@heplerbroom.com

## PROOF OF SERVICE

I hereby certify that on this 17th day of August, 2018, I caused to be electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing(s) to all counsel of record.

Michael F. Brown
DVG LAW PARTNER LLC
P.O. Box 645
Neenah, WI 54957
Email: mbrown@dvglawpartner.com
*Attorney for the Plaintiff*

J. Bryan Wood
THE WOOD LAW OFFICE, LLC
303 W. Madison St.
Suite 2650
Chicago, IL 60606
E-mail: bryan@jbryanwoodlaw.com
*Attorney for the Plaintiff*

*/s/ Thomas H. Wilson*