# IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | | |
|---|---|---|
| **SAJIDA AHAD, MD, on behalf of herself and all others similarly situated,** | ) ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | No.  15-cv-3308 |
| **BOARD OF TRUSTEES OF SOUTHERN ILLINOIS UNIVERSITY and SIU PHYSICIANS & SURGEONS, INC.,** | ) ) ) ) ) | |
| **Defendants.** | ) ) | |

## OPINION

**SUE E. MYERSCOUGH, U.S. District Judge.**

The cause before the Court is Plaintiff's Motion for Rule 23 Class Certification (d/e 57).  Plaintiff moves for class certification under Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3), or alternatively, under 23(c)(4) for her Illinois Equal Pay Act, Illinois Civil Rights Act, and Title VII claims.  Because the Court finds that Plaintiff has not shown the Rule 23(a) requirements of commonality and typicality, Plaintiff's Motion for Rule 23 Class Certification is DENIED.

# I. BACKGROUND

Plaintiff Sajida Ahad, M.D. brings this suit alleging gender-based pay discrimination on behalf of herself and a class of female physicians employed by Defendants: the Board of Trustees of Southern Illinois University and SIU Physicians & Surgeons, Inc. Plaintiff alleges that Defendants paid Plaintiff and other female physicians substantially lower compensation than male physicians for the same or similar work. Plaintiff brings her claims pursuant to the Illinois Equal Pay Act, Title VII, and the Illinois Civil Rights Act. See Am. Compl., (d/e 31). Defendants deny these allegations. See Answer to Am. Compl. (d/e 39). On September 29, 2017, the Court entered an opinion granting Plaintiff's Motion for Conditional Certification Under FLSA Collective Action, 29 U.S.C. § 201 et seq.

SIU School of Medicine operates under the authority of Defendant SIU Board of Trustees ("the Board"). Pl. Class Cert. Memo. at 2. Pursuant to statute, the Board is the employer of all School of Medicine employees, many of whom provide patient care through Defendant SIU Physicians & Surgeons, Inc., a university-related organization also known as "SIU Healthcare." Pl. Class Cert. Memo. at 2 (d/e 58). Plaintiff, a female physician, worked for

Defendants from approximately July 28, 2008 to March 21, 2014. Pl. Class Cert. Memo. at 2.

Defendants' physician faculty hold one of three tenure-eligible academic ranks: Assistant Professor, Associate Professor, and Professor.  Pl. Class Cert. Memo. at 3.  All physician faculty are expected to perform certain minimum duties in three categories: research, teaching, and service (including clinical service).  Pl. Class Cert. Memo. at 3.

Defendants employ physicians in different School of Medicine Departments.  This case focuses on seven Clinical Science/Springfield departments: Family & Community Medicine, Internal Medicine, Neurology, Obstetrics & Gynecology, Pediatrics, Psychiatry, and Surgery.  Pl. Class Cert. Memo. at 4.  Each Department is headed by a Department Chair.  In each department, faculty physicians are further classified by divisions.  The divisions are based on geographical location or specialization.  Each division is headed by a Division Chief.

A Master Agreement between SIU School of Medicine and SIU Healthcare requires SIU School of Medicine employees to provide services for SIU Healthcare.  Pl. Class Cert. Memo. at 3.  The Master

Agreement also requires that all physician members of SIU Healthcare and the SIU School of Medicine be compensated pursuant to the "Compensation Plan." Pl. Class Cert. Memo. at 5. The Compensation Plan "serves as the governing document for compensation," and it aims to provide for compensation that "is market based and represents fair and reasonable compensation for the efforts of faculty members" but "without regard to the payor for a particular patient or the patient's ability to pay." Compensation Plan, *4 (d/e 62). On its face, the Compensation Plan is undoubtedly gender neutral.

The Dean of SIU School of Medicine and the CEO of SIU Healthcare are responsible for the administration of the Compensation Plan. Pl. Class Cert. Memo. at 5. Currently, the SIU School of Medicine Dean and Provost Dr. Jerry Kruse is also the CEO of SIU Healthcare. Pl. Class Cert. Memo. at 4. Since at least 2010, all of SIU Healthcare's CEOs and the School of Medicine's Deans were men. Since 2010, only 15 individuals served as Department Chairs for the seven departments at issue and only three have been women. Pl. Class Cert. Memo. at 4. Defendants point out that the two largest Departments—Internal Medicine and

Family Practice—have been led by women during various time periods.  Defs. Opp'n to Class Cert. at 4 (d/e 68).

Under the Compensation Plan, Defendants' physician faculty members can receive three types of compensation, all of which must be paid in accordance with the Compensation Plan: (1) an academic base salary paid by SIU School of Medicine; (2) a clinical base salary paid by SIU Healthcare; and (3) a clinical incentive income paid by SIU Healthcare.  Pl. Class Cert. Memo. at 5.  Academic base salary compensates physician faculty for their academic and administrative duties and is a fixed, monthly amount.  Pl. Class Cert. Memo at 5-6.

The clinical base and clinical incentive income make up the clinical compensation.[1]  Pl. Class Cert. Memo. at 6.  Clinical compensation is calculated using a formula that assigns "Relative Value Units" ("RVUs") to the services the physician provided.  Pl. Class Cert. Memo. at 6.  Every procedure performed by a physician has a Current Procedural Terminology (CPT) code established by the

_____

[1] The Court notes that Defendants refer to this combined income as "practice plan income."  See Defs. Opp'n to Class Cert. at 4.  However, the Court understands that this term refers to the same income, so the Court will use the term "clinical compensation" for consistency.

federal government, and these codes translate into a certain number of federally established RVUs, irrespective of the specialty, geographic location, or gender of the physician. Defs. Opp'n to Class Cert. at 4. The clinical compensation is calculated by multiplying the physician's earned RVUs by a conversion factor. The conversion factor is different in each division and is determined every six months by dividing the total compensation received from all sources by the total RVUs of all division faculty. Defs. Opp'n to Class Cert. at 4. The RVUs and, therefore, the clinical compensation, is determined by each individual physician's time devoted to clinical practice, types and amount of procedures performed, specialty, and participation in call schedules. Defs. Opp'n to Class Cert. at 4. New clinical faculty are guaranteed a fixed clinical income during initial employment to allow them to build a practice, but those who generate more RVUs than anticipated can terminate the guarantee and be paid for all of their accrued RVUs. Defs. Opp'n to Class Cert. at 4. The clinical compensation is also subject to caps.

Hiring also follows a standardized process. However, each hiring decision relies on individualized factors. Defs. Opp'n to Class

Cert. at 2.  Defendants typically hire faculty physicians for the purpose of filling a specific sub-specialty need.  Defs. Opp'n to Class Cert. at 3.  For instance, if a transplant surgeon is needed, only fellowship-trained transplant surgeons will be considered for the position.  Defs. Opp'n to Class Cert. at 2.  When Defendants need to fill a position, the Department Chair completes a recruitment form for the position identifying a salary range, including an academic base salary and clinical compensation, which should be determined initially, in part, using data from the American Association of Medical Colleges ("AAMC").  Pl. Class Cert. Memo. at 6.  Prior to hiring, however, the recruitment tracking form must be reviewed and approved by the Department of Human Resources, SIU's Affirmative Action office, SIU Healthcare, the Office of Management and Budget, and the Dean and Provost.  Pl. Class Cert. Memo. at 7.

Once candidates are selected, they negotiate their compensation with their Department Chair.  Pl. Class Cert. Memo at 7.  The Department Chair considers the physician's background and qualifications, as well as market factors, and makes a compensation recommendation.  Pl. Class Cert. Memo. at 7.  To determine the initial academic base salary, the Department Chair

may consider specific fellowship training, external industry bench-
mark data from the AAMC, specific job responsibilities, level of
education and training, competing job offers, and availability of
third-party financial support for the position. Defs. Opp'n to Class
Cert. at 5. This recommendation is reviewed again by SIU's
Affirmative Action office, SIU Healthcare, the Office of Management
and Budget, and the Dean and Provost. Pl. Class Cert. Memo. at 7.

After a physician accepts employment with the Defendants,
they execute a Member Practice Agreement which identifies the
physician's duties and responsibilities and all compensation and
fringe benefits. Pl. Class Cert. Memo. at 7. These agreements are
largely the same for all physician faculty. They specify that new
physicians' clinical compensation is guaranteed for the first one or
two years of practice, subject to repayment obligations. Pl. Class
Cert. Memo at 7. New physicians also execute an Annual
Compensation Agreement that reflects the agreed academic base
salary and the anticipated clinical compensation for the coming
year. Pl. Class Cert. Memo. at 7-8.

Going forward, physicians' compensation is reviewed annually.
As with initial compensation, Department Chairs recommend

compensation adjustments for physicians in their departments. Those recommendations are subject to review and approval by the Dean.

The Compensation Committee also reviews physicians' compensation. Pl. Class Cert. Memo. at 8. The Compensation Committee consists of three community members and the Dean. Since 2010, besides the Deans, six other individuals have served on the committee, including one woman. Pl. Class Cert. Memo. at 8. The Compensation Committee reviews physicians' performance, compensation paid during the prior year, and proposed compensation for the upcoming year. Pl. Class Cert. Memo. at 8. The Committee reviews clinical compensation to make sure that the amount of anticipated clinical income in the next fiscal year's contract is a reasonable estimate of what they expect the faculty member will generate in clinical income the following year. Defs. Opp'n to Class Cert. at 7. Once the guarantee period ends, the faculty member is paid clinical income based on actual production of RVUs. The amount set forth in his or her contract then serves only as a monthly "draw" which is reconciled on a quarterly basis. Defs. Opp'n to Class Cert. at 7.

The Compensation Committee has the authority to adopt or reject the Department Chairs' recommendations as to the clinical base. Pl. Class Cert. Memo. at 8.

Clinical base for the current fiscal year is estimated. Clinical base is based on productivity, so clinical base is calculated by a faculty member's RVUs multiplied by a division conversion factor. Clinical base may also reflect administrative duties. The number of RVUs a faculty member earns depends on certain factors such as the number of patient encounters and the time devoted to clinical practice. Decl. of Dorsey ¶ 6 (d/e 68-14).

Market level factors are determined by the CEO and the department chair based on the circumstances of the Department, such as the site of practice, program reimbursement, specific program goals, and other factors. Comp. Plan at 7. The market level factor is then approved by the Compensation Committee. Id.

A Department Chair may establish that all or part of the Division or Department's RVUs shall be pooled prior to the calculation of individual-level clinical base to accommodate Department policy, e.g., if faculty members of the Department take equal shares of calls, rounds, or clinics or to implement other

Department or Division clinical practice goals.  The Compensation

Committee must approve the pooling plan.  The Committee

considers the plans annually in light of the overall charitable,

educational, and educational objectives of SIU P&S and its

consistency with market-based compensation.  Additionally, the

Dean has independent authority to increase tenure-track

physicians' compensation by 10% without additional review by the

Compensation Committee.  Pl. Class Cert. Memo. at 8.

The Dean of SIU School of Medicine reviews the department

chair's recommendation for SIU SM base compensation for faculty

members.  Decl. of Dorsey ¶ 2 (d/e 68-14).  The Dean does not

substantially participate in the establishment of the SIU SM base.

Decl. of Dorsey ¶ 2 (d/e 68-14).  Indeed, Dr. Kevin Dorsey, Dean of

SIU School of Medicine from 2001-2015, could not remember a time

when he participated substantively in the establishment of the

medical school salary of any clinical faculty member.  Decl. of

Dorsey ¶ 2 (d/e 68-14).

The Compensation Plan does not establish the factors to be

considered in developing a medical school salary.  Dr. Dorsey listed

contributing factors such as academic promotion, taking on or

giving up administrative duties or directorships, and third party funding for positions.  Decl. of Dorsey ¶ 6 (d/e 68-14).

Each year all physicians also execute a new Annual Compensation Agreement reflecting anticipated compensation for the coming year.  Pursuant to the Compensation Plan, the process of determining annual compensation is accomplished through a similar process as described above.

Plaintiff alleges that this process has resulted in discriminatory pay practices whereby female physicians are paid significantly less than similarly situated male physicians.  While employed by the Defendants, Plaintiff's job duties changed multiple times and her academic base salary was not increased. Additionally, she voiced concerns with her division chief and multiple female physicians that Defendants did not give females leadership positions and equal opportunities to succeed.  Plaintiff also formally complained about pay discrimination to Defendants' Executive Director of Human Resources, Penny McCarthy. McCarthy's notes indicated that Plaintiff believed that there may be a perception among the female faculty that there is a pay disparity

and that the school faculty was a "boys club."  Plaintiff did not provide affidavits of any putative class members.

Defendants argue that the process of determining compensation is highly individualized.  For example, Plaintiff was hired in 2008 after completing a residency in general surgery and a fellowship in minimally invasive and bariatric surgery.  Defs. Opp'n to Class Cert. at 6.  Her initial compensation totaled $250,000, which included $125,000 in academic base and $125,000 in clinical income, guaranteed for two years.  She later assumed the position of Director of the newly created Bariatric Surgery Program, where her academic salary was funded by St. John's Hospital.  Her primary role in that position was to develop and lead the Bariatric Surgery Program.  When Plaintiff resigned in March 2014, the program ended.  She remained on her guaranteed clinical compensation for two years, but did not earn enough RVUs to cover the guaranteed amounts and was required to pay back money during a 15-month reconciliation period to cover a portion of the overpayments.

Plaintiff and the Defendants have both hired experts to analyze pay and determine whether a statistically significant pay

disparity exists among similarly situated female and male physician faculty. The experts have reached opposite conclusions. Both experts concluded that a multiple regression analysis, a form of statistical modeling used to show the relationship between a dependent variable (here, compensation) and independent variables (such as gender, department, etc.), is the proper method to analyze the data. However, the two experts reached different conclusions on how the model should be constructed.

Plaintiff's expert, Dr. D.C. Sharp, conducted a multiple-regression analysis and concluded that female physicians received less pay than male physicians from 2010 to 2016 and that the difference in pay between genders was statistically significant. See Expert Report of D.C. Sharp, Ph.D. (d/e 57-9). His initial analysis separately analyzed the academic base salary assigned by Defendants, the academic salary actually paid in a given year, and clinical compensation paid. Dr. Sharp controlled for various factors, including year, specialization (i.e. Department), academic rank, and factors about physicians' backgrounds. His initial analysis found that female physicians annually made, on average, $18,318 less than male physicians in academic salary paid and

$30,559 less than male physicians in clinical compensation paid, and female physicians' academic salary rate was, on average, $21,329 less than that of male physicians.  Dr. Sharp excluded RVUs as a factor of clinical compensation in his regression analysis because he found it to be a "tainted" variable—that is, an explanatory variable that could be affected by the employer's alleged discriminatory behavior.  <u>See</u> Reply Report of D.C. Sharp, Ph.D. (d/e 57-10).

Defendants' expert, Dr. Chen Song, reached the opposite conclusion, finding that no statistically significant difference in pay existed between Defendants' female and male physicians.  <u>See</u> Expert Report of Chen Song, Ph.D. (d/e 68-15).  Dr. Song found that the analysis was properly done on a department-by-department basis because, after reviewing the evidence, she found that department heads were the relevant decision makers.  Dr. Song also utilized the AAMC Salary Benchmark in her analysis because this is a factor that is considered by Department heads at the time of hire—due, at least in part, to its inclusion on the recruitment form.  Dr. Song included RVUs as a driver of clinical compensation.

Dr. Song also used a new data set that had been compiled by Defendants and Defense counsel. The new data set included division information that previously was only contained in hardcopy documents. Dr. Song found that division information was an important variable because the RVU conversion factor varies by division. Dr. Song provided three models for determining whether a statistically significant pay difference existed between similarly situated male and female physicians: (1) a model that used AAMC median market benchmark data; (2) a model that used AAMC mean market benchmark data; and (3) a model that specifically controlled for the individual physician faculty's academic rank, division, and year. With all models, Dr. Song concluded that no statistically significant difference in pay existed between similarly situated female and male physicians.

Dr. Song evaluated Dr. Sharp's report and concluded that Dr. Sharp's analysis was flawed for a number of reasons. Dr. Song criticized Dr. Sharp, finding that Dr. Sharp did not answer whether female physicians' total compensation was less than that of the male physicians because Dr. Sharp analyzed the pay components separately rather than reviewing and comparing total compensation

for male and female physicians. Dr. Song found that Dr. Sharp's omission of RVUs as a factor for clinical compensation when clinical compensation is largely determined by total RVUs made Dr. Sharp's conclusions flawed as well. Dr. Song also criticized Dr. Sharp for not removing outliers, such as employees who had low pay records due to 'partial year' employment. Dr. Song opines that including such outliers in the regression database may have skewed Dr. Sharp's results. Additionally, Dr. Song noted that Dr. Sharp's analysis did not accurately predict individualized damages, but only provided average pay disparities between female and male physicians.

In his rebuttal report, Dr. Sharp addressed the criticisms of Dr. Song and ran new analyses using the data from Dr. Song's report. See Reply Report of D.C. Sharp, Ph.D. (d/e 57-10). Dr. Sharp disagreed with Dr. Song that the analysis should be done on a department-by-department basis. By disaggregating the data, Dr. Sharp reasoned, Dr. Song decreased the likelihood of finding statistically significant differences. Dr. Sharp believed that Dr. Song exaggerated departmental independence. Dr. Sharp believed that to the extent departmental independence existed, it could be

controlled for in other ways.  In his reply report Dr. Sharp defended his methodology of combining all of the departments into one pool, asserting that the use of other explanatory variables (i.e. medical school, publications, and the like) could be used to account for the differences between departments or specializations.

Dr. Sharp further stood by his earlier conclusion that RVUs may be a tainted variable and, therefore, are properly excluded from the analysis.  Female physicians tend to have lower RVUs than male physicians, which could be due to RVUs not being equally available to all physicians.  Additionally, anecdotal evidence showed that Plaintiff or other potential class members may not have had equivalent opportunity to obtain RVUs as other similarly situated physicians.  Therefore, in this report, Dr. Sharp conducted analyses that both included and excluded RVUs as a variable.  Including the RVUs eliminated two-thirds of the pay difference found in the multiple regression model.

Dr. Sharp still found statistically significant differences in pay after running a multiple regression analysis on a department by department basis, including RVUs, and eliminating the other methodological flaws that Dr. Sharp found in Dr. Song's analysis.

Using two different estimation methods, Dr. Sharp concluded that even taking into account RVUs, the impact of a being a female physician, relative to being a male physician with the same attributes, is to reduce total compensation by $12,217 per year.

Dr. Song submitted a rebuttal report in August 2017.[2]  <u>See</u> Rebuttal Report of Dr. Song (d/e 68-16).  In this report, Dr. Song disagreed that Dr. Sharp's new analyses properly accounted for departmental independence because the new analyses did not allow the other variables to interact with the department variable.  Dr. Song again disagreed that RVUs should be excluded from the analysis.  Finally, Dr. Song demonstrated that two of the three models he used—the AAMC Median Model and the AAMC Mean Model—still produced no statistically significant pay difference when using Dr. Sharp's aggregated methodology.

Plaintiff moves for class certification of her Illinois Equal Pay Act, Title VII, and Illinois Civil Rights Act claims pursuant to Federal Rule of Civil Procedure 23.  Plaintiff argues the putative class meets the requirements of Rule 23(a) and can be certified

---

[2] Plaintiff moved to strike this report, because it was not specifically authorized and provided for in the scheduling order.  However, the Court denied this Motion.  <u>See</u> d/e 82.

under Rule 23(b)(2) for equitable relief and/or under Rule 23(b)(3) as a class created by predominance and superiority for damages. Alternatively, Plaintiff requests certification under Rule 23(c)(4) of any issues the Court deems appropriate.

Defendants oppose class certification and argue that compensation decisions are too individualized for class treatment. Defendants argue that Plaintiff has not met her burden to show commonality or typicality pursuant to Rule 23(a) and predominance or superiority pursuant to Rule 23(b)(3), and that class treatment under Rule 23(b)(2) is not appropriate because each class member would be entitled to an individualized award of money damages.

While the Court finds that Plaintiff has met her burden to show numerosity and adequacy of representation, Plaintiff has not met her burden to show commonality or typicality. Accordingly, the Court denies Plaintiff's Motion for Class Certification.

## II.   JURISDICTION AND VENUE

This Court has subject matter jurisdiction because Plaintiff's claims are based on federal law. <u>See</u> 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising

under the Constitution, laws, or treaties of the United States.").
The Court has supplemental jurisdiction over Plaintiff's state law
claims pursuant to 28 U.S.C. § 1367.  Venue is proper because the
events giving rise to the claim occurred in Sangamon County,
Illinois.  See 28 U.S.C. § 1391(b)(2) (a civil action may be brought in
a judicial district where a substantial part of the events or
omissions giving rise to the claim occurred).

### III.   LEGAL STANDARD

"The purpose of class action litigation is to avoid repeated
litigation of the same issue and to facilitate prosecution of claims
that any one individual might not otherwise bring on her own."
Chicago Teachers Union, Local No. 1 v. Bd. of Educ. of City of
Chicago, 797 F.3d 426, 433 (7th Cir. 2015).  The Court's decision to
certify a class action under Federal Rule of Civil Procedure 23 "is
not free-form, but rather has been carefully scripted by the Federal
Rules of Civil Procedure."  Id.  To be certified as a class action, a
proposed class must meet the requirements of Federal Rule of Civil
Procedure 23(a), as well as one of the three provisions in Rule 23(b).
Messner v. Northshore Univ. HealthSystem, 669 F.3d 802 (7th Cir.
2012).  Under Rule 23(a), class actions can only be brought if:

(1) the class is so numerous that joinder of all members is impracticable (numerosity);

(2) there are questions of law or fact common to the class (commonality);

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class (typicality); and

(4) the representative parties will fairly and adequately protect the interests of the class (adequacy of representation).

Id. (parentheticals added).

In addition to these requirements, the proposed class must fall within one of the class categories set forth in Rule 23. Rule 23(b) sets forth four primary categories of classes: 1) to avoid indivisible relief or inconsistent standards of conduct for defendant (Fed. R. Civ. P. 23(b)(1)(A)); 2) to protect absent class members when the existence of a limited fund or stare decisis would be dispositive as to non-members or hinder their ability to protect their interests (Fed. R. Civ. P. 23(b)(1)(B)); 3) where the primary relief sought is equitable, such as injunctive relief to control defendant's behavior when defendant acts as generally applied to the class (Fed. R. Civ. P. 23(b)(2)); and 4) when common questions predominate over individual questions and a class is the superior method to dispose of the claims (Fed. R. Civ. P. 23(b)(3)).

The parties focus on two of these class types: injunctive relief under Rule 23(b)(2) and predominance and superiority under Rule 23(b)(3). A class can be certified under Rule 23(b)(2) when "the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class[;] . . . [i]t does not authorize class certification when each class member would be entitled to an individualized award of monetary damages." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 360–61 (2011).

To certify a class under Rule 23(b)(3), a plaintiff must prove: "(1) that the questions of law or fact common to the members of the proposed class predominate over questions affecting only individual class members; and (2) that a class action is superior to other available methods of resolving the controversy." Messner, 669 F.3d at 811.

Alternatively to the four class types, under Rule 23(c)(4), if the Rule 23(a) requirements are met, the court may rule on certain

issues as to the class which do not dispose of the cases in full.
"When appropriate, an action may be brought or maintained as a
class action with respect to particular issues." Fed. R. Civ. P.
23(c)(4). Rule 23(c)(4) may be appropriate "[i]f there are genuinely
common issues, issues identical across all the claimants, issues
moreover the accuracy of the resolution of which is unlikely to be
enhanced by repeated proceedings, then it makes good sense,
especially when the class is large, to resolve those issues in one fell
swoop while leaving the remaining, claimant-specific issues to
individual follow-on proceedings." McReynolds v. Merrill Lynch,
Pierce, Fenner & Smith, Inc., 672 F.3d 482, 491 (7th Cir. 2012),
quoting Mejdrech v. Met–Coil Sys. Corp., 319 F.3d 910, 911 (7th
Cir. 2003).

The Court will first analyze whether Plaintiff has met each
Rule 23(a) requirement. In analyzing class certification, "a court
should not turn the class certification proceedings into a dress
rehearsal for the trial on the merits." Messner, 669 F.3d at 811. "A
party seeking class certification must affirmatively demonstrate his
compliance with the Rule—that is, he must be prepared to prove
that there are in fact sufficiently numerous parties, common

questions of law or fact, etc." <u>Wal-Mart Stores</u>, 564 U.S. at 350 (emphasis in original).  Plaintiff bears the burden of showing that the proposed class meets the Rule 23 requirements, but this showing need not be "to a degree of absolute certainty.  It is sufficient if each disputed requirement has been proven by a preponderance of evidence." <u>Messner</u>, 669 F.3d at 811.

## IV.   ANALYSIS

### A. The Proposed Class is Sufficiently Numerous.

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1). From the Defendants' records, Plaintiff has identified approximately 165 female faculty physicians who have been employed during the class period.  These putative class members now reside in an estimated 16 different states.  Pl. Memo. at 15.  Defendants have not argued that Plaintiff has not met the requirement of numerosity, and the Court finds that the numerosity requirement is met.

## B. Plaintiff Has Not Shown that Common Answers Exist and, Therefore, Has Not Met Her Burden of Commonality.

The main dispute between the parties with regard to class certification revolves around commonality. Rule 23(a)(2) requires Plaintiff to demonstrate that there are questions of law or fact common to the class. Plaintiff must show that the class members have suffered the same injury and that their claims depend on a common contention that "is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 349–50 (2011). Wal-Mart explained that:

> What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.

Id. at 350 (emphasis in original) (internal citations omitted).

In order to show commonality of a putative class based on alleged employment discrimination, a plaintiff must show that the alleged class-wide discrimination has a common cause. The form of

this common cause can vary—it could be a company-wide employment policy or a few unified decision-makers. In Wal-Mart, plaintiffs sought to certify a class of over a million female workers employed by Wal-Mart, alleging that Wal-Mart discriminated against female workers in violation of Title VII. Id. They claimed that local managers exercised their discretion over pay and promotions disproportionately in favor of men, which had an unlawful disparate impact on female employees, and that Wal–Mart's refusal to impose more stringent limits on its managers' authority over compensation and promotion decisions amounted to disparate treatment. Id. The Supreme Court held that the absence of a company-wide policy to explain the gender disparity in pay precluded class certification, especially because Wal-Mart employed thousands of local managers who exercised discretion. Wal-Mart Stores, Inc., 564 U.S. at 356 ("In a company of Wal–Mart's size and geographical scope, it is quite unbelievable that all managers would exercise their discretion in a common way without some common direction.").

According to Plaintiff's expert, female physicians are paid less at a statistically significant level than similarly situated male

physicians.  Plaintiff argues that her expert accounted for all
relevant gender-neutral reasons for the pay disparity; and,
therefore, the pay differential must have been the result of gender
discrimination.  However, to try this action as a Rule 23 class, there
must be some "glue" that can produce a common answer to the
questions of whether and why compensation for female physicians
was lower than compensation for similarly situated male
physicians.  Id. at 352.  For example, that "glue," the Supreme
Court explained in Wal-Mart, could be a biased employment testing
procedure or a general policy of discrimination established by top
managers.  Id. at 351.  Plaintiff argues that the "glue" in this case is
Defendants' implementation of their Compensation Plan, pursuant
to which Defendants establish and adjust physicians'
compensation.  Plaintiff acknowledges that the Compensation Plan
does not explicitly discriminate against women and that initial
compensation recommendations were made at the department level.
However, she argues that implementation of the Compensation Plan
was still an employment practice that resulted in class-wide
discrimination because Department Chairs made compensation
decisions in accordance with the Plan and because final

compensation decisions included review by Defendants' Dean and
the Compensation Committee, both of which had the ability and
authority to change the initial compensation recommendation.
Plaintiff contends that this implementation policy of the
Compensation Plan resulted in gender discrimination in the form of
lower pay.

Plaintiff relies heavily on the Seventh Circuit decisions of
McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 672 F.3d
482, 492 (7th Cir. 2012), and Chicago Teachers Union, Local No. 1
v. Board of Education of the City of Chicago, 797 F.3d 426, 433 (7th
Cir. 2015). In McReynolds, the plaintiffs alleged class-wide racial
discrimination in the form of disparate income between black and
white brokers. The court granted class certification, finding that,
unlike Wal-Mart, the discretion of local management was influenced
by two company-wide policies: "authorization to brokers, rather
than managers, to form and staff teams; and basing account
distributions on the past success of the brokers." McReynolds, 672
F.3d at 489. The court did not decide the issue of whether racial
discrimination existed and noted that the disparity could have been
caused by a force other than discrimination. However, the court

found that class action treatment was appropriate, considering that
"[t]he only issue at this stage is whether the plaintiffs' claim of
disparate impact is most efficiently determined on a class-wide
basis rather than in 700 individual lawsuits." Id. at 490.

In Chicago Teachers Union, the plaintiffs alleged racial
discrimination in the process and outcome of school reconstitution,
which is a practice of replacing a school's entire staff as a remedy
for failure. 797 F.3d at 435. The process of reconstituting schools
included three steps: (1) the CEO identified all of the schools eligible
under state law for reconstitution due to poor past performance; (2)
the CEO reduced that list by removing those that met objective
criteria of test scores and graduation rates; and (3) the CEO and
other high-level board members met to discuss and determine the
types of information that they would consider to determine each
school's eligibility for reconstitution and then analyzed the schools
according to that information. Id. The Seventh Circuit held that
the fact that the last step was subjective and potentially case-by-
case did not destroy the potential for commonality created by the
first two objective steps: "Every one of those teachers could answer
the question, 'why was I disfavored?' by pointing to the initial

objective criteria that impacted only African-American teachers."

Id.  Therefore, class action treatment was appropriate to determine whether the initial steps had a disparate impact on African-American teachers.

Further, whether the third subjective step had a disparate impact was also appropriate for class certification.  As the Seventh Circuit summarized:

> [S]ubjective, discretionary decisions can be the source of a common claim if they are, for example, the outcome of employment practices or policies controlled by higher-level directors, if all decision-makers exercise discretion in a common way because of a company policy or practice, or if all decision-makers act together as one unit.

Id. at 438.  This is because decisions by high-level managers affect a much larger portion of an organization than those made by lower-level managers.  "Consequently, discretionary authority exercised by high-level corporate decision-makers, which is applicable to a broad segment of the corporation's employees, is more likely to satisfy the commonality requirement than the discretion exercised by low-level managers in Wal–Mart."  Id. at 440.

Unlike the plaintiffs in McReynolds and Chicago Teachers Union, Plaintiff has not demonstrated how the facially neutral

company-wide policy at issue resulted in discrimination in this case. In <u>McReynolds</u>, the plaintiffs presented evidence that the policy of leaving teaming decisions to individual brokers caused disparate treatment as the brokers were more likely to choose teammates that were of the same race. These teaming decisions resulted in lower compensation for the African-American brokers. Likewise, in <u>Chicago Teachers Union</u>, two objective factors limited the pool of schools in a way that had a disparate impact on African Americans.

Here, Plaintiff has not shown how the seemingly gender-neutral Compensation Plan could have created the disparate compensation. First, the discretion given to Department Chairs by the Plan does not, without more, establish a common question capable of classwide resolution. Plaintiff argues that the Department Chairs' pay decisions were limited by the authority given to them in the Compensation Plan and by the budget. Plaintiff notes in support of her position that the Compensation Plan delegates discretion to Department Chairs and establishes objective factors to guide the Department Chairs in that exercise. But such an arrangement is unproblematic unless Plaintiff makes

some showing that a factor may have created the disparate impact, such as in <u>McReynolds</u>.  <u>See Jones v. Nat'l Council of Young Men's Christian Ass'ns of the U.S.A.</u>, 34 F. Supp. 3d 896, 905 (N.D. Ill. 2014) (noting that the policies at issue in <u>Wal-Mart</u> did not give managers "unfettered discretion to pay and promote employees as they saw fit.  Rather, and as the Supreme Court carefully noted, although the company granted broad discretion to managers to increase wages and to select employees for promotion, that discretion had limits and was subject to corporate oversight.").  Plaintiff has not presented any argument that objective factors considered by the Department Chairs or the Dean in determining compensation resulted in the pay disparity.  Without a showing that the seemingly neutral factors considered by the Department Chairs were biased against female physicians, the facts of this case are too far from the facts of <u>McReynolds</u>.  Plaintiff might have tried to argue that the policy of using RVUs to calculate clinical compensation was an objective factor that created a disparate impact, because, at least in Plaintiff's experience, female physicians did not have an equal opportunity to earn RVUs.  However, this would not have been a conceivable class-wide issue, especially in light of the fact that some

divisions pooled RVUs.  While there may be gender discrimination in pay decisions, Plaintiff has only pointed to a plan that provided for a process that gave discretion to Department Chairs.

Second, Plaintiff has not shown that discretion exercised by one or a few high-level individual(s) could have created the disparate impact.  Plaintiff essentially argues that the Compensation Plan allowed for discretion in terms of compensation decisions at the department level and that this discretion was not thoroughly vetted at the Dean's level for gender discrimination. However, the authority that the Dean and the Committee have to edit the compensation is insufficient to create a common question such that each case can be addressed together.  Plaintiff has provided no evidence that the Dean or the Committee regularly changed any compensation recommendation by the Department Chair.   However, the fact that some oversight existed in the form of review by the Dean does not change the analysis unless the Dean also exercised discretion in setting pay.  Without a showing that the Dean was the subjective decision-maker that inserted gender bias into the pay determinations, this case is simply too far from Chicago Teachers Union.

The Compensation Plan does not create the necessary "glue" to connect the alleged disparate treatment to one class-wide subjective decision maker. Instead, this case bears more similarity to cases that have not found commonality post-<u>Wal-Mart</u> because no company-wide policy existed that was responsible for the alleged discrimination.

Plaintiff's statistical evidence is not sufficient to turn the tides in this analysis either. In <u>Wal-Mart</u>, the Court rejected statistical evidence as a sufficient basis to establish commonality because, even if it showed gender disparity in every store, it would not show a common cause. 564 U.S. at 360. <u>See also</u> <u>Jones</u>, 34 F. Supp. 3d at 909 ("A well done multiple regression analysis may go a long way to establishing that there <u>is</u> a race-based disparity, ruling out the possibility that an observed disparity is simply the product of chance. But ruling out chance says only that something, or some combination of things, other than chance, is causing the disparity; it does not identify what that thing, or those things, actually may be."). Likewise, the statistical evidence here does not and cannot show whether a common <u>cause</u> existed regardless of the statistically significant showing of pay disparities based on gender.

Plaintiff may be able to show commonality among a subclass, such as by department. The Court recognizes, however, that statistically significant findings of disparate treatment are less likely to be visible at the department level, which may be why Plaintiff has not sought certification of a subclass. In this case, the evidence shows that any relevant subjective decisions were made at the department level. Accordingly, the Court finds that Plaintiff has not met her burden of proving commonality pursuant to Rule 23(a)(2).

### C. Plaintiff has Not Met Her Burden of Showing Typicality.

The Rule 23(a)(3) "typicality requirement primarily directs the district court to focus on whether the named representatives' claims have the same essential characteristics as the claims of the class at large." Retired Chicago Police Ass'n v. City of Chicago, 7 F.3d 584, 597 (7th Cir. 1993). The named representatives' claims are typical if they arise out of the same event, practice, or course of conduct that gives rise to the claims of the other class members and if they are based on the same legal theory. Rosario v. Livaditis, 963 F.2d 1013, 1018 (7th Cir. 1992). "A class is not fairly and adequately represented if class members have antagonistic or conflicting

claims." <u>Riffey v. Rauner</u>, 873 F.3d 558, 563–64 (7th Cir. 2017) (quotation omitted).

Because the Court has found that Plaintiff has not identified a common policy that is the cause of the alleged disparate impact, Plaintiff cannot demonstrate that her claim is typical of the claims of other class members. <u>See</u> <u>Jones</u>, 34 F. Supp. 3d at 911 (citing <u>Gen. Tel. Co. of Sw. v. Falcon</u>, 457 U.S. 147, 157 (1982)) ("The commonality and typicality requirements of Rule 23(a) tend to merge.").

### D. Plaintiff Is an Adequate Class Representative and Plaintiff's Counsel is Adequate Class Counsel.

The adequacy of representation inquiry "consists of two parts: (1) the adequacy of the named plaintiffs as representatives of the proposed class's myriad of members, with their differing and separate interests, and (2) the adequacy of the proposed class counsel." <u>Gomez v. St. Vincent Health, Inc.</u>, 649 F.3d 583, 592 (7th Cir. 2011). Defendants do not dispute that Plaintiff is an adequate class representative or that Plaintiff's counsel are adequate class counsel. Plaintiff's interests are in line with the class, and she has a sufficient interest in the outcome of the case. Plaintiff's counsel

have proven themselves sufficiently competent, experienced, and qualified to conduct the proposed litigation. Therefore, the Court finds that Plaintiff has met her burden of showing adequacy of representation.

However, because the Court finds that Plaintiff does not satisfy the commonality and typicality requirements, the Court finds that Plaintiff does not satisfy the requirements of Rule 23(a) and cannot certify the class. Therefore, the Court need not discuss the requirements of Rule 23(b).

## V. CONCLUSION

For the reasons stated, Plaintiff's Motion for Class Certification (d/e 57) is DENIED.

**ENTERED: September 12, 2018**

**FOR THE COURT:**

*s/ Sue E. Myerscough*
**SUE E. MYERSCOUGH**
**UNITED STATES DISTRICT JUDGE**