E-FILED
Friday, 29 March, 2019  09:08:14 AM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| **SAJIDA AHAD, MD, on behalf of herself and all others similarly situated,** | ) ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | No.  15-cv-3308 |
| **BOARD OF TRUSTEES OF SOUTHERN ILLINOIS UNIVERSITY and SIU PHYSICIANS & SURGEONS, INC.,** | ) ) ) ) ) ) | |
| **Defendants.** | ) | |

**OPINION**

**SUE E. MYERSCOUGH, U.S. District Judge.**

Plaintiff Sajida Ahad, M.D., ("Ahad") has sued the Board of Trustees of Southern Illinois University and SIU Physicians & Surgeons, Inc., alleging gender-based pay discrimination.  On September 29, 2017, the Court conditionally certified the case as a collective action.  Three individuals have opted into the class: Drs. Jan Rakinic ("Rakinic"), Christina Vassileva ("Vassileva"), and Erica Rotondo ("Rotondo") (collectively with Ahad, "Plaintiffs").  Before the Court is Defendants' motion seeking to decertify the collective

action.  Because the balance of the factors that the Court must consider at this stage in the litigation favors decertifying the collective action, Defendants' motion is granted.

## I.  BACKGROUND

Plaintiff Sajida Ahad, M.D., brings this suit alleging gender-based pay discrimination on behalf of herself and a purported class of female physicians against the Board of Trustees of Southern Illinois University and SIU Physicians & Surgeons, Inc.  The Board of Trustees of Southern Illinois University acts for the SIU School of Medicine ("SIU SOM") and SIU Physicians & Surgeons, Inc. ("SIU P&S") does business as SIU Healthcare.  SIU SOM and SIU P&S (collectively "Defendants") employed the physicians that comprise the conditionally certified class.

Plaintiff alleges that Defendants paid Plaintiff and other female physicians substantially lower compensation than male physicians for the same or similar work.  Plaintiff brings her claims pursuant to the Federal Equal Pay Act, Illinois Equal Pay Act (EPA), Title VII, and the Illinois Civil Rights Act.  Defendants deny these allegations.

Defendant SIU Board of Trustees is the employer of all SIU SOM employees, many of whom provide patient care through

Defendant SIU P&S, a university-affiliated organization also known as SIU Healthcare.  Plaintiff, a female physician, worked for Defendants from July 28, 2008 to March 21, 2014.  Cox-Largent Decl. ¶ 23.

Defendants' physician faculty hold one of three tenure-eligible academic ranks: Assistant Professor, Associate Professor, and Professor.  Pls.' Opp'n to Defs.' Mot. to Decertify Collective Action 5 ("Opp'n").  All physician faculty are expected to perform certain minimum duties in three categories: research, teaching, and service (including clinical service).  Id. at 9.

Defendants employ physicians in different School of Medicine Departments.  Id. at 3.  Ahad and opt-in plaintiffs Rakinic and Vassileva all worked in the Department of Surgery.  Id.  Opt-in plaintiff Rotondo worked in the Department of Family and Community Medicine.  Id.  Each Department is headed by a Department Chair responsible for supervision of the Department, including recruitment and hiring.  Cox-Largent Decl. ¶ 11.  In each department, faculty physicians are further classified by divisions. Id.  The divisions are based on geographical location or

specialization.  Id.  Each division is headed by a Division

Chairperson.  Id.

A Master Agreement between SIU SOM and SIU P&S requires

SIU SOM employees to provide services for SIU P&S.  Opp'n 5.  The

Master Agreement also requires that all physician members of SIU

P&S and SIU SOM be compensated pursuant to the "Compensation

Plan."  Id. at 6.  The Compensation Plan "serve[s] as the governing

document for compensation," and it aims to provide for

compensation that "is market based and represents fair and

reasonable compensation for the efforts of faculty members."

Compensation Plan, *4 (d/e 62).  The inclusion of relative value

units ("RVUs") as a basis for incentive compensation in the

Compensation Plan is intended to reward physician effort "without

regard to the payor for a particular patient or the patient's ability to

pay."  Id.  On its face, the Compensation Plan is undoubtedly

gender neutral.

The Dean of SIU SOM and the CEO of SIU P&S are responsible

for the administration of the Compensation Plan.  Opp'n 6.  Since

2016, the Dean and Provost of SIU SOM has been Dr. Jerry Kruse.

Id. at 5.  Since at least 2010, all of SIU P&S' CEOs have been men. Id. at 5–6.

Under the Compensation Plan, Defendants' physician faculty members can receive three types of compensation, all of which must be paid in accordance with the Compensation Plan: (1) an academic base salary paid by SIU SOM; (2) a clinical base salary paid by SIU P&S; and (3) a clinical incentive income paid by SIU P&S.  Id. at 6. Academic base salary compensates physician faculty for their academic and administrative duties and is a fixed, monthly amount.  Id.

The clinical base and clinical incentive income make up the clinical compensation.  Id.  Clinical compensation is calculated using a formula that assigns RVUs to the services the physician provided.  Defs.' Mot. to Decertify Collective Action 8 (d/e 86) ("Mot. to Decertify").  Individual RVUs are based on the current Medicare RVU fee schedule and are uniform across medical specialties and geographic locations.  Compensation Plan, *11; Mot. to Decertify 8. Clinical compensation is calculated by multiplying the physician's earned RVUs by a conversion factor.  Mot. to Decertify 8.  The conversion factor is different in each division and is recalculated

periodically.  Id.  The RVUs and, therefore, the clinical compensation, are determined by each individual physician's time devoted to clinical practice, types and amount of procedures performed, specialty, and participation in call schedules.  New clinical faculty are guaranteed a fixed clinical income during initial employment to allow them to build a practice, but those who generate more RVUs than anticipated can terminate the guarantee and be paid for all of their accrued RVUs.  Mot. to Decertify 8.  The clinical compensation is also subject to caps.

Hiring decisions and compensation recommendations are standardized to some extent but are also based on a number of individualized factors, including, but not limited to, need, salary survey data, the source of funding, and the physician's background and qualifications, as well as market factors.  Defs.' Mem. Law Supp. Mot. to Decertify 17 (d/e 86-1) ("Mem.").  To determine the initial academic base salary, the Department Chair may consider specific fellowship training, salary surveys compiled by the American Association of Medical Colleges, specific job responsibilities, level of education and prior experience, competing job offers, and availability of third-party financial support for the

position.  Opp'n 7.  This recommendation is reviewed again by the Human Resources Department, SIU's Affirmative Action office, the Office of Management and Budget, and the Dean.  Id.

After a physician accepts employment with Defendants, they execute a Member Practice Agreement which identifies the physician's duties and responsibilities and all compensation and fringe benefits.  Id. at 8.  New physicians also execute an Annual Compensation Agreement that reflects the agreed academic base salary and the anticipated clinical compensation for the coming year.  Id.

Going forward, physicians' compensation is reviewed annually. As with initial compensation, Department Chairs recommend compensation adjustments for physicians in their departments. Those recommendations are subject to review and approval by the Dean.  Id. at 7.  SIU P&S' Compensation Committee also reviews physicians' compensation.  Id. at 8.

Plaintiff alleges that this process has resulted in discriminatory pay practices whereby female physicians are paid significantly less than similarly situated male physicians.

Defendants argue that the process of determining compensation is highly individualized.

This Court conditionally certified a collective action under the FLSA on September 29, 2017.  Shortly thereafter Plaintiff moved for class certification of her Illinois Equal Pay Act, Title VII, and Illinois Civil Rights Act claims pursuant to Federal Rule of Civil Procedure 23.[1]  Finding that Plaintiff had not met her burden to show commonality or typicality, the Court denied Plaintiff's Motion for Class Certification in an Opinion and Order dated September 12, 2018.  Defendants now move to decertify the collective action previously conditionally certified by the Court under Section 216(b) of the Fair Labor Standards Act (FLSA).  See 29 U.S.C. § 216(b).

## II.  LEGAL STANDARD

Pursuant to Section 216(b) of the FLSA, a plaintiff may bring a collective action on behalf of themselves "and other employees similarly situated."  29 U.S.C. § 216(b).  A prospective member of the collective action may "opt-in" by filing a written consent form in the court where the action is brought; a person who does not opt-in

---

[1] In the briefing on the instant motion, both parties have referred to and incorporated by reference their briefs on the Rule 23 class certification motion. See Opp'n 2, 13; Reply 6 (d/e 97).

is not part of the FLSA collective action and is not bound by the

court's decision.  Gambo v. Lucent Techs., Inc., No. 05 C 3701,

2005 WL 3542485, at *3 (N.D. Ill. Dec. 22, 2005).

The FLSA does not detail the process a court should employ to

determine whether potential class members are "similarly situated."

See Smallwood v. Ill. Bell Tel. Co., 710 F. Supp. 2d 746, 750 (N.D.

Ill. 2010) (citing Hoffmann–La Roche, Inc. v. Sperling, 493 U.S. 165,

170–174 (1989)).  Nor has the Seventh Circuit done so.  Id.  A

majority of courts, including courts in this District, have adopted a

two-step method to determine whether a plaintiff is "similarly

situated" to putative class members.  See, e.g., North v. Bd. of Trs.

of Ill. State Univ., 676 F. Supp. 2d 690, 694 (C.D. Ill. 2009); Jirak v.

Abbott Laboratories, Inc., 566 F. Supp. 2d 845, 847 (N.D. Ill. 2008)

(collecting cases).

At Step 1, the court decides if a class should be "conditionally"

certified.  See Russell v. Ill. Bell Tel. Co., 575 F. Supp. 2d 930, 933

(N.D. Ill. 2008).  At the first step, plaintiffs need only make "a

modest factual showing sufficient to demonstrate that they and

potential plaintiffs together were victims of a common policy or plan

that violated the law."  Bitner v. Wyndham Vacation Resorts, Inc.,

301 F.R.D. 354, 357 (W.D. Wis. 2014) (internal citations and quotation marks omitted).  The plaintiff's burden at Step 1 is minimal and the standard is "fairly lenient."  Berndt v. Cleary Bldg. Corp., No. 11-cv-791, 2013 WL 3287599, at *7 (W.D. Wis. Jan. 25, 2013).  "[T]he purpose of this first stage is merely to determine whether 'similarly situated' plaintiffs do in fact exist."  Myers v. Hertz Corp., 624 F.3d 537, 555 (2d Cir. 2010) (emphasis and citations omitted).  If the court concludes that the plaintiff has met her burden at Step 1, the court certifies the conditional class and may order that appropriate notice be provided to potential class members.  This Court ruled on the first step of the test when it conditionally certified the case as a collective action.  See Opinion and Order (d/e 53).

Step 2 occurs after the conclusion of discovery and the opt-in process is complete.  The parties engaged in additional discovery on the opt-in plaintiffs, and Defendants triggered the second step by moving to decertify the collective action.  At this step, "the court's inquiry is more stringent" than during Step 1.  Mielke v. Laidlaw Transit, Inc., 313 F. Supp. 2d 759, 762 (N.D. Ill. 2004).  With the benefit of discovery, the court examines three factors: "1) whether

the plaintiffs share similar or disparate employment settings; 2)

whether the various affirmative defenses available to the defendant

would have to be individually applied to each plaintiff; and 3)

fairness and procedural concerns." Id.  At Step 2, the court may

also revisit the "similarly situated" determination in light of the

additional discovery conducted and make a final ruling on the

certification.  North, 676 F. Supp. 2d at 695.

At this stage in the litigation, Defendants' motion requires

analysis under the second step of the two-step process.

### III.  ANALYSIS

### A. While Plaintiffs Share Some Factual and Employment Settings, Individual Issues Predominate.

Plaintiffs bear the burden of demonstrating that they are

similarly situated.  Camilotes v. Resurrection Health Care Corp.,

286 F.R.D. 339, 345 (N.D. Ill. 2012).  In order to maintain a suit as

an FLSA collective action the plaintiffs must identify a "factual

nexus that binds the plaintiffs together as victims of a particular

violation of the . . . law[ ]." Vennet v. Am. Intercontinental Univ.

Online, No. 05 C 4889, 2005 WL 6215171, at *6 (N.D. Ill. Dec. 22,

2005).  While Plaintiffs need only be similarly—not identically—

situated, a collective action is not appropriate when determining whether a plaintiff has a viable claim "depend[s] on a detailed, fact-specific inquiry." Alvarez v. City of Chicago, 605 F.3d 445, 449 (7th Cir. 2010).

With regards to this first factor, courts typically consider similarities or differences in the opt-in plaintiffs' job titles and duties, work locations, supervision, and compensation. Camilotes, 286 F.R.D. at 346. The Court may also consider if there is a common policy or practice of the employer that violates the FLSA. Id.

Consideration of these variables leads to the conclusion that the opt-in Plaintiffs are too dissimilarly situated to continue as a collective action. Significant factual differences exist among the plaintiffs' job duties and work settings, such that these individualized issues will predominate over issues common to the collective action.

1.  Plaintiffs have disparate job duties and work settings.

Plaintiffs encourage the Court to view their positions at a high level of generality, noting that all SIU SOM physician faculty position descriptions contain core duties such as 'administration,'

'teaching,' 'research,' and 'service,' or "highly similar terms."  Opp'n
9.  Defendants ask the Court to take a much closer view, assessing
what each plaintiff actually does in their respective positions in
order to determine whether they are similarly situated.  While
taking Plaintiffs' position was sufficient at step one of the
certification process, the Court must take a closer look at the
second step.

Plaintiffs encourage a level of generality that would all but
eliminate the 'similarly situated' determination.  It is of course
almost always true that any two or more physicians will have
"substantially similar medical educations and . . . residencies" and
general job responsibilities that include some measure of patient
care and administration.  See Opp'n 14–15.  But the more stringent
inquiry required at this step necessitates more than that.  Here,
analyzing the actual duties performed by each of the plaintiffs on a
day-to-day basis, as well as the individualized factors that
determined initial compensation recommendations, leads to the
conclusion that they are not similarly situated.

At a more general level, only two of the plaintiffs shared
similar job settings.  Both Ahad and Rakinic were in the

Department of Surgery in the Division of General Surgery.  Even within the same division, each had a different area of focus.  Ahad practiced in the area of bariatric surgery and Rakinic specialized in colon and rectal surgery.  Vassileva, though in the same department, was in the Division of Cardiothoracic Surgery, practicing cardiothoracic surgery.  Rotondo, meanwhile was in an entirely different department—the Department of Family and Community Medicine—and an entirely different job setting in that she was exclusively employed by SIU SOM in its Federally Qualified Health Center (FQHC) where she was a family practice physician.  Rotondo's teaching duties though also related to the practice of osteopathic medicine as she was a doctor of osteopathy.

Further, while three of the plaintiffs were recruited into the position of Assistant Professor, their jobs duties still varied widely in spite of sharing a common job title.  Ahad was recruited specifically to fill the position of Medical Director of Bariatric Surgery—a position that was created when she was hired and eliminated when she left.  Cox-Largent Decl. ¶ 23.  Ahad described this as a "leadership position."  Ahad Dep. 111:7–8 (d/e 86-3).  This position required not only clinical and surgical activities, but also

significant administrative responsibilities, including community outreach efforts to grow the program, Ahad Dep. 123:1–18, and development and evaluation of policies and procedures and quality improvement programs, Ahad Dep. 136:2–8.

Another Assistant Professor, Vassileva, devoted as much as half of her time to research and only a small fraction to administration.  Vassileva Dep. Ex. 10 (d/e 86-12).  While Vassileva was appointed as Director of the Center for Valvular Heart Disease, her contract specifically anticipated that her time commitment to that administrative position would be only about six-and-a-half hours per month on average or eighty hours a year in the aggregate. Vassileva Dep. Ex. 15 (d/e 86-13).  The medical director agreement governing Ahad's appointment as Director of Bariatric Surgery, in contrast, required that she devote fifteen hours each week to her administrative role.  Ahad Dep. Ex. 29 (d/e 86-4).

Finally, the third opt-in plaintiff hired as an Assistant Professor, Rotondo, held no administrative positions, Rotondo Dep. 103:3–9 (d/e 86-14), and devoted nearly all of her time to family practice medicine and teaching responsibilities and almost none to research, Rotondo Dep. Ex. 7 (d/e 86-15).  The fourth opt-in

plaintiff, Rakinic, was also, like Ahad, recruited to SIU SOM specifically to set up a new program, but Rakinic was hired into the job title of Associate Professor.  Rakinic Dep. 15:15– 20 (d/e 86-10); Ex. 2.  Rakinic never held a Medical Director position but was named Vice Chair for Clinical Affairs for the Department of Surgery. Rakinic Dep. Ex. 6 (d/e 86-10).  The position descriptions covering Rakinic's position for each year of her employment show that the anticipated percentage of her time she would devote to administrative responsibilities ranged from ten to thirty percent depending on the year.  Rakinic Dep. Ex. 7 (d/e 86-10, 11).

The position descriptions for each of the plaintiffs reflect similar differences in the time commitments required for teaching and service responsibilities.  Moreover, the proportions devoted to each of the core responsibilities—administration, research, teaching and service—changed from year to year for every one of the plaintiffs.  In some years, nearly half of some positions was anticipated to be related to teaching, Rotondo Dep. Ex. 7, while for others teaching comprised only a quarter of the position's responsibilities, Rakinic Dep. Ex. 7.  Some Plaintiffs were expected to commit as much as sixty percent of their time to service

responsibilities, Rotondo Dep. Ex. 7, while others, as little as twenty-five percent, Vassileva Dep. Ex. 10.

Plaintiffs contend that these dissimilarities in job responsibilities are distinctions without differences, arguing that labeling physician positions (i.e. bariatric surgeon or cardiothoracic surgeon) focuses only on a small portion of a physician's job duties—the clinical responsibilities—and "conceal[s] the interchangeable nature of duties." Opp'n 14. Plaintiffs also claim that differences between departments are overstated by Defendants. As discussed above, though, there are not only significant variations in the clinical aspects of Plaintiffs' job duties, but all aspects—clinical, administration, teaching, and research.

The Compensation Plan's emphasis on rewarding physician productivity, as reflected by the use of RVUs tied to particular clinical services in determining clinical income, creates further variation. Differences between practice areas and departments then can have significant impacts on compensation, as can differences in the percentage of time a given physician devotes to service responsibilities, as opposed to administration, research, or teaching.

2. <u>The Factors Affecting Each Opt-in Plaintiffs' Compensation are Highly Individualized.</u>

Beyond the differences in day-to-day responsibilities of the Plaintiffs, the compensation structures of the Plaintiffs also demonstrate that they are not similarly situated. For example, while Ahad, Vassileva, and Rotondo were hired into the job title of Assistant Professor, only Vassileva rose to the position of Associate Professor. Rakinic, recruited as an Associate Professor, eventually rose to the position of Professor. These advancements, or lack thereof, affected compensation. When Vassileva was promoted to Associate Professor, she received a $10,000 increase in her base salary, Vassileva Dep. Ex. 8, and when Rakinic was promoted to full Professor her base was increased by $20,000, Rakinic Dep. Ex. 6.

Ahad's recruitment into a Medical Director position affected the initial compensation recommendation for the position as reflected by the fact that her compensation was $50,000 more than that of the most-recently hired Assistant Professor. Cox-Largent Decl. ¶ 22. Similarly, Vassileva's appointment to director of the valve program came with a $20,000 increase to base salary, Vassileva Dep. 46:2–11, while Rakinic's appointment to a Vice Chair

position was accompanied by a $15,000 increase, Rakinic Dep. Ex. 6.  As these appointments to administrative positions affected compensation, the fact that Rotondo did not hold an administrative position then, surely affected her compensation.

Market forces, including need and demand, also affected recruitment and, in turn, initial base compensation recommendations and compensation adjustment recommendations. For example, Ahad and Rakinic were recruited to develop new programs, while Vassileva was hired to replace a departing physician.  Rakinic received an equity adjustment when her junior partner received one in order to keep him from being hired away. Rakinic Dep. 84:5–85:23.  Vassileva received a significant increase in her base academic compensation in order to retain a number of cardiothoracic surgeons and keep them from leaving for private practice.  Vassileva Dep. 53:4–19.  Rotondo's initial compensation reflected the fact that she had several years' experience in private practice prior to joining SIU SOM.

Market factors also affected productivity, which then affects clinical income.  By example, Ahad was recruited to set up a bariatric surgery program specifically to compete with an existing

program.  Due to low Medicaid reimbursement rates though, the new program limited the number of Medicaid patients it would take, thereby limiting the program's growth and Ahad's productivity (and in turn, compensation).  Ahad Dep. 68:23–69:6.  As a result, Ahad did not generate enough RVUs in her first two years to meet her guarantee, and thus entered a reconciliation period.  On the other hand, Rakinic was so clinically productive that some years she generated the most RVUs in her division, Rakinic Dep. Ex. 9, and she was able to end her guarantee early, Rakinic Dep. 57:6–18. Vassileva's income was not impacted by the ability to take Medicare or Medicaid patients, Vassileva Dep. 97:15–20, but market changes—in this case, a competing facility hiring its own cardiac surgeon—resulted in a significant decrease in her clinical activity and workload, Vassileva Dep. Ex. 13.  Rotondo, who worked in the FQHC, participated in a fee-pooling agreement that was unique to that employment setting.

Plaintiffs state that Defendants' contention that these individualized differences in compensation calculations are of consequence essentially amounts to a white-collar exemption to the Equal Pay Act that does not exist.  Opp'n 10–11. Importantly,

however, none of the cases cited by the Plaintiff in support of this point are collective actions; rather each involved only a single plaintiff bringing claims under the Equal Pay Act.  See King v. Acosta Sales & Mrktg., 678 F.3d 470 (7th Cir. 2012); Hildebrandt v. Ill. Dep't of Nat'l Res., 347 F.3d 1014 (7th Cir. 2003); Storrs v. Univ. of Cincinnati, 271 F. Supp 3d 910 (S.D. Ohio 2017).  So, while Plaintiffs' general statement is true, plaintiffs overlook an important distinction.  The inquiry required to determine both liability and damages here is vastly more complex than say, calculating unpaid overtime for time spent by foundry workers showering and changing clothes at the end of a shift, see DeKeyser v. Thyssenkrupp Waupaca, Inc., 860 F.3d 918 (7th Cir. 2017), or for bus drivers paid hourly wages, see Mielke, 313 F. Supp. 2d 759.  The individualized inquiries required here demonstrate that the plaintiffs are not similarly situated, and that decertification is, therefore, appropriate.

3. Plaintiffs have not identified a common policy or practice responsible for the alleged discrimination.

Beyond consideration of Plaintiffs' respective positions, Plaintiffs have not identified a common policy or practice that has caused the alleged unequal treatment.  See Vennet, 2005 WL

6215171, at *6 ("There must be a demonstrated similarity among
the situations of each plaintiff beyond simply claiming that the
FLSA has been violated . . . .").  While the presence of a unified
policy or standard practice is not strictly necessary to proceed as a
collective action, the absence of one weighs in favor of
decertification.  Mielke, 313 F. Supp. 2d at 763–64.

Again, Plaintiffs ask the Court to take a wide-angle view,
suggesting that the manner in which Defendants establish and
adjust salaries is a "single" or "centralized" process.  Viewing the
process set out in the parties' briefs as a "singular practice for
determining compensation," Opp'n 7, overlooks each of the
individualized considerations that factors into compensation
decisions—decisions which occur at multiple different levels of
review.

Plaintiffs argue that the necessary "factual nexus that binds
the plaintiffs together as victims of a particular violation," see
Vennet, 2005 WL 6215171, at *6, in this case is Defendants'
implementation of their Compensation Plan, by which Defendants
establish and adjust physicians' compensation.  Plaintiffs
acknowledge that the Compensation Plan is facially gender neutral

and that initial compensation recommendations were made at the department level.  However, Plaintiffs argue that implementation of the Compensation Plan was still an employment practice that resulted in statistically significant gender pay disparities.  See Opp'n 15.

Plaintiffs have not shown how the facially gender-neutral Compensation Plan could have created the disparate compensation. The discretion given to Department Chairs by the Plan to make recommendations for initial compensation and compensation adjustments demonstrates that there is not a unified policy or practice present.  At the stage of determining initial compensation, Department Chairs consider a number of individualized factors, including salary survey data, funding sources, the candidate's background and qualifications, and market factors.  In making compensation adjustments, the Compensation Plan likewise delegates discretion to Department Chairs, but the Compensation Plan also establishes objective factors which guide the process. Rather than a unified policy or common practice, Plaintiffs have only pointed to a plan that provided for a process that gives

discretion to Department Chairs to consider individualized factors in making compensation decisions.

Plaintiffs also note several times that SIU SOM's Dean has decision-making authority in physician compensation matters and that the Dean and the CEO of SIU P&S are responsible for administration of the Compensation Plan.  See Opp'n 5–6. Similarly, Plaintiffs note that the Dean must review both proposed salary ranges and initial compensation recommendations, as well as compensation adjustment recommendations.  Plaintiffs have not, however, shown that discretion exercised by one or two high-level individuals could have created the disparate impact.

The Compensation Plan does not create the necessary "factual nexus" that binds the plaintiffs together.  Instead, this case bears more similarity to cases that have not found plaintiffs to be similarly situated because no unified policy or common practice existed that was responsible for the alleged violation.  See Mielke, 313 F. Supp. 2d at 764 (declining to certify the plaintiff's proposed collective action in part "[g]iven the absence of a uniform policy" but instead certifying a smaller collective action consisting of similarly

situated claimants who were affected by two separate but identical policies).

Nor does the statistical evidence presented by the Plaintiffs establish that the Plaintiffs are similarly situated.  The Court notes that Defendants have filed a Motion to Exclude Reports and Testimony of David Sharp, Phd. (d/e 98).  That motion, filed nearly eight months after the close of briefing on the class certification motion for which the expert evidence was submitted to support, attacks the methodologies employed by Plaintiffs' expert.  Whether that rendered it untimely is largely moot at this point, as the Court previously considered Dr. Sharp's opinions in its ruling on class certification.  See Opinion (d/e 102) at 14–19.  Regardless, in the Rule 23 context, in Wal-Mart v. Dukes, 564 U.S. 338 (2011), the Supreme Court rejected statistical evidence as a sufficient basis to establish commonality because, even if it showed gender disparity in every store, it would not show a common cause.  564 U.S. at 360.  Likewise, the statistical evidence here does not and cannot show whether a common cause existed regardless of the statistically significant showing of pay disparities based on gender.

## B. Affirmative Defenses Available to Defendants are Highly Individualized as to Each Plaintiff.

With regard to the second factor to be analyzed at Step 2 of the certification process, the Court must consider "whether defendants' defenses could be applied across the board to plaintiffs' claims and potential plaintiffs' claims or whether many and perhaps disparate defenses could be raised." Russell, 721 F. Supp. 2d at 820 (quotation omitted). If a court must conduct a detailed inquiry into each plaintiff's claims based on a defendant's individualized defenses, this factor weighs in favor of decertification. Camilotes, 286 F.R.D. at 352. The Court does not consider the merits of the defenses, but only whether they can be applied uniformly to all of the plaintiffs. Russell, 721 F. Supp. 2d at 820.

Here, the highly individualized process used to determine compensation will necessarily require Defendants to present individualized evidence as to each Plaintiff in order to show that "any other factor other than sex" accounts for the differential in compensation. See 29 U.S.C. § 206(d)(1). Because the determination of liability involves consideration of a number of factors unique to each Plaintiff, including job responsibilities,

productivity, and market forces as discussed previously, how this defense could be shown by common proof is unclear.  Cf. Russell, 721 F. Supp. 2d at 820–21 (finding factor weighed against decertification where plaintiffs were "subjected to common practices and policies," "[d]efenses relating to liability largely require[d] an examination of company records or mechanical calculations," and defenses "appear[ed] to be applicable to all plaintiffs").  Similarly, among the comparator physicians identified by Plaintiffs, only two Plaintiffs identify a single common comparator.  In order to rebut Plaintiffs' claims of unequal pay for equal work, the same individualized factors regarding both job responsibilities and compensation structures would have to be considered for each of the comparators as well.

For much the same reasons, Defendants' defenses as to damages also must be applied individually.  The Seventh Circuit has cautioned that even in cases where there are common questions as to liability—and this is not such a case—"the remedy is so tailored to each particular plaintiff that a collective action is inappropriate."  Alvarez, 605 F.3d at 449 n.1.

Additionally, Defendants raise an entirely distinct defense to Rotondo's claims, pointing to a Separation Agreement and Release she executed prior to opting in to this case.  <u>See</u> Rotondo Dep. Ex. 26.  This defense does not apply to any other plaintiff.

The issues in this case require an individualized analysis to prove both liability and damages.  As application of defenses to the claims must also be individualized, consideration of this factor weighs in favor of decertification.

### C. Fairness and Procedural Concerns Weigh in Favor of Decertification.

Finally, with regard to the third factor of Step 2 of the certification process, the Court must consider whether it is fair to the parties, as well as procedurally feasible, to adjudicate the case as a collective action.  "A collective action is oxymoronic . . . where proof regarding each individual plaintiff is required to show liability." <u>Russell</u>, 721 F. Supp. 2d at 822 (quotation omitted).

Defendants argue that proceeding as a collective action would require presentation of voluminous, individualized evidence. Defendants also raise due process concerns, arguing that allowing Plaintiffs to proceed collectively would effectively require Defendants

to conduct four separate trials in a single proceeding.  Plaintiffs claim that proceeding as a collective action will not pose any difficulties, that there would be substantial overlap of evidence, and that the risk of inconsistency outweighs Defendants' due process concerns.

Given the variety of individualized issues presented by this case, the third factor in this step of the analysis also weighs in favor of decertification.  Because Plaintiffs have not shown that they are similarly situated, allowing them to proceed collectively on their claims does not promote judicial economy.  As the Court has already noted, the process by which Defendants establish and adjust compensation is not the "virtually uniform process" Plaintiffs make it out to be.  Beyond common evidence pertaining to the Master Agreement or the Compensation Plan in general terms, and some testimony from common decision makers, nearly all of the evidence in this case appears likely to be quite individualized at every phase.  Given the vast factual differences in Plaintiffs' job responsibilities and compensation structures, permitting this case to proceed as a collective action would be impractical and unfair.

## IV.  CONCLUSION

For the reasons stated, Defendants' Motion to Decertify Collective Action (d/e 86) is GRANTED.  The claims of the opt-in plaintiffs are dismissed without prejudice.  Defendants' Motion to Exclude Reports and Testimony of David Sharp, Phd. (d/e 98) is DENIED without prejudice as moot.


**ENTERED: March 28, 2019**


**FOR THE COURT:**

$\phantom{XXXXXXX}$ ***/s/ Sue E. Myerscough***
$\phantom{XXXXXXX}$ **SUE E. MYERSCOUGH**
$\phantom{XXXXXXX}$ **UNITED STATES DISTRICT JUDGE**