## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | |
|---|---|
| **SAJIDA AHAD, MD, on behalf of herself** ) | |
| **and all others  similarly situated,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 15-cv-03308** |
| ) | |
| **BOARD OF TRUSTEES OF SOUTHERN** ) | |
| **ILLINOIS UNIVERSITY, and** ) | |
| **SIU PHYSICIANS & SURGEONS, INC.,** ) | |
| **d/b/a SIU HEALTHCARE,** ) | |
| ) | |
| **Defendants.** ) | |

## OPINION AND ORDER

**SUE E. MYERSCOUGH, U.S. District Judge:**

Before the Court is a Motion for Summary Judgment
submitted by Defendants Board of Trustees of Southern Illinois
University and SIU Physicians & Surgeons, Inc. (hereinafter
collectively referred to as "Defendants").  (d/e 113).  Because triable
issues of fact remain in each of the four Counts in Plaintiff's
Amended Complaint, Defendants' Motion for Summary Judgment
(d/e 113) is DENIED.

# I.   BACKGROUND

The Court draws the following facts from the parties' Local Rule 7.1(D)(1)(b) statements of undisputed material facts.  The Court discusses any material factual disputes in its analysis.  Immaterial facts or factual disputes are omitted.  Any fact submitted by any party that was not supported by a citation to evidence will not be considered by the Court.  See Civil LR 7.1(D)(2)(b)(2).  In addition, if any response to a fact failed to support each allegedly disputed fact with evidentiary documentation, that fact is deemed admitted.  Id.

Defendant Board of Trustees of Southern Illinois University (the "Board") is responsible for overseeing and maintaining Southern Illinois University and Southern Illinois University School of Medicine ("SIUSM").  Defendant SIU Physicians & Surgeons, Inc. ("SIUPI") is a separate non-profit tasked with supporting the University by providing faculty physicians at SIUSM the ability to perform clinical practices.  The Board is the employer of all SIUSM employees.

Dr. Sajida Ahad was one of those employees.  She was also a concurrent employee of SIUPI.  From 2008 to 2014, Dr. Ahad was

employed by Defendants as an Assistant Professor on tenure track in the Department of Surgery with an appointment to the Division of Surgery.  Before being hired by Defendants, Dr. Ahad earned a medical degree from Aga Khan Medical College Karachi, Pakistan, in 1998.  She also completed a residency at the Mayo Clinic in Rochester, Minnesota beginning in 2001 until 2006.  After her residency, Dr. Ahad performed a surgical fellowship in laparoscopic surgery at the University of Washington, completing the fellowship in 2008 just prior to joining Defendants.

Dr. Ahad's duties in her position were split between academic and clinical duties.  Approximately 40% of Dr. Ahad's time was spent on academic duties such as teaching, research, and administrative duties.  The remaining 60% of her time was devoted to clinical service duties involving patient care.

Dr. Ahad's compensation was governed by a Compensation Plan while employed by Defendants.  Under the Plan, physicians employed by Defendants received both clinical income and an academic base income.  While the academic base is a set amount determined annually, the clinical component is formula-based.  The formula uses a measurement called a Relative Value Unit (RVU).

Each task a physician performs is assigned an RVU amount such that the greater number of high-RVU tasks a physician performs, the higher that physician's clinical compensation should be.

Defendants and Dr. Ahad agreed that Dr. Ahad's academic base would be $125,000 annually and clinical income would be $125,000 annually, guaranteed for each of the first two years of Dr. Ahad's employment. The clinical amount was guaranteed to allow Dr. Ahad to develop a practice and increase productivity. The guarantee period was standard among Defendant-employed physicians. The guarantee period operated so that those who performed more high-RVU tasks could eventually earn their way out of the guarantee period early. Those who performed low-RVU tasks would have to enter a reconciliation period during which a portion of that physician's salary would be deducted back to Defendants until the advanced salary from the guarantee was paid back. The guarantee period is generally twelve months. After Dr. Ahad's guarantee period ended, Dr. Ahad earned a total of $204,138.47 in 2012 and $235,903.22 in 2013. Dr. Ahad resigned her position in March 2014.

Dr. Ahad has pointed to four male physicians who received greater pay from Defendants than she did both while she was employed by Defendants and immediately after: Dr. Jarrod Wall, Dr. David Rea, Dr. Brent Cetindag, and Dr. Adam Reid.  Each physician received a higher guaranteed initial compensation as well as greater wages for the years 2012 and 2013.

Specifically, Dr. Wall received a total guarantee of $325,000 for his first two years and subsequent wages of $328,269.91 in 2012 and $344,581.94 in 2013.  Dr. Rea received a total guarantee of $275,000 for his first two years and subsequent wages of $324,137.77 in 2012 and $368,820.92 in 2013.  Dr. Cetindag received a total guarantee of $325,000 for his first two years and subsequent wages of $288,835.69 in 2012 and $270,700.20 in 2013.  Dr. Reid began working for Defendants in 2014 after Dr. Ahad resigned.  Defendants agreed to pay Dr. Reid a total guarantee of $375,000 for his first two years, though his total compensation for his first year totaled $391,715.78.

In response to this pay disparity, Dr. Ahad brought a four-count amended complaint against Defendants alleging violations of the Equal Pay Act of 1963, 29 U.S.C. § 206(d), the Illinois Equal Pay

Act of 2003, 820 ILCS 112 et seq., Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., and the Illinois Civil Rights Act, 740 ILCS 23/1 et seq.  On September 29, 2017, the Court conditionally certified Plaintiff's action as a collective action under 29 U.S.C. § 216(b).  See Op. and Order (d/e 53).  However, on March 29, 2019, the Court, on Defendants' motion, decertified the collective action after finding the three opt-in plaintiffs were too dissimilar from Plaintiff under the collective action provisions in § 216(b) of the Fair Labor Standards Act.  See Op. and Order (d/e 109).  Since then, Defendants have filed the present Motion for Summary Judgment (d/e 113) under Rule 56 of the Federal Rules of Civil Procedure.

## II.  LEGAL STANDARD

Summary judgment under Rule 56 is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  On such a motion, the facts, and all reasonable inferences derived therefrom, are viewed in the light most favorable to the non-moving party.  Scott v. Harris, 550 U.S. 372, 380 (2007); Blasius v. Angel Auto., Inc., 839 F.3d 639, 644

(7th Cir. 2016) (citing <u>Cairel v. Alderden</u>, 821 F.3d 823, 830 (7th Cir. 2016)).

A genuine dispute as to any material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). The moving party bears the burden of establishing that there is no genuine dispute as to any material fact. <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986); <u>Modrowski v. Pigatto</u>, 712 F.3d 1166, 1168 (7th Cir. 2013) (explaining that Rule 56 "imposes an initial burden of production on the party moving for summary judgment to inform the district court why a trial is not necessary" (citation omitted)). After the moving party does so, the non-moving party must then go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." <u>Anderson,</u> 477 U.S. at 255 (quotation and footnotes omitted). Summary judgment is only warranted when the moving party carries its initial burden and the non-moving party cannot establish an essential element of its case on which it will bear the burden of proof at trial. <u>Kidwell v. Eisenhauer</u>, 679 F.3d 957, 964 (7th Cir. 2012).

### III.  ANALYSIS

At summary judgment, the Court accepts as true Plaintiff's factually supported version of events.  The legal issue is whether a jury could find Plaintiff's version of events support any or all of the Counts in the Amended Complaint.  The Court finds that a jury could.

> a.   *Dr. Ahad's claims under the federal Equal Pay Act and Illinois Equal Pay Act present genuine issues of material fact from which a jury could find in Plaintiff's favor.*

Counts One and Two of Plaintiff's Amended Complaint allege Defendants violated the Equal Pay Act of 1963, 29 U.S.C. § 206(d) ("EPA"), and the Illinois Equal Pay Act of 2003, 820 ILCS 112 et seq. ("IEPA"), respectively, by underpaying Plaintiff as compared to her male colleagues.  See Am. Compl. (d/e 31) at p. 25 & 26.  As both parties concede, "[t]he [Illinois Equal Pay Act] and the federal Equal Pay Act are evaluated using the same standards."  Hubers v. Gannett, Inc., 16 C 10041, 2019 WL 1112259, at *4 n.8 (N.D. Ill. Mar. 11, 2019); Gauen v. Bd. of Educ. Of Highland Cmty. Unit. Sch. Dist. No. 5, 16-0207, 2017 WL 2869942, at *3 n.3 (S.D. Ill. July 5, 2017).  Therefore, the Court's summary judgment analysis is the same as to Plaintiff's EPA and IEPA claims.

The EPA prohibits discrimination in wages "between employees on the basis of sex" when those employees perform "equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions."  29 U.S.C. § 206(d)(1).  A plaintiff alleging claims under the EPA bears the initial burden of establishing a prima facie case of wage discrimination.  Once the plaintiff does so, the burden of persuasion shifts to the defendant to offer a gender-neutral justification for the unequal pay.  Warren v. Solo Cup Co., 516 F.3d 627, 630 (7th Cir. 2008).

> i.  *Plaintiff has raised triable issues of fact in her prima facie case under the Equal Pay Act.*

To establish her prima facie case of wage discrimination, and meet her initial burden, Plaintiff must show, by a preponderance of the evidence, that "(1) higher wages were paid to a male employee, (2) for equal work requiring substantially similar skill, effort and responsibilities, and (3) the work was performed under similar working conditions." Warren, 516 F.3d at 630 (quoting Stopka v. Alliance of Am. Insurers, 141 F.3d 681, 685 (7th Cir.1998)). Plaintiff need not prove discriminatory intent to establish her prima

facie case.  Id.  Neither party disputes that Dr. Ahad was paid less than some of her male colleagues or that their work was performed under similar working conditions.  Instead, the parties focus their arguments on whether Dr. Ahad and her male colleagues performed equal work.  Therefore, the first and third elements of Plaintiff's prima facie case are considered satisfied for purposes of summary judgment.  The only remaining issue is whether Dr. Ahad and her alleged comparators can be considered to have performed equal work.

"In determining whether two jobs are equal, the crucial inquiry is 'whether the jobs to be compared have a 'common core' of tasks, i.e., whether a significant portion of the two jobs is identical.'" Cullen v. Ind. Univ. Bd. Trs., 338 F.3d 693, 698 (7th Cir. 2003) (quoting Fallon v. Illinois, 882 F.2d 1206, 1209 (7th Cir.1989)).  Once a plaintiff has established a common core of tasks, "the court must ask whether any additional tasks make the jobs 'substantially different.'"  Id.  In considering this inquiry, the EPA and the applicable Equal Employment Opportunity Commission regulations specify three elements to be considered: required skill, effort, and

responsibility.  See 29 U.S.C. § 206(d)(1); 29 C.F.R. §§ 1620.13–

1620.17.

> The terms constitute separate tests, each of which must
> be met in order for the equal pay standard to apply.  It
> should be kept in mind that "equal" does not mean
> "identical."  Insubstantial or minor differences in the
> degree or amount of skill, or effort, or responsibility
> required for the performance of jobs will not render the
> equal pay standard inapplicable.  On the other hand,
> substantial differences, such as those customarily
> associated with differences in wage levels when the jobs
> are performed by persons of one sex only, will ordinarily
> demonstrate an inequality as between the jobs justifying
> differences in pay.  However, differences in skill, effort or
> responsibility which might be sufficient to justify a
> finding that two jobs are not equal within the meaning of
> the EPA if the greater skill, effort, or responsibility has
> been required of the higher paid sex, do not justify such
> a finding where the greater skill, effort, or responsibility
> is required of the lower paid sex.

29 C.F.R. § 1620.14(a).  The parties do not dispute that Dr. Ahad's

position and those of her alleged comparators required equal effort.

Therefore, the only elements the Court considers at this stage are

the required skills and responsibilities of the positions.

When considering whether two jobs require "equal skill," the

equal pay standard will not apply only where "the amount or degree

of skill required to perform one job is substantially greater than that

required to perform another job."  29 C.F.R. § 1620.15(a).  Factors

used to determine the level of skill required include "experience, training, education, and ability." Id.  The level of skill required is measured only in terms of those skills required to perform the job, and any others the employee may possess but which are not required are not considered.  Id.; see Cullen, 338 F.3d at 699 ("the comparison at [the skill assessment] juncture is between positions, not individuals").  Furthermore, the equal pay standard will apply "even though the employee in one of the jobs may not exercise the required skill as frequently or during as much of his or her working time as the employee in the other job." Id.

Defendants argue that Plaintiff cannot, as a matter of law, be considered to have performed equal work as her male colleagues for purposes of the EPA.  Specifically, Defendants state that the highly skilled nature of the work involved, e.g., medicine, pulls Dr. Ahad's claims outside the purview of the EPA because the work cannot be considered standardized.  Def.'s Mot. Summ. J. (d/e 113) p. 45. Defendants also argue that Dr. Ahad's status as a bariatric surgeon means her work was unequal compared to that of other physicians who were fellowship-trained in different types of surgery.  Therefore,

in Defendants' view, Plaintiff cannot meet her initial burden of establishing a prima facie case of pay discrimination.

Taking the facts in the light most favorable to Plaintiff, a reasonable jury could find that Dr. Ahad and the male comparators performed equal work. First, triable issues of fact exist regarding whether Dr. Ahad's and her male comparators' jobs had a 'common core' of tasks. The parties do not dispute that Dr. Ahad and the comparators shared common duties generally, including administrative, teaching, research, and clinical duties, including operating room and non-operating rooms duties like consulting patients, preoperative care, and post-operative care. What the parties do dispute is whether the specific type of surgical care performed by each physician, which itself occupies only a fraction of each physician's duties, is a significant enough difference to render the 'common core' tasks not substantially similar under the EPA.

Triable issues of fact exist regarding whether Dr. Ahad and her comparators performed a 'common core' of tasks. Dr. Ahad's duties consisted of academic and clinical duties, in which she allocated about 40% of her time to academic duties and 60% of her time to clinical duties. Pl.'s Ex. 15. Drs. Wall, Cetindag, Reid, and Rea

each allocated their total duties similarly.  See Pl.'s Statement of
Additional Material Facts (d/e 118) pp. 69–73.  Of the clinical
duties, Dr. Ahad's consisted of general, bariatric, endoscopic,
foregut, and trauma surgeries, as well as non-surgery duties like
patient consultation and post-operative rounds.  Id. at 69.  Dr.
Wall's clinical duties consisted of general and trauma surgeries and
about 90% of his trauma and critical care duties were non-
operative.  Id. at 70.  Dr. Cetindag's clinical duties also consisted of
general and trauma surgeries and less than 10% of his trauma
duties involved surgeries.  Id. at 71.  Dr. Reid performed general,
bariatric, and trauma surgeries and most of his trauma and critical
care duties were also non-surgical.  Id. at 71–72.  Lastly, Dr. Rea's
clinical duties consisted of general, trauma, breast, and transplant
surgeries and about half of his patient care was non-surgical
duties.

Defendants argue that the male comparators' duties were too
unique to be compared to Dr. Ahad because of the differences in
types of surgery and their performance of trauma care.  However,
many of Defendants' arguments for each physician center around
their titles.  Def.'s Reply (d/e 130) pp. 53–62.  Additionally, to the

extent that Defendants dispute Plaintiff's characterization of each physician's duties, the disputes represent triable issues of fact to be decided by a jury, not at summary judgment. But taken in the light most favorable to the Plaintiff, the facts as stated could lead a reasonable jury to find that Plaintiff and her comparators shared a 'common core' of tasks.

Triable issues also exist regarding whether Dr. Ahad and the comparators performed work requiring substantially equal "experience, training, education, and ability," and, therefore, equal skill. 29 C.F.R. § 1620.15(a). Dr. Ahad and each of the comparators were all employed in the Department of Surgery's General Surgery Division with the same rank of Assistant Professor. Each physician had substantial medical training, including medical school, residencies, and specialized fellowships, though the parties dispute the degree to which that training was generalized and whether the difference in the fellowship specialization renders each physicians' skills unequal. While Defendants argue that Dr. Ahad's performance of bariatric surgeries makes her unique, Dr. Ahad has cited evidence, which Defendants do not dispute, showing that physicians in the Division of General Surgery performed surgeries

outside of their own specialty areas, indicating each possessed interchangeable skills.  In any event, the inquiry into whether the skills required of Dr. Ahad's and her comparators' jobs were substantially equal is primarily a factual determination suitable for the jury to decide as the finder of fact.  See Fallon, 882 F.2d at 1208.  On the facts alleged, a jury could determine that the skills required were substantially equal.

Finally, Defendants argue that Dr. Ahad's responsibilities as the Medical Director of Bariatric Surgery render her job responsibilities unequal and remover her job from the EPA analysis. However, while such responsibilities may otherwise support a finding of unequal work, such a finding is not supported here because Dr. Ahad was the lower paid employee despite being tasked with these additional responsibilities.  See 29 C.F.R. § 1620.14(a) ("However, differences in . . . responsibility which might be sufficient to justify a finding that two jobs are not equal within the meaning of the EPA if the greater . . . responsibility has been required of the higher paid sex, do not justify such a finding where the greater . . . responsibility is required of the lower paid sex.").

Triable issues of fact abound as to whether Dr. Ahad and her alleged male comparators performed equal work.  The facts, when viewed in the light favorable to Plaintiff, could lead a reasonable jury to determine that the work was equal under the EPA.  As such, the Court finds that Plaintiff has carried her burden as to her prima facie case under the EPA and IEPA claims at summary judgment. Having so concluded, the Court next turns to Defendant's stated defenses.

> ii.   *Defendants have not carried their burden to establish defenses to Equal Pay Act liability as a matter of law.*

Once Plaintiff has carried her burden to establish a prima facie case of wage discrimination under the Equal Pay Act, the burden shifts to Defendants to establish that the difference in pay was pursuant to any one of four statutory exceptions, namely: "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex."  29 U.S.C. § 206(d)(1); Warren, 516 F.3d at 630.  "The fourth exception is a 'broad, 'catch-all' exception and embraces an almost limitless number of factors, so long as they do not involve sex.'"  Id. (quoting Fallon, 882 F.2d at

1211).  However, the stated justification "must also be bona fide. In other words, an employer cannot use a gender-neutral factor to avoid liability unless the factor is used and applied in good faith." Id.  Indeed, the burden is on the defendant to "prove, not just assert," that the stated nondiscriminatory justification is the reason for the pay disparity at summary judgment.  King v. Acosta Sales & Mktg., Inc., 678 F.3d 470, 474 (7th Cir. 2012).

Defendants have not carried their burden.  Defendants argue that Dr. Ahad's lower pay was based on factors other than sex. Specifically, Defendants argue that Dr. Ahad's lower base salary was, unlike her comparators, based on her Medical Director Agreement with Defendants; that Dr. Ahad's clinical compensation was lower because of her lower RVU earnings; that her comparators' salaries were higher as a result of "market forces"; that Dr. Ahad's salary was affected by her decision not to take trauma call; and that Dr. Ahad was paid less because she declined to take over a breast surgery practice when another physician left SIUSM.  However, each of Defendants' stated reasons present triable issues of fact.

Dr. Ahad was hired in February 2008.  While the parties dispute the exact title of Dr. Ahad's initial position, they do not dispute that she was initially hired to work in the Department of Surgery with an appointment to the Division of General Surgery. Then, in August 2008, Defendants state that SIUSM entered into a Medical Director Agreement with St. John's Hospital (SJH) in Springfield, Illinois.  Under the Agreement, Dr. Ahad was to serve as the Director of Bariatric Surgery for a joint Bariatric surgery program between SIUSM and SJH.  Defendants argue that this Agreement is sex-neutral and determined the rate of pay for Dr. Ahad.  However, not only do the parties dispute whether the terms of Dr. Ahad's initial offer letter were replaced and superseded by the terms of the Agreement, the parties also dispute whether Dr. Ahad's employment was governed by the Agreement at all.  See Pl.'s Resp. to Def.'s Undisputed Material Facts (d/e 118) p. 12–14.  Indeed, the document itself as submitted contains neither Dr. Dunnington's signature (the Chair of the Department of Surgery at SIUSM at the time) nor Dr. Ahad's signature.  "Medical Director Agreement," Def. Ex. B/29, B-111.  Whether Dr. Ahad's salary was governed by a

sex-neutral Medical Director Agreement, therefore, remains a question for the finder of fact.

Defendants also argue that Dr. Ahad's salary was determined by their RVU productivity compensation system. This argument, too, raises questions for a finder of fact. "Under the Equal Pay Act, the inquiry is not whether any merit system *exists*, but rather whether differences in pay are *due* to the proper application of that merit pay system." Lauterbach v. Ill. State Police, 2015 WL 4555548, at *7 (C.D. Ill. July 28, 2015) (emphasis in original). While Defendants have adequately shown that such a merit-based system exists, they have not proven that Dr. Ahad's pay was due to the system's proper application. Defendants argue that Dr. Ahad's lower salary was hampered by a string of falling dominos which diminished her ability to generate RVU's. To wit, Defendants state that Dr. Ahad did not earn high RVU's because she could not take Medicare or Medicaid patients because the bariatric surgery program had not been determined to be a 'Center of Excellence.' Defendants argue that Dr. Ahad's lower RVU numbers were also the result of her declining to take additional trauma call after 2010 and declining to take over a breast surgery practice in 2012.

In response, Dr. Ahad argues that each of the above barriers to higher RVU production was the result of the Defendants' actions. Plaintiff disputes Defendants' arguments, citing to her own deposition in which she states that "we had no marketing support, we didn't have a full-time coordinator to help recruit those patients . . . So the limitation posed by SIU on staffing I think was one of the biggest problems in us developing [the bariatric] program to attain [Center for Excellence] numbers." Def.'s Ex. B, B-018–019. Moreover, Plaintiff disputes that she voluntarily stopped taking trauma call, instead asserting that she and another female doctor were asked to stop taking trauma call in 2010 by the Chair of the Department of Surgery. Dr. Ahad also disputes Defendants' arguments that she would have been able to earn additional RVU's if she had taken on the offered breast surgery practice. Defendants do not explain why Dr. Ahad was denied the resources she cited nor explain why she specifically was asked to stop taking trauma call, both of which may have impacted her ability to earn additional RVU's. Accepting the parties' arguments in the light most favorable to Plaintiff as the nonmoving party, the validity of Defendants' stated sex-neutral reasons for the disparity in pay raise triable

issues of fact suitable for a jury.  Therefore, Defendants' have not carried their burden at summary judgment to prove a sex-neutral reason for the disparity in pay.  Accordingly, Defendants' motion for summary judgment as to Plaintiff's claims under federal Equal Pay Act and Illinois Equal Pay Act must be denied.

>    b.   *Dr. Ahad's claims under Title VII and the Illinois Civil Rights Act also present triable issues of facts from which a jury could find in Plaintiff's favor.*

Counts Three and Four of Plaintiff's Amended Complaint allege that the disparity in wages also amounts to violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., and the Illinois Civil Rights Act ("ICRA"), 740 ILCS 23/1 et seq. When a non-discrimination statute like ICRA does not establish who bears the burden of proof, courts apply the Title VII standard. Frobose v. Am. Sav. & Loan Ass'n of Danville, 152 F.3d 602, 616 (7th Cir. 1998).  Therefore, Plaintiff's Title VII and ICRA claims are analyzed together.  E.g., Jordan v. Evans, 2019 WL 4278179, at *4 (N.D. Ill. Sept. 9, 2019); Johnson v. Bd. of Trs. of S. Ill. Univ., 2014 WL 5797477, at *2 (S.D. Ill. Nov. 7, 2014).

Title VII prohibits employers from discriminating against employees based on "race, color, religion, sex, or national origin."

42 U.S.C. § 2000e–2(a).  In claims under Title VII, the burden of poof remains at all times with the plaintiffs to show discriminatory intent.  <u>Fallon</u>, 882 F.2d at 1213.  The legal standard which the plaintiff must overcome on summary judgment, then, "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action."  <u>Ortiz v. Werner Enters., Inc.</u>, 834 F.3d 760, 765 (7th Cir. 2016) (holding that the previously applied "direct" and "indirect" methods of showing Title VII discrimination must be analyzed together such that "all evidence belongs in a single pile and must be evaluated as a whole.").  What matters at summary judgment is whether a plaintiff has presented enough evidence, either direct or circumstantial, to allow the jury to find in her favor.  <u>Vega v. Chicago Park Dist.</u>, 954 F.3d 996, 1004 (7th Cir. 2020).

Dr. Ahad has done so.  The Seventh Circuit has held that "suspicious timing, ambiguous statements, words and actions toward other employees in the protected group, and 'other bits and pieces from which an inference of discriminatory intent might be drawn' are among the types of circumstantial evidence that may

illustrate an inference of discrimination on the part of the decisionmaker." Paz v. Wauconda Healthcare and Rehab. Ctr., 464 F.3d 659, 655–66 (7th Cir. 2006) (quoting Rudin v. Lincoln Land Cmty. Coll., 420 F.3d 712, 720–21 (7th Cir. 2005)).  Dr. Ahad cites to multiple sources of evidence from which a reasonable fact finder may infer discrimination against women.  Specifically, Dr. Ahad points to her own deposition in which she states that she was forced to extend her reconciliation period from twelve to fifteen months—during which a portion of her pay was deducted back to Defendants if she did not meet certain RVU benchmarks—as a condition for her being allowed to take her first maternity leave. Def.'s Ex. B, B-021, B-053.  Dr. Ahad also points to notes from meetings between multiple female doctors employed by Defendant and Defendants' Director of Human Resources, Penny McCarty, as evidence of sex-based discrimination.  Dr. Ahad cites portions of McCarty's meeting notes with Dr. Ahad in which Dr. Ahad states she "[w]as chastised for pregnancy verbally [and] in writing" and "[w]as told the [bariatric] program wasn't as successful because of her pregnancy."  Pl.'s Ex. 3, 11113–11114.  Perhaps most significant, Dr. Ahad provides excerpts from an email between

McCarty and then-Chairman of the Division of General Surgery, Dr. John Mellinger, in which Dr. Mellinger stats that Dr. Ahad's pregnancies and resulting maternity leaves were factors in Dr. Ahad not receiving the support and resources Dr. Ahad requested for the bariatric program.  Pl.'s Ex. 24.  According to Dr. Ahad, those decisions not only resulted in Dr. Ahad not being able to raise her RVU production levels, but also hindered her ability to further develop the bariatric program.  As a result, the evidence Dr. Ahad presents could also lead a reasonable jury to conclude that Defendants' RVU-productivity system of pay was applied in a discriminatory manner.

The Court finds that the submitted evidence—when reviewed as a whole, taken in the light most favorable to Dr. Ahad, and including the reasonable inferences drawn therefrom—could lead a reasonable jury to conclude that Defendants discriminated against Dr. Ahad by paying her less because of her sex.  Because she has presented such evidence, Dr. Ahad has carried her burden at summary judgment as to her Title VII claims, and by extension her ICRA claims.  See Jordan v. Evans, 2019 WL 4278179, at *4 (N.D.

Ill. Sept. 9, 2019); <u>Johnson v. Bd. of Trs. of S. Ill. Univ.</u>, 2014 WL 5797477, at *2 (S.D. Ill. Nov. 7, 2014).

## IV.   CONCLUSION

Plaintiff has put forth evidence to support each of the four Counts of her Amended Complaint and from which a reasonable jury could find in her favor.  Each Count, therefore, raises triable issues of fact.  Accordingly, Defendants' Motion for Summary Judgment (d/e 113) must be DENIED.

**IT IS SO ORDERED.**
**ENTERED:  December 23, 2021.**
**FOR THE COURT:**

/s/ Sue E. Myerscough
**SUE E. MYERSCOUGH**
**UNITED STATES DISTRICT JUDGE**